21-1333
Rynasko v. New York University

Parker, *Circuit Judge,* concurring in part and dissenting in part:

I concur in part and respectfully I dissent in part. I believe the majority correctly concluded that Christina Rynasko lacks standing to sue New York University for breach of contract because she was not a party to, or an intended beneficiary of, Emily's contract with NYU. I also believe Rynasko's quasi-contract claims fail because she has not plausibly alleged an injury in fact to herself as opposed to her daughter. I part ways with my colleagues because I conclude that the court below correctly denied the motion to add Casey Hall-Landers[1] as a plaintiff in the Proposed Second Amended Complaint ("PSAC") because the PSAC failed plausibly to allege breach of contract by NYU and because its quasi-contract claims are legally insufficient.

## BACKGROUND

The plausibility of allegations under review on this appeal must be analyzed in the context of the COVID-19 pandemic and the consequent restrictions on university life. COVID-19 caused millions of people across the country to upend their lives and to change their daily routines, often dramatically, to avoid serious illness and death.

---

[1] Hall-Landers uses they/them pronouns. Appellants' Br. at 9 n.1.

Universities, like other institutions, were forced to rapidly adjust to the changed reality wrought by COVID. After the virus arrived in March 2020, NYU and other universities were required to comply with rapidly changing laws that sought to reduce the spread of the disease. After New York banned most in-person gatherings, NYU and other universities concluded that switching to remote education was essential to protect the health of students, staff, and the university community, while still allowing students to graduate on time despite the pandemic. *See* Executive Order No. 202.3 (Mar. 16, 2020).

Nevertheless, disappointed students such as the proposed new plaintiff Casey Hall-Landers have brought lawsuits, arguing that the legally mandated switch to remote education was inferior to the in-person experience that they had allegedly been promised and that students thus were owed a pro-rated tuition refund.[2] Although the reasons for this disappointment necessarily differed from

---

[2] This lawsuit was filed as a putative class action. Although the class certification issue has not yet been addressed, I believe that the class action allegations in the PSAC are implausible because commonality and predominance would have to be found among the extremely heterogenous class, which the PSAC defines as "all people who paid NYU Spring Semester 2020 tuition and/or fees for in-person educational services that NYU failed to provide and whose tuition and fees have not been refunded." J. App'x at A-594. *See Garcia De León v. N.Y. Univ.*, No. 21 CIV 05005 (CM), 2022 WL 2237452, at *17 (S.D.N.Y. June 22, 2022) (denying class certification in a similar lawsuit against NYU).

2

student to student, essential to their allegations is the belief that NYU profited from the changed mode of instruction because remote learning was less costly than in-person learning. They thus argue that the degree to which remote learning was an inferior experience to in person education can be quantified and should be refunded to them by the university. *See, e.g.*, *In re Columbia Tuition Refund Action*, 523 F. Supp. 3d 414 (S.D.N.Y. 2021).

Casey Hall-Landers's conclusory assertion in the PSAC that NYU reaped windfall financial benefits from the COVID-19 pandemic suffers from two serious defects: it is not supported in the PSAC and it is objectively false. J. App'x at A-562. Tellingly, the PSAC contains no plausibly alleged facts supporting the assertion that that NYU has received the sort of windfall that would support contract damages or be unjust to retain and thus require restitution. In the absence of plausible allegations of this sort, the proposed amended complaint was legally insufficient, and the district court properly denied leave to amend.

It is undisputed that NYU's transition to remote education was accompanied by myriad unexpected costs. Most obviously, NYU was required to license the variety of software, such as Zoom, that made remote learning possible. The vast majority of professors, staff, and students had never used these programs

3

before and therefore required training to use them effectively. In addition, the shift to working from home offices required universities to purchase equipment such as computers and webcams for faculty and staff. Similarly, the many services that universities provide for their students, such as mental health counseling, also had to be moved online, requiring not only significant infrastructure costs but also extensive compliance costs to make sure that the university followed all relevant laws and regulations, especially as many students returned to their home states.

What is more, the largest components of the university's fixed costs remained unchanged. The salaries and benefits of professors and staff still had to be paid, HVAC and other necessary systems maintained, electricity and other bills paid. The pandemic also imposed new costs in preparation for the return of in-person instruction. The university spent heavily on COVID testing, retrofitting classrooms to allow for the simulcasting of courses, personal protective equipment, upgraded ventilation, and gallons of hand sanitizer. Businesses and institutions everywhere had similar experiences.[3]

---

[3] When totaled, the costs of the pandemic to universities were extraordinary. One study estimated that the total cost of the pandemic to American universities as of February 2021 was $183 billion. Paul N. Friga, *How Much Has Covid Cost Colleges? $183 Billion*, Chron. Higher Educ. (Feb. 5, 2021), https://www.chronicle.com/article/how-to-fight-covids-financial-crush. Another estimate pegged New York's universities as having lost $3.9 billion from the

4

In addition to the direct costs of the pandemic, the university saw many other sources of revenue dry up. The university could no longer obtain revenue from summer school programs, ticket sales to university art museums, plays, and sporting events, and even sweatshirt sales to tourists. Importantly for universities such as NYU that include large hospitals, the pandemic caused hospital revenues to drop sharply as elective surgeries were delayed or canceled. Sarah Kliff, *Hospitals Knew How to Make Money. Then Coronavirus Happened*, N.Y. Times (May 15, 2020), https://www.nytimes.com/2020/05/15/us/hospitals-revenue-coronavirus.html; *see generally* Amicus Br. of the American Council on Education.

In short, the PSAC plausibly alleges neither a contract claim nor an unjust enrichment claim. Instead, it relies on vague and conclusory allegations about NYU's financial situation and the materials that comprised the implied contract between NYU and its students.

---

beginning of the pandemic through 2021, including $1.1 billion in direct pandemic related expenditures. *See* Amicus Br. of the American Counsel of Education at 11. (citing Letter from Drew Bogner, Interim President, & Keith Cushing, Vice President for Rsch., Admin., and Servs., to CICU Bd. of Trs., *2019 Economic Overview* at 3 (Apr. 26, 2021), https://tinyurl.com/cjkzwbzx).

## DISCUSSION

The district court properly denied amendment as futile. First, none of the materials that comprise NYU's implied contract with its students, including Hall-Landers, includes a specific promise of in-person education. Under New York law, that ends the matter. What is more, a provision of the implied contract that the majority purports to enforce granted the University broad discretion to modify course offerings and the mode of instruction in its discretion. This specific and unambiguous disclaimer allowed NYU to transition to remote education once New York barred in-person gatherings. The majority reaches the opposite conclusion only by brushing aside inconvenient points of New York law and relying on inapposite cases that analyzed different contractual provisions and were decided under laws markedly different from New York law.

Second, because the majority has correctly concluded that a valid and enforceable contract exists between NYU and Hall-Landers which covers the subject matter of their claim, Hall-Landers is foreclosed from maintaining claims for unjust enrichment and money had and received.

I.

Turning to Hall-Landers's implied contract claim in the PSAC, I believe that the district court was correct to deny leave to amend as futile for two reasons. First, the PSAC failed to identify any "specific promise" of in-person education, as required by New York law and, second, the specific and unambiguous disclaimer provision permitted NYU to change the mode of instruction after New York barred in-person gatherings.[4]

A.

In New York, the relationship between a university and its students is "contractual in nature." *Prusack v. State*, 498 N.Y.S.2d 455, 456 (2d Dep't 1986). New York law is clear that "*only specific promises* set forth in a school's bulletins, circulars and handbooks, which are material to the student's relationship with the school, can establish the existence of an implied contract." *Keefe v. New York L. Sch.*, 897 N.Y.S.2d 94, 95 (1st Dep't 2010) (emphasis added). Thus, to state a claim for breach of implied contract, a student must identify "specifically designated and discrete promises" that were allegedly breached. *Nungesser v. Columbia Univ.*, 169 F. Supp.

---

[4] I agree with the majority that Hall-Landers's conversion claim was futile.

3d 353, 370 (S.D.N.Y 2016) (quoting *Ward v. N.Y. Univ.*, No. 99 CIV. 8733 (RCC), 2000 WL 1448641, at *4 (S.D.N.Y. Sept. 28, 2000)). Here, none was alleged.

The question is not, as the majority claims, "whether a reasonable factfinder could conclude that Hall-Landers's plausible allegations demonstrate an implied contract to provide in-person services." Maj. Op. at 24. Rather, it is whether a reasonable factfinder could conclude that Hall-Landers has identified somewhere in NYU's "bulletins, circulars and handbooks" a *specific promise* of in-person education.[5] Hall-Landers has not done so, and that omission should end the inquiry.

Hall-Landers and the majority point to several allusions to in-person education. For example, NYU's course catalog listed courses as "in-person" and

---

[5] Many cases define the implied contract between a university and its students even more narrowly, guaranteeing students only that if they comply with the rules set out by the university, they will eventually obtain a degree. *Carr v. St. John's Univ., New York*, 231 N.Y.S.2d 410, 413 (2d Dep't 1962), *aff'd,* 12 N.Y.2d 802 (1962) ("When a student is duly admitted by a private university, secular or religious, there is an implied contract between the student and the university that, if he complies with the terms prescribed by the university, he will obtain the degree which he sought."); *Gally v. Columbia Univ.*, 22 F. Supp. 2d 199, 206 (S.D.N.Y. 1998) ("When a student enrolls at a university, an implied contract arises: if the student complies with the terms prescribed by the university, she will obtain the degree she seeks.").

8

NYU's marketing materials extolled the virtues of life in New York City. Maj. Op. at 24; J. App'x at A-569. The majority concludes that "NYU, in light of its representations and longstanding history, impliedly agreed that in-person courses, services, activities, and facilities would comprise a substantial part of the NYU educational experience for which students contracted."[6] Maj. Op. at 25. Allegations such as these don't cut it. There is a great distance between "impliedly agreed" and "specifically promised" and nothing in the PSAC nor the majority opinion plausibly alleges that NYU specifically promised in-person courses. The motion to amend was therefore properly denied as futile.

---

[6] In addition, "longstanding history" is not an appropriate consideration when analyzing an implied contract between a university and a student. The majority, citing an out-of-circuit case, claims that NYU's "past course of conduct" helps to form the basis of an implied contract promising in-person services. Maj. Op. at 24–25 (citing *Gociman v. Loyola Univ. of Chicago*, 41 F.4th 873, 885 (7th Cir. 2022)). Although this appears to be the law in Illinois, *Gociman*, 41 F.4th at 883, and Washington, D.C., *Shaffer v. George Washington Univ.*, 27 F.4th 754, 763 (D.C. Cir. 2022), the majority cites no authority supporting the contention that customs or past practices are relevant under New York law. This is not surprising, given that New York law enforces "only specific promises" contained in university materials, and a past practice is, by definition, not a specific promise. *See Gertler v. Goodgold*, 487 N.Y.S.2d 565, 568 (1st Dep't 1985) ("the university's academic and administrative prerogatives [cannot] be impliedly limited by custom"), *aff'd* 66 N.Y.2d 946 (1985).

**B.**

Even if Hall-Landers had identified a specific promise of in-person education, the proposed amendment would still be futile because their contract with NYU includes a provision that specifically allowed NYU to transition to remote learning. The first page of the Tisch Bulletin states, under the bolded word "Notice," that "The policies, requirements, course offerings, schedules, activities, tuition, fees, and calendar of the school . . . are subject to change without notice at any time at the sole discretion of the administration. Such changes may be of any nature, including, but not limited to, the elimination of the school, programs, classes, or activities; the relocation or modification of the content of any of the foregoing; and the cancellation of scheduled classes or other academic activities."[7] J. App'x at A-125. This notice could not be clearer or broader. It allows NYU to take actions "of any nature" "without notice at any time at the sole discretion of the administration." The specific and unambiguous language of this provision applies to NYU's shift to remote education after New York law banned in-person gatherings.

---

[7] As the majority notes, a substantially identical disclaimer appears prominently in the College of Arts and Sciences bulletin. Maj. Op. at 7 n.3.

10

The majority has no way of dealing with this language in the implied contract it purports to interpret and enforce except by claiming the language "must be understood as a single data point in the context of all the other factors shaping the contours of the implied contract between NYU and its students." Maj. Op. at 27–28. With respect, this search for "data points," whatever and wherever they might be, is not a valid approach to contract interpretation under New York law. Basic principles of contract interpretation require us to read the contract "as a whole, with every part interpreted with reference to the whole." *Kaplan v. Kaplan*, 106 N.Y.S.3d 102, 105 (2d Dep't 2019). It is uncontested that "a specific disclaimer . . . may excuse the university from a specific promise that would otherwise be a contractual obligation." *Deen v. New Sch. Univ.*, No. 05 CIV. 7174 KMW, 2007 WL 1032295, at *2 (S.D.N.Y. Mar. 27, 2007) (quoting *Prusack*, 498 N.Y.S.2d at 456) (cleaned up). Thus, all – not isolated, randomly selected – "data points" that make up the implied contract must be interpreted alongside of this prominent and specific provision which explicitly allows NYU to change the mode of instruction in its discretion. The majority's concerns about one-sided contracts cannot excuse a failure to respect and apply unambiguous contract language. After all, that is what courts are required to do.

11

Moreover, plausibility is contextual. The majority studiously avoids any meaningful engagement with the context in which NYU was operating when it allegedly breached the contract. The transition to remote learning was not voluntary. The cessation of in-person classes was required by law and was undertaken to ensure that Hall-Landers and the entire NYU community remained healthy and safe during a pandemic that was causing thousands of deaths in the community. Instead of simply canceling the semester, NYU invested significant resources to switch rapidly to remote instruction. I do not doubt that Hall-Landers was frustrated and disappointed that they could not continue their dance education in NYU's dance studios, but the burdens of COVID fell not just on them, they fell on everyone else as well. Hall-Landers knew that life at NYU might change because, when they enrolled, the Tisch Bulletin told them that. While they could not have anticipated the COVID pandemic, NYU's disclaimer gave the university the flexibility to respond and explicitly allowed the mode of instruction to be changed.

As support for the "data point" approach, the majority asserts that "we join several of our sister circuits that have reached similar conclusions in analogous cases." Maj. Op at 25. With respect, none of the cases cited is analogous. None

12

applied New York law, and none involved contractual language similar to that of NYU's disclaimer. In both *Jones* and *Gociman*, disclaimer language was not before the court. *Jones v. Administrators of Tulane Educ. Fund*, 51 F.4th 101, 115 (5th Cir. 2022); *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 884 (7th Cir. 2022). In *Shaffer*, the D.C. Circuit did analyze a disclaimer provision, but that provision did not mention the cancellation of courses, did not include any specific language related to changing the location or modifying the content of courses, and did not include the "sole discretion" language included in NYU's disclaimer. *Shaffer v. George Washington Univ.*, 27 F.4th 754, 764 (D.C. Cir. 2022). In contrast, the Sixth Circuit upheld the dismissal of a tuition refund case in which similar disclaimer language was present. *Dean v. Chamberlain Univ., LLC*, No. 21-3821, 2022 WL 2168812, at *2 (6th Cir. June 16, 2022) ("Chamberlain reserves the right to revise, add, or delete courses, alter the total number of class hours, suspend, cancel, or postpone a class").

There is no way to avoid the conclusion that, under settled New York contract law, the disclaimer gives NYU broad latitude to modify course offerings and the mode of instruction. With such a clause in the contract, Hall-Landers cannot state a plausible claim for breach of an implied contract.

13

The majority fears that interpreting the disclaimer as New York law requires would give students no recourse if a university decided to simply cancel all classes for no reason and without warning. Maj. Op. at 28–29. With respect, farfetched hypotheticals such as this one are not a basis for disregarding applicable principles of contract interpretation. On this appeal, we are faced with the question of whether NYU breached any specific promise it made to Hall-Landers. It did not. It exercised the authority unambiguously granted to it by the terms of the implied contract. For these reasons, the district court was correct to conclude that Hall-Landers has not identified a specific promise of in-person education and that NYU was entitled to transition to remote education.

## II.

I agree with the majority that Hall-Landers has plausibly alleged the existence of a valid and enforceable implied contract, which covers the subject matter of her claim – although we disagree as to its terms. Where we part company is that I believe that the existence of such a contract dooms Hall-Landers's unjust enrichment and money had and received claims.[8]

---

[8] I would also hold that the unjust enrichment claims of the PSAC were futile because Hall-Landers does not plead facts to demonstrate that NYU's retention of tuition was unjust, and that "equity and good conscience" requires restitution. As noted above, NYU was legally forbidden from holding in-person classes, and

14

Under New York law, when "the parties execute[] a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter" is barred. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) (citing *Clark–Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987)); *see also 110 E. 138 Realty LLC v. Rydan Realty, Inc.*, 179 N.Y.S.3d 15, 18 (1st Dep't 2022) ("unjust enrichment cause of action is . . . barred, since the written sales contract governs the parties' dispute"); *ASG & C, Inc. v. Arch Specialty Ins. Co.*, No. 21-1761-CV, 2022 WL 839805, at *1 (2d Cir. Mar. 22, 2022) ("Here, the parties entered into an express written contract . . . that governs ASG & C's claim. Accordingly, ASG & C is limited to recovery on the contract and may not seek recovery based on an alleged quasi contract."); *Corsello v. Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (2012) ("An unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim."). The fact that Hall-Landers's contract with NYU is an implied contract is of no moment: "*Clark–Fitzpatrick* precludes unjust enrichment claims whenever there is a valid and enforceable contract governing a

---

consequently switched to remote education. Although Hall-Landers implies that NYU received a windfall from this switch, that claim is not pleaded with sufficient specificity and does not address the additional costs that accompanied the switch to remote education.

15

particular subject matter, whether that contract is written, oral, or implied-in-fact." *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 587 (2d Cir. 2006) (citing *Jim Longo, Inc. v. Rutigliano*, 742 N.Y.S.2d 877 (2d Dep't 2002)).

Alternative pleading is, of course, available and in some instances appropriate. For both an unjust enrichment and contract claim to survive a motion to dismiss, however, the plaintiff must allege either that the contract does not cover the subject matter of the dispute or that it is invalid or unenforceable as written. *See Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co., N.A.*, 837 F.3d 146, 150 (2d Cir. 2016) ("[W]here a valid and enforceable contract governs the relevant subject matter of the parties' dispute, the contract—rather than principles of restitution—should determine the measure of a party's recovery for events arising from that subject matter."); *see also DeWitt Stern Group, Inc. v. Eisenberg*, 14 F. Supp. 3d 480, 485 (S.D.N.Y. 2014) (stating that because a contract existed, the relevant inquiry was whether any portion of the contract "is by its terms unenforceable as written, and therefore allows Plaintiff the right to plead a claim for equitable relief in the alternative should certain provisions of the contract be found invalid"). Eventually, however, the court will determine if the contract is valid and covers the subject matter at issue, and at that point the plaintiff must elect a remedy.

16

Here, Hall-Landers cannot maintain both the contract and unjust enrichment claims for one central reason: nowhere in the PSAC does Hall-Landers allege that the contract with NYU is invalid or unenforceable or that it does not cover the subject matter at issue in this case, i.e., tuition payments. That should be the end of the matter and the district court's denial of the motion to amend should be affirmed.

The majority, however, claims that "[i]f Hall-Landers is not ultimately able to establish an *enforceable* implied contract with NYU," the limitation on bringing unjust enrichment claims along with contract claims "may not apply." Maj. Op. at 33. The majority, however, does not explain why the contract, as written, could possibly be unenforceable – and, as noted above, Hall-Landers does not allege that the contract was invalid or unenforceable. It appears that the majority believes that the fact that NYU may be able to bring a successful impracticability or impossibility contract defense could render the contract unenforceable. Maj. Op. at 30–31. This approach is based on a proposition that is not the law in New York. The only authority that the majority cites – as well as the cases it collects – does not support this proposition and, in fact, does not involve contract defenses at all. Maj. Op. at 33 (citing *Agerbrink v. Model Serv. LLC*, 155 F. Supp. 3d 448, 458–59

17

(S.D.N.Y. 2016)). I agree that were this case to advance beyond the pleading stage, NYU would have a viable impossibility defense. But that is not a sound reason for permitting a legally insufficient complaint to go forward.

Hall-Landers has not alleged that their contract with NYU is invalid or unenforceable as written, nor that their claims are outside the scope of the contract. The hypothetical possibility that NYU may eventually prevail on the merits is irrelevant to the long-established requirement of New York law that forbids the maintenance of both contract and equitable claims when a valid and enforceable contract covers the subject matter of the dispute.

In conclusion, because the majority has found that Hall-Landers has a valid and enforceable contract with NYU that covers tuition claims, the unjust enrichment and money had and received claims should be dismissed.