# EXHIBIT 71

*CONFIDENTIAL*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CASEY E. HALL-LANDERS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>NEW YORK UNIVERSITY,<br><br>Defendant. | Case No. 1:20-cv-03250-GBD |

**DECLARATION OF REBECCA KIRK FAIR**

**September 18, 2024**

## TABLE OF CONTENTS

I.    Expert Qualifications and Assignment ............................................................... 1

    A.    Expert Qualifications ....................................................................... 1

    B.    Assignment ....................................................................................... 2

II.   Summary of Opinions .................................................................................... 3

III.  Background .................................................................................................... 5

    A.    The Parties ....................................................................................... 5

    B.    Allegations ....................................................................................... 6

    C.    Overview of Plaintiff's Experts' Methodologies ............................ 6

        1.    The Proposed Gaskin Conjoint Survey ................................ 7

        2.    The Weir Damages Methodology ......................................... 9

IV.   Real-World Data Do Not Support Plaintiff's Allegations of a "Reduction in Market Value" and a "Tuition Overpayment" ..................................................... 9

    A.    Tuition for NYU Remote Programs Is the Same as for In-Person Programs ......................................................................................... 9

    B.    Many Students, Including Named Plaintiff, Elected to Re-Enroll and Pay the Same or Higher Tuition for Remote Instruction in the Summer and Fall of 2020 ................................................................ 11

V.    The Expected Conclusions and Assertions Presented by Plaintiff's Experts Are Inconsistent with Market Outcomes ........................................................... 14

    A.    Student Behavior Contradicts Mr. Weir's Assertions Regarding Proposed Class Member Preferences Absent a Price Reduction or Refund ............................................................................................. 14

    B.    NYU's Costs and the Competitive Dynamics of Higher Education Suggest Tuition Rates Would Not Be Reduced Even if the Need for Remote Instruction in Spring 2020 Had Been Anticipated ............. 15

        1.    Background on NYU's Costs and Tuition Setting.................. 15

        2.    The Competitive Dynamics of Higher Education Are Inconsistent with a Reduction in Tuition ............................... 16

    C.    NYU's Response to the Pandemic Allowed Students to Continue Their Pursuit of a Degree and Education................................................... 19

VI.   The Proposed Gaskin Conjoint Survey Would Be Inappropriate To Measure the Fair Market Value of Access to NYU Campus During the Covid-19 Pandemic ....................................................................................................... 20

    A.    The Proposed Gaskin Conjoint Survey Can Only Measure Willingness to Pay and Cannot Directly Predict Tuition Levels .......................... 20

B.  The Design of the Proposed Gaskin Conjoint Survey Would Be Unable to Capture the Complexity of Making a University Enrollment Decision .............................................................................................22

C.  The Proposed Gaskin Conjoint Survey Unrealistically Abstracts Away from the Covid-19 Pandemic and Its Heterogeneous Impact on Students, Leading to Unreliable Results ........................................................24

VII.  The Conjoint Survey Design Proposed by Mr. Gaskin Is Fundamentally Flawed and Likely to Overstate the Fair Market Value of Access to NYU Campus During the Covid-19 Pandemic .............................................................26

A.  The Proposed Gaskin Conjoint Survey's Target Population Is Flawed and Vulnerable to Biases Introduced by the Proposed Survey Design.......................26

1.  Mr. Gaskin's Proposed Target Population Have Outdated and Irrelevant Experiences with Selecting an Educational Program...................................................................................... 27

2.  Mr. Gaskin's Proposed Target Population Will Likely Include Irrelevant Respondents with No Experience at NYU or Other Potentially Relevant Institutions ....................................... 28

3.  Mr. Gaskin's Proposed Target Population Are Less Likely to Have Relevant Experience with Remote Education ............................ 29

B.  The Proposed Gaskin Conjoint Survey's Instructions Are Likely to Introduce Cognitive Dissonance and Would Likely Inflate the Estimate of the "Class and Campus Format" Attribute ..............................................30

C.  The Proposed Gaskin Conjoint Survey's Attributes Will Ask Respondents to Make Uninformative Trade-offs Among the Four Distractor Attributes, Which Is Likely to Further Inflate Any Value Associated with the "Class and Campus Format" Attribute .......................................35

VIII.  Mr. Weir's Proposed Estimation of an "Overpayment" Relies on Invalid Assumptions and Unplausible Measures of Willingness to Pay from the Proposed Gaskin Conjoint Survey ..............................................................................38

## I.    EXPERT QUALIFICATIONS AND ASSIGNMENT

### A.    Expert Qualifications

1.    I am a Managing Principal with Analysis Group, Inc., a consulting firm headquartered in Boston, Massachusetts. I have a Master of Business Administration degree in finance and applied economics from the MIT Sloan School of Management in Boston, Massachusetts and a B.A. from Middlebury College, where I majored in economics and minored in computer science. My curriculum vitae and a list of cases in which I have testified in the past four years are attached as **Appendix A**.

2.    Over my twenty-five-year career at Analysis Group, I have conducted economic analyses and consulted in a broad range of cases involving the evaluation of impact, injury and damages and the assessment of class certification issues. I have worked on over 500 matters involving intellectual property, false advertising, class certification, mergers, and antitrust. I also have extensive experience in survey development and administration, and analysis of data on consumer behavior, and have written and spoken extensively on these topics.

3.    Much of my training and expert work has been in the assessment of consumer behavior, consumer perception, and consumer understanding, through both qualitative analyses, empirical work, and academic theory. I have served as an expert witness and supported experts in matters involving economic analyses, data analytics, and valuation, as well as in the evaluation, design, and implementation of primary research, including analyses of consumer surveys. I have served as an expert witness in matters involving the design, implementation, and analyses of consumer surveys, studying usage, preferences, and perceptions among businesses and consumers. I have supported the design and implementation of online, mall-intercept, and telephone surveys using a variety of methodologies.

4.    Over these assignments and through formal graduate and undergraduate coursework, I have developed expertise in survey design, defining and soliciting target sample populations, and data analyses. I also have experience in the evaluation of surveys conducted by opposing experts related to consumer perception, feature value, and other aspects of marketing and consumer demand in connection with consumer protection, antitrust, intellectual property, and trademark matters. This expertise has been applied in investigations and litigations related to

1

consumer protection across industries, including those involving allegations of false advertising, deceptive or insufficient disclosures, and product defects. I have also worked with several universities in both litigation and non-litigation matters related to the evaluation of competition, tuition, and financial aid. I have been invited to speak on topics related to consumer protection, antitrust and competition, and surveys by the American Bar Association, the Canadian Bar Association, the New York State Bar Association, and the Knowledge Group.

### B.    Assignment

5.    I have been asked by counsel for New York University ("NYU") to review and evaluate whether (1) the conjoint survey proposed by Mr. Gaskin and the proposed reliance on this conjoint by Mr. Weir (the "Proposed Gaskin Conjoint Survey")—if designed and implemented[1] —and (2) the proposed damages methodology used by Mr. Weir would produce reliable and scientifically adequate calculations of an alleged "overpayment of the University Tuition resulting from the switch from in-person classes and access to the University campus to online classes and not having access to the University campus."[2] I have also been asked if the Proposed Gaskin Conjoint Survey would be sufficient to determine if the "economic outcome would be that many or all of the students would not have enrolled at all" if the "Defendant would not have lowered their tuition in concert with demand."[3]

6.    In undertaking this assignment, I relied on my expertise in consumer behavior, my experience in conducting and interpreting qualitative and quantitative research about consumer perceptions and understandings and whether and to what extent these perceptions and understandings influence their purchase behavior. I applied my expertise and experience in the review and evaluation of materials produced in connection with this matter, as well as my extensive expertise in developing, testing, and analyzing surveys. A list of the documents, materials, and other information I have considered for this declaration is provided in **Appendix B**. I reserve the right to supplement my opinions in response to any additional information provided to me.

---

[1]    Declaration of Steven P. Gaskin, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, June 21, 2024 ("Gaskin Declaration"); Declaration of Colin B. Weir, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, June 21, 2024 ("Weir Declaration").

[2]    Weir Declaration, ¶ 6.

[3]    Weir Declaration, ¶ 33.

7.      Analysis Group is being compensated at a rate of $1,100 per hour for my time on this case. No compensation is contingent on the nature of my findings or on the outcome of this litigation.

## II.    SUMMARY OF OPINIONS

8.      I have reached the following opinions:

- Real-world data on tuition, applications, and enrollment for NYU programs both before, during, and after the Spring of 2020 do not support Plaintiff's allegations of a reduction of the fair market value of their education and a tuition overpayment as a result of NYU transitioning to remote education in the Spring 2020 semester. First, NYU tuition and fees charged do not differ between comparable in-person and remote instruction programs. Second, enrollment data shows many students continued to enroll in remote classes in the context of the Covid-19 pandemic. In the Summer of 2020, nearly 8,000 students (the largest summer enrollment during 2016-2020), including Named Plaintiff, chose to take classes despite knowing in advance that instruction would occur remotely, and tuition would not be reduced. Further, more than 40% of students enrolled at NYU in the Fall of 2020 elected to take courses exclusively remotely, despite having the option of in-person or blended instruction (a mix of remote and in-person). Named Plaintiff in fact took a mix of remote, blended, and in-person courses. None of these facts support a reduction in the fair market value of proposed class members' education and none support Mr. Weir's conclusions regarding student choices in the absence of a reduced cost of tuition. See **Section IV**.

- These real-world outcomes, which are not considered by Mr. Gaskin and Mr. Weir, directly contradict their study design, their articulation of the expected results and projected outcomes of the Proposed Gaskin Conjoint Survey, and their assertions regarding the allegations and

3

*CONFIDENTIAL*

purported damages in this matter. As a result, if a "reduction in fair market value" were estimated from the Proposed Gaskin Conjoint Survey it would reflect the biased and unreliable survey design. My analysis of these real-world data indicates that the amount paid by proposed class members is consistent with the fair market value of the education services provided by NYU in the Spring of 2020 and the tuition charged for that education. See **Section V**.

- The expected contradictory outcome of the Proposed Gaskin Conjoint Survey is unsurprising as it is an inappropriate tool for this matter. Specifically, a conjoint cannot be used as designed to measure any purported decrease in fair market value of the education received by proposed class members in this case for three reasons. First, conjoint analysis would, at best, measure changes in respondents' willingness to pay, not actual changes in tuition prices. For the results of a properly designed conjoint survey to measure changes in prices, one would need to show that the changes in willingness to pay would result in an equivalent change in market prices, and that would require a consideration of both demand and supply factors, including competitor universities' responses and NYU's cost structure. Neither Mr. Gaskin nor Mr. Weir have considered any of these factors. Second, conjoint analysis is not an appropriate tool to study market prices or aggregate willingness to pay for a multi-attribute, bespoke product such as higher education. Third, the extraordinary circumstances surrounding the Covid-19 pandemic cannot be appropriately modeled or described by a conjoint study, particularly when the target population did not experience the challenge of advancing their education in the midst of a pandemic. See **Section VI**.

- In addition to the failure to use a relevant methodology, Mr. Gaskin introduces three design elements that would materially inflate the biased and irrelevant measures of willingness to pay for the key "Class

and Campus Format" attribute: (1) the survey's target population
cannot be representative of members of the proposed class, as it will
include respondents who may have never attended or been accepted to
NYU or any of the other schools included in the survey; (2) regardless
of when target respondents attended college, none of the survey's
target population could have faced the question presented regarding
on-campus or remote instruction, leading to minimal engagement from
respondents; and (3) the survey's distractor attributes, which will ask
respondents to make uninformative trade-offs, are likely to inflate any
estimates of the fair market value associated with the "Class and
Campus Format" attribute. These flaws would lead Plaintiff's experts
to overestimate the fair market value of in-person instruction and NYU
campus access during the Covid-19 pandemic. See **Section VII**.

- Finally, Mr. Weir's proposed estimation of an "overpayment
calculation" relies on the estimates of the Proposed Gaskin Conjoint
Survey. Given the flaws of the Proposed Gaskin Conjoint Survey
identified in this Declaration, Mr. Weir's estimation of purported
damages will also be unreliable and inflated. See **Section VIII**.

## III.    BACKGROUND

### A.    The Parties

9.    Plaintiff is Casey E. Hall-Landers, individually and on behalf of all others similarly
situated.[4] Mx. Hall-Landers, who was enrolled at NYU during the Spring 2020 semester,[5] brings
suit against NYU on their own behalf and on behalf of members of the Proposed Class.[6] Plaintiff's
Proposed Class is defined as:

---

[4]    Second Amended Class Action Complaint and Demand for Jury Trial, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD, September 18, 2023 ("Complaint"), p. 1.

[5]    Complaint, ¶ 18.

[6]    Complaint, ¶ 103.

> All undergraduate students enrolled in classes at New York
> University at one of NYU's New York campuses during the Spring
> 2020 semester who paid tuition.[7]

10.    Defendant is New York University, the "largest private research university in the US," founded in 1831, with over 26,000 undergraduate and non-degree students enrolled in the New York campus as of the Spring 2020 semester.[8]

### B.    Allegations

11.    Plaintiff alleges that because of NYU's "response to the novel Coronavirus Disease 2019 … pandemic," proposed class members "lost the benefit of the in-person education for which they paid, and/or the services for which their fees were paid, without having their tuition and fees refunded to them."[9]

### C.    Overview of Plaintiff's Experts' Methodologies

12.    Counsel for Plaintiff retained Mr. Steven P. Gaskin to "design and describe a market research survey and analysis that would enable [Mr. Gaskin] to assess the extent of any reduction in market value resulting from the Closure of the University Campus […] compared to the market value of online classes and no access to the University's campus or facilities."[10]

13.    Counsel for Plaintiff also retained Mr. Colin B. Weir to "ascertain whether it would be possible to determine damages on a class-wide basis using common evidence"; "to work with

---

[7]    Plaintiff's Notice of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, June 21, 2024 ("Motion to Certify Class"), p. 1.

[8]    New York University, "About NYU," www.nyu.edu/about.html; New York University, "NYU at a Glance," www.nyu.edu/about/news-publications/nyu-at-a-glance.html; New York University, "Factbook and Common Data Sets," www.nyu.edu/employees/resources-and-services/administrative-services/institutional-research/factbook.html; Declaration of MJ Knoll-Finn, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 16, 2024 ("Knoll-Finn Declaration"), ¶4 ("Excluding graduate and continuing education students, a total of 26,264 students were enrolled at NYU's New York campuses during the Spring 2020 semester. This figure includes degree (e.g. bachelor's, associate's, certificates) as well as non-degree students (e.g. visiting undergraduate students, precollege credit-bearing program students.").

[9]    Complaint, ¶ 1.

[10]    Gaskin Declaration, ¶ 10.

Steven Gaskin to help design (from an economic perspective), and to evaluate the economic suitability of a conjoint survey […] to measure the overpayment of the University Tuition"; and "to provide a framework for the calculation of damages suffered by the proposed class."[11]

### 1.    The Proposed Gaskin Conjoint Survey

14.    Plaintiff and proposed class members seek "disgorgement of the difference between *the fair market value* of the online learning provided versus the *fair market value* of the live, in-person instruction in a physical classroom on a physical campus with the attendant benefits for which they contracted."[12] To that end, Mr. Gaskin purports to have designed "a market research survey and analysis" that would enable him "to assess the extent of any reduction in market value resulting from the Closure of the University Campus (measured in dollars and/or percentage terms)."[13] Mr. Gaskin proposes a "choice-based conjoint" survey that he claims can be used to estimate "the difference in market value between in-person classes and full access to New York University's campus and facilities, compared to the market value of online classes and no access to New York University's campus or facilities, at the time and point of acceptance."[14]

15.    The Proposed Gaskin Conjoint Survey screens for 300 survey completions from respondents who are "United States residents aged 18 and over who indicate that they personally applied to New York University or one of its competitors for undergraduate education in the **past 20 years**."[15]

16.    The proposed survey then introduces respondents to a list of university attributes: a) the university name, one of five universities that Mr. Gaskin appears to have defined as NYU "competitors" (Boston University, Columbia University, Cornell University, New York University, or Northeastern University); b) a range of the university's ranking "sourced from U.S. News and World Report" (e.g., top 10, top 11-20, top 21-30, or top 31-50 university in the U.S.); c) the student-faculty ratio; d) the 4-year Graduation Rate; e) the Ethnic Diversity Index, f) the

---

[11]    Weir Declaration, ¶ 6.

[12]    Gaskin Declaration, ¶ 9 (emphasis added).

[13]    Gaskin Declaration, ¶ 10.

[14]    Gaskin Declaration, ¶¶ 10, 12.

[15]    Gaskin Declaration, ¶ 35, 38.

"Class and Campus Format," which indicate whether "classes are conducted online or in person at the university's campus," and "[w]hether or not students have physical access to the university campus, its facilities, and the accompanying campus experience"; and g) the Tuition per Semester.[16] Throughout my report, I refer to the "Best National University Ranking," "Student-Faculty Ratio," "4-Year Graduation Rate," and "Ethnic Diversity Index" attributes as the "distractor attributes," as they are, in Mr. Gaskin's words, intended "to provide a reasonable and engaging choice task" and are not part of Mr. Gaskin's ultimate calculation.[17]

17.     Respondents are each then shown "a sample choice task, and then a series of twelve choice tasks, each containing a choice set of three different, hypothetical university options […] be described by the combinations of levels of the features" described above, and they will be asked which university they would select, and whether they would "be willing to enroll at the university that you chose above with the tuition indicated."[18] Notably, respondents will be asked to assume, among other things, that they are making "university choices prior to the COVID-19 pandemic, so it should not be a factor in your decisions."[19]

18.     According to the Gaskin Declaration, the value of each of the features shown to respondents will be calculated directly from the Proposed Gaskin Conjoint Survey and those values will then be used to "estimate any reduction in market value (measured in dollars and/or percentage terms) due to the Closure of the New York University Campus in Spring 2020."[20] Mr. Gaskin also claims that this estimate "will apply equally to all Class Members."[21]

---

[16]     Gaskin Declaration, ¶¶ 30, 46.

[17]     Gaskin Declaration, ¶¶ 27, 54.

[18]     Gaskin Declaration, ¶¶ 47-48.

[19]     Other assumptions include: "1) You have applied and been accepted to each of these universities; 2) You are actually considering enrolling as an undergraduate at a college or university; 3) Each of the features shown about each university is true, even if you know or think otherwise, including cost of tuition; 4) The universities do not vary on any features other than the features that are shown to vary in the exercise." Gaskin Declaration, FN 25.

[20]     Gaskin Declaration, ¶ 56.

[21]     Gaskin Declaration, ¶ 55.

2.    *The Weir Damages Methodology*

19.    Mr. Weir states that he will calculate damages by taking the estimated reduction in fair market value, referred to as the "Overpayment" factor which "will be the output of the Gaskin conjoint analysis and market simulation," multiplying it by "the amount the class paid in instructional fees" and a "Prorate" factor, which intends to measure "the fraction of the days that students were taking online classes and not having access to the University campus divided by the total days that students would have otherwise had in-person classes and access to the University campus."[22] Notably, this analysis relies on data from Mr. Gaskin's Proposed Conjoint Study to estimate the "Overpayment" factor, and there is no indication that other data or market data will be considered.

## IV.    REAL-WORLD DATA DO NOT SUPPORT PLAINTIFF'S ALLEGATIONS OF A "REDUCTION IN MARKET VALUE" AND A "TUITION OVERPAYMENT"

20.    Real-world data do not support Plaintiff's allegations that proposed class members are entitled to a refund of tuition and fees because the "fair market value" of their education was reduced. Specifically, overall application rates, enrollment behavior, and tuition levels for NYU programs, including the enrollment and attendance choices made by Named Plaintiff and proposed class members, directly refute the Plaintiff's allegations and expected damages findings of the Plaintiff's experts. These data are not even considered by Plaintiff's experts.

### A.    Tuition for NYU Remote Programs Is the Same as for In-Person Programs

21.    Plaintiff and proposed class members remained enrolled at NYU during the Spring of 2020 and were able to attend NYU classes in a remote instruction format during the state and city lock-downs due to Covid-19 at that time. While Plaintiff alleges that remote instruction is inferior to in-person classes[23] and asserts that it therefore has a lower fair market value, Plaintiff and their experts ignore that NYU offers remote instruction programs at the same tuition rates as in-person programs. Such data indicate the education received in person and remotely command

---

[22]    Weir Declaration, ¶¶ 44-45.

[23]    Complaint, ¶ 8 ("limited online experience presented by Google or Zoom, void of face-to-face faculty and peer interaction, separated from program resources, and barred from facilities vital to study.").

the same fair market value. Further these data provide a relevant, real-world benchmark for the fair market value of the education received by proposed class members during the Spring of 2020.

22.    While NYU tuition and fees can vary depending on the major, school, or college in which students enroll, the term, and/or the number of corresponding credits taken, in the time before, during, and after Spring of 2020, tuition and fees did not differ based on the extent to which students use campus facilities, or between remote and in-person instruction formats, when both formats are available.[24] According to Mr. Shirky, NYU's Vice Provost for AI and Technology in Education, tuition at NYU (within an individual school or department), tuition has never depended on whether instruction for the program occurs remotely or in-person during his tenure, which started in 2001.[25] These pricing practices are consistent with the deposition testimony of Martin Dorph, Executive Vice President of NYU, stating that "70 percent of NYU's budget is made up of people: The people that provide the education, the people that support education, the people that maintain the campus and the facilities" and the value delivered and the cost incurred by NYU for access to the education are independent of whether instruction is in person or remote.[26]

23.    For example, in Spring 2020, tuition and registration and service fees for 12 credits at NYU's Division of Applied Undergraduate Studies in the Undergraduate School of Professional Studies totaled $26,654, regardless of whether students end up selecting remote or in-person

---

[24]    Deposition of William Clay Shirky, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, May 16, 2024 ("Shirky Deposition"), p. 126 ("[A]re you familiar with any difference in tuition between an online program or an in-person program? A. We, New York University, has online and in-person tuitions are set through the same process. There can be some variance by school, but within school, there's not variance by degrees, if that makes sense[.]"); Declaration of Anthony Bonano, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 10, 2024 ("Bonano Declaration"), ¶ 10; Declaration of William Clay Shirky, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 16, 2024 ("Shirky Declaration"), ¶ 10. See also New York University, "Tuition," www.nyu.edu/students/student-information-and-resources/bills-payments-and-refunds/tuition-and-fees.html ("Tuition for the Fall, Spring and Summer semesters vary for NYU students based on their major or program, the school or college they are matriculated in, their admit term and the number of credit hours taken," "Tuition and other student charges are set regardless of the method of instruction and will not be refunded in the event instruction occurs remotely for any part of the Academic Year.").

[25]    Shirky Declaration, ¶ 10; Shirky Deposition, p. 126; Bonano Declaration, ¶ 10. See also New York University, "Tuition," www.nyu.edu/students/student-information-and-resources/bills-payments-and-refunds/tuition-and-fees.html ("Tuition for the Fall, Spring and Summer semesters vary for NYU students based on their major or program, the school or college they are matriculated in, their admit term and the number of credit hours taken," "Tuition and other student charges are set regardless of the method of instruction and will not be refunded in the event instruction occurs remotely for any part of the Academic Year.").

[26]    Deposition of Martin Dorph, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, May 21, 2024 ("Dorph Deposition"), pp. 235, 242; New York University, "NYU Registration and Services Fees Explanation," NYU_Hall-Landers_00000964.

instruction formats.[27] Similarly, the Tandon School of Engineering offered graduate degrees, such as the M.S. in Cybersecurity and the M.S. in Management of Technology, both in-person and remote,[28] and charged the same tuition for the two options.[29] Beyond NYU, evidence suggests that more than 75% of universities charge the same or more for remote compared to in-person instruction.[30]

### B.    Many Students, Including Named Plaintiff, Elected to Re-Enroll and Pay the Same or Higher Tuition for Remote Instruction in the Summer and Fall of 2020

24.    Despite the option to return to campus, and the corresponding limits on in-person instruction and physical face-to-face time with professors, students continued to pursue remote instruction in the Summer and Fall of 2020 at NYU. NYU's remote programs provided students who could not or did not want to attend classes in person with the opportunity to benefit from the same professors and level of education as those attending classes in person, and, importantly, obtain an equivalent degree following graduation while addressing their personal preferences and constraints. In fact, enrollment in such programs continues to grow. According to Mr. Shirky, the number of students enrolled in NYU's programs with some component of remote instruction grew steadily from 2017 to 2021.[31] For example, 7,730 students enrolled in some online degree programs in the 2017-18 academic year, whereas 11,745 enrolled in the 2021-22 academic year (a 52% increase), despite tuition costs increasing yearly during the same period.[32]

---

[27]    New York University, "NYU Registration and Service Fees," NYU_Hall-Landers_00009374.

[28]    New York University, "NYU Tandon School of Engineering 2018-2020 Bulletin," NYU_Hall-Landers_00008768–9154 at 8847, 9049–9053, 9075–9078.

[29]    New York University, "NYU Registration and Service Fees," NYU_Hall-Landers_00009374.

[30]    Richard Garrett and Bethany Simunich, *CHLOE 6: Online Learning Leaders Adapt for a Post-Pandemic World*, Quality Matters and Eduventures Research, 2021 , p. 24 ("The overall pattern for tuition policies for online learning is similar to prior CHLOE studies where the majority (64%) of institutions generally charge a standard tuition rate that is the same as on-ground tuition. And like previous CHLOE studies, an equal number (14%) reported higher tuition rates for online learning and lower tuition rates for online learning. A small number (3%) reported no pattern, and 4% indicated that they do not offer fully online programs.").

[31]    Shirky Declaration, ¶¶ 13-14, Figure 1.

[32]    Shirky Declaration, ¶ 13, Figure 1; Declaration of Martin S. Dorph, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 13, 2024 ("Dorph Declaration"), ¶ 16.

25.    Real-world data also contradict Mr. Weir's assertion that, if NYU did not lower the tuition prices after being forced to transition to remote classes in the Spring of 2020, "the economic outcome would be that many or all of the students would not have enrolled at all."[33] Contrary to his unsubstantiated conclusion, enrollment and tuition data from Summer and Fall of 2020 indicate that many students, elected to attend NYU remotely, and many even chose to do so when in-person options were available. Named Plaintiff, for example, took a mix of remote, blended (remote and in-person), and in-person courses.[34] These preferences and outcomes emphasize that many, if not all proposed class members, including Named Plaintiff, considered the tuition to be the fair market value of the education received, even when provided remotely. The data surrounding student behavior directly refutes Mr. Weir's assertions.

26.    First, Named Plaintiff, despite knowing in advance that instruction for Summer 2020 courses would be remote, as shown in **Figure 1**, opted to continue taking classes at NYU, and their family paid the full tuition rate to enroll in three courses in that term, despite tuition not being reduced due to instruction being remote.[35] More broadly, about 8,000 undergraduate students enrolled to take classes in the Summer of 2020,[36] the largest Summer class between 2016 and 2020, despite students knowing in advance classes would be fully remote.[37]

---

[33]    Weir Declaration, ¶ 37.

[34]    New York University, "Fall 2020 Course Registrations," NYU_Hall-Landers_00001808–816.

[35]    New York University, "Summer 2020 Course Registrations," NYU_Hall-Landers_00001841–845; Bonano Declaration, ¶¶ 10, 12. During the Summer of 2020, NYU's Tisch School of the Arts made a special accommodation for students in the Dance BFA Program, such as Named Plaintiff, allowing students to take courses remotely during the Summer of 2020 and complete part of their curriculum in-person during the Spring of 2021 (beginning in January 2021). See Declaration of Sean Curran, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 12, 2024 ("Curran Declaration "), ¶¶ 6, 12.

[36]    Knoll-Finn Declaration, ¶ 5, Figure 1; Bonano Declaration, ¶ 10.

[37]    Knoll-Finn Declaration, ¶ 6, Figure 1. Summer 2020 enrollment was 7,997, which was 13% larger than the 2016 Summer class of 7,080 (the second largest class between 2016 and 2020) and 25% larger than the average Summer class between 2016 and 2019.

**Figure 1**
**Partial Screenshot from NYU's "A Summary Update on Covid-19 Developments,"**
**April 11 2020[38]**

### Summer Sessions—Remotely Held Classes

Both summer sessions—which begin May 26 and July 6—will be held remotely.

27.     Second, in the Fall of 2020, NYU offered a mix of fully remote, in-person, and blended courses (i.e., courses with a mix of remote and in-person instruction).[39] As explained in **Section IV.A**, tuition in the Fall 2020 was the same regardless of the method of instruction;[40] and a little higher than the tuition charged to proposed class members in the Spring of 2020.[41] A large share of undergraduate students enrolled at NYU's New York campuses in the Fall 2020 (42%, or 11,580 out of 27,241) elected to take all of their classes remotely, even though the option of either in-person or blended instruction was now available and the tuition was not lower for remote classes. Of the 11,580 students who elected to take all of their classes remotely, 2,686 were students who first enrolled in NYU courses in the Fall of 2020, and the rest were returning students.[42] Other students took at least some of their Fall 2020 classes remotely, including Named Plaintiff who took a mix of online, in-person, and blended courses.[43] Such patterns reflect that the real-world willingness of students to pay for remote instruction—many of whom are proposed class members—was higher than the tuition charged in Spring of 2020, even when the option for in-person instruction was available. These patterns further suggest that the tuition paid by Named Plaintiff and proposed class members is commensurate with the fair market value of the education received.

28.     Third, the choices made by undergraduate students in the Fall of 2020, with 42% electing to take all of their classes remotely, and the rest taking at least some in person and/or

---

[38]   New York University, "A Summary Update on COVID-19 Developments," April 11, 2020, NYU_Hall-Landers_00000347.

[39]   Knoll-Finn Declaration, ¶ 7; Shirky Declaration, ¶ 12.

[40]   Bonano Declaration, ¶ 10; Shirky Declaration, ¶ 12.

[41]   Dorph Declaration, ¶ 16.

[42]   Knoll-Finn Declaration, ¶ 9.

[43]   New York University, "Fall 2020 Course Registrations," NYU_Hall-Landers_00001808–816.

blended classes, highlight the heterogenous preferences for remote compared to in-person instruction across students.[44] Such variation is expected given the reality of health, travel, international restrictions, regulations, and other logistical challenges in the Spring, Summer, and Fall of 2020.

29.      The tuition parity between remote and in-person instruction programs coupled with the demand for remote NYU programs at the same price (or higher) in the Summer and Fall of 2020 indicate that students perceived the tuition price for an NYU remote education as appropriate "fair market value," and contradict the Plaintiff's allegation of a reduction in this "fair market value" of their education.

## V.      THE EXPECTED CONCLUSIONS AND ASSERTIONS PRESENTED BY PLAINTIFF'S EXPERTS ARE INCONSISTENT WITH MARKET OUTCOMES

### A.      Student Behavior Contradicts Mr. Weir's Assertions Regarding Proposed Class Member Preferences Absent a Price Reduction or Refund

30.      Despite Mr. Weir's claim that "one of the most important and most frequent topics of discussion between Mr. Gaskin and myself was the data on actual tuition set in the real-world marketplace,"[45] Mr. Weir and Mr. Gaskin ignore that real-world data on applications for NYU programs, tuition, and enrollment before, during, and after the Spring of 2020, as well as data on enrollment choices made by students in the Spring and Fall of 2020. As explained in **Section IV**, these data exist, making the need for a conjoint survey moot, as market data do not support Plaintiff's allegations that proposed class members are entitled to a refund of tuition and fees because the "fair market value" of their education was reduced. Neither expert has indicated an intention to consider market data or student behavior. This lack of real-world market data is known to further limit the already poor predictive power of conjoint analysis.[46] Further, their study design, their articulation of the expected results, and their assertions regarding the allegations and purported damages in this matter are contradicted by these real-world outcomes.

---

[44]    Knoll-Finn Declaration, ¶ 9.

[45]    Weir Declaration, ¶ 37.

[46]    See, e.g., Paul B. Ellickson, Mitchell J. Lovett, and Bhoomija Ranjan, "Product Launches with New Attributes: A Hybrid Conjoint-Consumer Panel Technique for Estimating Demand," *Journal of Marketing Research*, Vol. 56, No. 5, 2019, pp. 709-731, p. 2.

31.     Given these real-world outcomes, any "reduction in fair market value" estimated by the Proposed Gaskin Conjoint Survey, purportedly reflecting an "overpayment," would therefore reflect a biased and unreliable survey design. Analyses of real-world data indicates that the amount paid by Plaintiff and proposed class members is consistent with the fair market value of the education services provided by NYU in the Spring of 2020, and the tuition charged for remote NYU programs. These data are inconsistent with the reduction in "fair market value"[47] alleged by Plaintiff and the expected results described by Plaintiff's experts.[48] The discrepancy between these data and the expected results of the Proposed Gaskin Conjoint Survey proves the unreliability of this survey, its results, and Mr. Weir's damages calculations.

**B.      NYU's Costs and the Competitive Dynamics of Higher Education Suggest Tuition Rates Would Not Be Reduced Even if the Need for Remote Instruction in Spring 2020 Had Been Anticipated**

32.     An analysis of university costs and the dynamics of tuition pricing, as well as university enrollment dynamics, including the process of university admission, indicates that NYU would have been unlikely to lower tuition even if on campus access restrictions could have been predicted and some students would have elected to withdraw from NYU. These dynamics and the stability of tuition emphasize that, even if a restriction requiring remote instruction changed some students' preferences, the tuition paid by Named Plaintiff and proposed class members in the Spring 2020 semester would not have changed.

*1.      Background on NYU's Costs and Tuition Setting*

33.     As a non-profit educational institution, NYU does not operate like a traditional commercial enterprise, and does not, for example, set tuition for a given year and program by identifying the maximum amount the market will bear while allowing it to maintain a certain level of enrollment.[49] Instead, as described by Mr. Dorph, NYU's Executive Vice President, NYU considers a host of factors—including its educational mission, costs, and providing an affordable

---

[47]    Gaskin Declaration, ¶ 9.

[48]    Gaskin Declaration, ¶¶ 9-10, 28, 53-55; Weir Declaration, ¶¶ 28-29.

[49]    Dorph Declaration, ¶¶ 10-11.

option relative to its peers—when developing an annual operating budget,[50] which is funded in part by tuition revenue, and sets tuition at rates that will allow it to support that operating budget for a given academic year.[51] As described by Mr. Dorph, the tuition and fees charged to even full-freight students and the tuition received from all students do not cover all operating costs of running NYU.[52] In addition, affordability is an important factor for NYU in setting tuition rates:[53] Starting in fiscal year 2016 and continuing through 2020 (and beyond), NYU limited tuition increases to less than 3% per year.[54] As a result, NYU went from being ranked number four in the Chronicle of Higher Education's list of most expensive universities in 2016 to number 52 in 2020.[55]

34.     In addition, many of NYU's costs, including salaries for faculty and staff, remained constant during the Covid-19 pandemic, such that NYU could not simply reduce tuition without a financial impact, as approximately 70% of NYU's operating costs cover NYU's staff, including its faculty,[56] whom NYU continued to pay during Covid-19.[57]

2.     *The Competitive Dynamics of Higher Education Are Inconsistent with a Reduction in Tuition*

35.     Additional factors are also inconsistent with a reduction in tuition. First, the landscape of university admissions has become increasingly competitive for students, and NYU, like other highly selective universities, experiences excess demand. The number of undergraduate applications in the U.S. rose steadily from 9.6 million in 2014 to 13.1 million in 2022, a 36%

---

[50]    New York University, "Major Categories of Revenue - Fiscal Year 2020," NYU_Hall-Landers_00009358–359.

[51]    Dorph Declaration, ¶¶ 10-11.

[52]    Dorph Declaration, ¶¶ 12, 14; New York University, "NYU Registration and Services Fees Explanation," NYU_Hall-Landers_00000964.

[53]    Dorph Declaration, ¶ 12.

[54]    Dorph Declaration, ¶ 12.

[55]    See New York University, "A Letter from NYU President Andrew Hamilton," April 13, 2022, www.nyu.edu/about/leadership-university-administration/office-of-the-president/communications/a-letter-from-nyu-president-andrew-hamilton-041222.html; Dorph Declaration, ¶ 12.

[56]    Dorph Deposition, pp. 235, 242.

[57]    Dorph Declaration, ¶ 11.

increase in less than a decade,[58] with platforms such as Common Application becoming commonplace and simplifying the process of applying to multiple universities,[59] while enrollment remained fairly stable—from 3.1 million undergraduate students admitted and newly enrolled in Fall 2014 to 2.9 million in Fall 2022.[60] NYU specifically, as shown in **Figure 2** from NYU's website, received over 113,000 undergraduate applications for the Class of 2027, 58% more applications than in 2018. It admitted only 9% of these prospective students, compared to 20% in 2018, which is suggestive of NYU becoming more selective, and facing higher excess demand. When the number of students who are interested in attending NYU exceeds available student seats, an unwillingness by some proposed class members to pay Spring 2020 tuition would not put sufficient downward pressure on NYU's tuition.

**Figure 2**
**Graphic of Admissions, Applications, and Enrollees at NYU from NYU's Website, 2018-2023[61]**



---

[58]  National Center for Education Statistics, "Number of Applications for Admission from First-Time, Degree/Certificate-Seeking Undergraduate Students Were Received by Postsecondary Institutions in the Fall by Admission/Enrollment Status," www.nces.ed.gov/ipeds/TrendGenerator/app/answer/10/101?cid=102.

[59]  National Bureau of Economic Research, "Common Application Has Had Wide-Ranging Effects on College Admissions," November 1, 2019, www.nber.org/digest/nov19/common-application-has-had-wide-ranging-effects-college-admissions.

[60]  National Center for Education Statistics, "Number of Degree-Seeking Undergraduate Students Enrolled in Postsecondary Institutions for the First-Time in the Fall," https://nces.ed.gov/ipeds/TrendGenerator/app/answer/2/5

[61]  New York University, "Factbook and Common Data Sets," www.nyu.edu/employees/resources-and-services/administrative-services/institutional-research/factbook.html.

36.     Second, supply is generally limited for a given university, and NYU, like other top universities, ultimately matriculates roughly the same number of first-year undergraduate students each year. For example, as shown in **Figure 2**, between 2020 and 2023, the number of undergraduate students enrolled at NYU each year actually decreased from 6,173 students enrolled in 2018 to 5,818 in 2023.[62] In the event that more students than anticipated reject their admission offer to NYU in any given application cycle, the university is also able to admit others in the waitlist without changing tuition.[63]

37.     Third, admitted students' willingness to pay—including that of many of the proposed class members—is likely to be higher than both the set price of tuition and the actual payment amount rendered to NYU (after institutional scholarships and aid, tuition remission programs, and other forms of financial aid are taken into account).[64] Admittance to NYU includes attendance to the university, long-run tangible benefits in terms of their degrees' value for their career prospects, possible intangible and intrinsic lifelong value stemming from receiving a college-level education, and the benefits of NYU's alumni network, none of which are considered in Mr. Gaskin's Proposed Conjoint Survey. Further, the excess demand is consistent with willingness to pay being higher for many students than the list tuition price.

38.     These real-world data reflect that demand for enrolling in highly competitive universities, such as NYU, is much higher than supply. This imbalance further suggests that tuition is set well below students' willingness to pay. As a result, even if the willingness to pay for NYU classes had decreased as a result of moving to remote instruction, as alleged by Plaintiff, Plaintiff's experts have provided no evidence that this lower willingness to pay is below the tuition paid. Even if one were to apply market dynamics relevant to for-profit institutions, which NYU is not, it would not be a reasonable expectation that NYU would reduce tuition rates, as the tuition paid by students appears commensurate of the fair market value of their education. In fact, as many

---

[62]    New York University, "Factbook and Common Data Sets," www.nyu.edu/employees/resources-and-services/administrative-services/institutional-research/factbook.html.

[63]    New York University, "Waitlist FAQ," www.nyu.edu/admissions/undergraduate-admissions/how-to-apply/wait-list-faq.html.

[64]    For example, during the Spring 2020 semester, NYU undergraduate institutional aid offset 21.4 percent of total tuition charged. "New York University Tuition and Institutional Aid - Spring 2020," Bonano Deposition, Exhibit 7, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, May 11, 2020 ("New York University Tuition and Institutional Aid - Spring 2020, Bonano Deposition, Exhibit 7").

*CONFIDENTIAL*

students chose to continue their studies at NYU in the Summer of 2020 (including Named Plaintiff) and in the Fall of 2020 remotely (including Named Plaintiff for part of their courses),[65] and many incoming first-year students elected remote instruction, one would not expect to see a decrease in aggregate demand for NYU programming from actual or prospective students if accurately studied. Such real-world data contradict the expected findings of the Proposed Gaskin Conjoint Survey and Mr. Weir's damages calculations.

### C.     NYU's Response to the Pandemic Allowed Students to Continue Their Pursuit of a Degree and Education

39.     NYU's response to the Covid-19 pandemic allowed the proposed class members to continue their education under extraordinary circumstances. Facing unprecedented risks for the health of NYU employees and students, on March 3, 2020, a petition signed by over 25,000 people asked NYU to move class instruction to a remote format.[66] NYU did transition classes to remote instruction, training its faculty on remote learning, and increasing IT support, among other measures,[67] and later that month, universities in the state of New York, including NYU, were directed by Governor Cuomo's orders to "close in-office personnel functions effective at 8PM on Sunday, March 22" of 2020,[68] preventing both faculty and students from accessing the university campus.[69] Students' responses to this transition were, as expected, heterogenous. For example, NYU conducted a survey of first-year undergraduates in the first two weeks of April 2020 and

---

[65]     Hall-Landers Deposition Vol. 1, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, April 12, 2024 ("Hall-Landers Deposition, Vol.1"), pp. 218-219 ("Q: The summer semester of 2020 was conducted remotely, correct? A: Yes. Q: And you participated in that, correct? A: Yes."). The Named Plaintiff also chose to continue their studies at NYU in the Fall of 2020 through a mix of remote, in-person, and blended courses. See, e.g., New York University, "Fall 2020 Course Registrations," NYU_Hall-Landers_00001808–816.

[66]     Change.org, "Close NYU Washington square and Brooklyn Campuses due to COVID-19 in NYC," www.change.org/p/coronavirus-close-nyu-washington-square-and-brooklyn-campuses-due-to-covid-19-in-nyc.

[67]     See, e.g., New York University, "Summary of NYU's Response to the Latest COVID-19-related Developments," March 24, 2020, NYU_Hall-Landers_00000936–943; Shirky Declaration, ¶¶ 6-7.

[68]     The Official Website of New York State, "Governor Cuomo Issues Guidance on Essential Services Under The 'New York State on PAUSE' Executive Order," March 20, 2020, www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order.

[69]     New York University, "Summary of NYU's Response to the Latest COVID-19-related Developments," March 24, 2020, NYU_Hall-Landers_00000936–943.

found that 40.7% of respondents ranked the transition to remote learning positively, with an additional 25.6% rating the experience as neutral (5-6).[70]

## VI.    THE PROPOSED GASKIN CONJOINT SURVEY WOULD BE INAPPROPRIATE TO MEASURE THE FAIR MARKET VALUE OF ACCESS TO NYU CAMPUS DURING THE COVID-19 PANDEMIC

40.    As established in **Section IV** and **Section V**, the Proposed Gaskin Conjoint Survey is not necessary to address the at-issue allegations, as data on real-world outcomes already exist. Further, market dynamics and student preferences contradict the validity of any purported decrease in "fair market value" of proposed class members' education. However, even if these real-world data did not exist, the Proposed Gaskin Survey would be an inappropriate tool for measuring the alleged harm to the proposed class. First, the proposed study and associated analyses cannot measure or estimate actual changes in tuition prices or tuition paid; it only provides measures of willingness to pay. Second, while a conjoint study can be used to evaluate relative importance of complex products or attributes, it is not possible to simplify a multi-attribute, bespoke product like higher education into a simplified array of fixed attributes presented as hypothetical choices. Third, the extraordinary circumstances surrounding the Covid-19 pandemic cannot be appropriately modeled or described in a conjoint study, nor can respondents to the study make choices disregarding the extreme circumstances that Covid-19 presented. Mr. Gaskin has not even demonstrated an attempt to place the respondent in the mindset that prevailed at the time that the relevant decisions would have been made.

### A.    The Proposed Gaskin Conjoint Survey Can Only Measure Willingness to Pay and Cannot Directly Predict Tuition Levels

41.    Mr. Gaskin and Mr. Weir intend to use this survey to directly measure an expected change in "tuition prices." However, a conjoint survey, even if it were properly designed and an appropriate tool for this particular context, cannot be used to directly measure market prices. It is well established in the survey literature that a properly designed conjoint survey provides a simplified measurement of demand, assuming product or service availability, stable competitive

---

[70]    New York University, "Remote Learning Cohort Text Outreach Report," NYU_Hall-Landers_00009281.

conditions, and constant supply-side costs,[71] such that the survey can only measure respondents' willingness to pay for the attributes of a product tested in the survey.[72] Willingness to pay estimates constitute "only measures of shifts in demand and do not take into account the competitive response to feature enhancement,"[73] and are therefore not equivalent to market price estimates.

42.    For the results of a properly designed conjoint survey to measure changes in prices, one would need to show that the changes in willingness to pay would result in an equivalent change in market prices. To model but-for competitive outcomes and price equilibriums, one must understand the relative pricing and demand in the actual market, the prevailing and but-for pricing decisions of competitor products or services, and the underlying cost structure for the product or service. An evaluation of NYU's ability and need to change tuition prices following the transition to remote instruction should consider, at least, the following factors: 1) whether the cost structure for offering an NYU education remotely was sufficiently lowered to make lower tuition possible, 2) whether demand fell to a level sufficient to generate excess supply of available spots for applicants, and 3) competitor universities' responses—if any, including to tuition prices, as they were all similarly impacted by Covid-19.

43.    Neither Mr. Gaskin nor Mr. Weir have considered whether the cost of providing education changed due to the transition toward remote education and the Covid-19 pandemic,[74] and that demand for an NYU education substantially exceeded supply. My analysis of both supply and demand for NYU education indicates that, given the excess demand and near-fixed supply at NYU (see **Section V.B**), any change in demand as a result of NYU transitioning to remote instruction during the Spring 2020 semester would not result in NYU modifying tuition prices.[75]

---

[71]    Bryan K. Orme, *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020, pp. 4, 88, 104-105. Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014, pp. 421-456, p. 422 ("Conjoint-based surveys can be thought of as an experimental approach to assessing demand for products."), p. 426.

[72]    See, e.g., Bryan K. Orme, *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020, p. 84.

[73]    Greg M. Allenby, Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," *Proceedings of the Sawtooth Software Conference*, 2013, pp. 341-355, p. 354.

[74]    New York University, "Taking Stock - The Impact of COVID-19 and Looking to the Future," April 27, 2020, NYU_Hall-Landers_00000946-953 at 946.

[75]    See also, Expert Declaration of Jonathan T. Tomlin, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD, September 18, 2024 ("Tomlin Declaration"), Section IV.D.2.

**B.    The Design of the Proposed Gaskin Conjoint Survey Would Be Unable to Capture the Complexity of Making a University Enrollment Decision**

44.    Conjoint studies, by design, limit the number of attributes under consideration in a purchase decision.[76] As a result, conjoint analyses are more typically used to study relatively simpler consumer product categories.[77] When applied to a "product" category as complex as university enrollment, a conjoint analysis—including the Proposed Gaskin Conjoint Survey—will force respondents to ignore the myriad of factors and considerations relevant when making such an important decision, and impose instead artificial commonality across respondents by asking them to focus on a small set of arbitrary attributes.

45.    Mr. Gaskin justifies his choice of relying on conjoint analysis by claiming he has used a similar methodology in other matters,[78] while Mr. Weir merely states that "[i]t is well known that conjoint analysis has a long history of use in education."[79] However, none of the sources cited by Mr. Weir support the use of conjoint analysis to estimate the fair market value of access to professors in person or to a university campus. Instead, the three cited studies merely discuss "designing parenting workshops," "improving patient care," and "designing the medical school curriculum" at a Canadian university.[80] According to Mr. Dorph, NYU has never used a conjoint analysis to set tuition prices.[81]

46.    The reason conjoint analysis is not an adequate tool to value physically accessing NYU's campus is that decisions surrounding which university to enroll in, whether for undergraduate or graduate courses, are among the most complex and life-changing decisions people can make. These decisions determine professional and personal careers for years to come and are therefore driven by a combination of complex and often highly individualized factors.

---

[76]    "Traditional conjoint analysis makes some heroic assumptions, including…that complex decision making can be explained using a limited number of dimensions." See, e.g., Bryan K. Orme, *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020, p. 29.

[77]    See, e.g., Vithala R. Rao, *Applied Conjoint Analysis*, Springer, 2014, p. 8.

[78]    Gaskin Declaration, ¶ 15.

[79]    Weir Declaration, ¶ 14, citing Bryan K. Orme, *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020, p. 157.

[80]    Bryan K. Orme, *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020, p. 157.

[81]    Dorph Declaration, ¶ 13.

47.     In other words, college education, particularly at highly selective institutions like NYU, has the characteristics of a high-involvement good.[82] Prospective students often consult numerous sources of information and consider numerous factors in deciding which schools and programs to apply to, including, but not limited to, visits to campuses, attendance of information sessions, online research of college guides, and interactions with current and former students.

48.     Prospective students further consider a multitude of personal factors and trade-offs between different schools, including whether the school is public or private; lifestyle factors (e.g., campus setting, living on- or off-campus, sororities/fraternities, desire to live in a particular geography or in an urban/non-urban environment); the size of the school (e.g., universities or smaller colleges); specific athletic programs; the composition of the faculty; access to a particular program, offered major, or faculty member; probability of acceptance for their preferred program; family considerations; the school's religious affiliation; and whether the university is considered a "safety," "target," or a "reach" based on the strength of their application.

49.     None of this complexity is captured in a conjoint analysis or the Proposed Gaskin Conjoint Survey. The Proposed Gaskin Conjoint Survey will, by necessity, exclude important decision-making criteria, which the literature notes will result in upward biased valuations of the included attributes.[83] Mr. Gaskin's proposed design also imposes a fixed set of criteria on students with different priorities.

50.     Even the attributes included in the Proposed Gaskin Conjoint Survey do not reflect the complexity of this decision. For example, respondents will be instructed to consider just five "competitor" universities— Boston University, Cornell University, Columbia University, NYU, and Northeastern University—all highly selective and all private universities located in New York state or Boston, MA. Based on this set of schools, the Proposed Gaskin Conjoint Survey will not capture or assign any value to respondents' potential geographic preferences for schools outside the Northeastern U.S., for public universities, for smaller schools, for less selective schools, or for specific schools for athletics programs, among other characteristics discussed above not captured in Mr. Gaskin's selection of these schools. For example, Named Plaintiff, a dance major, only

---

[82]    Philip Kotler and Kevin Lane Keller, *Marketing Management* 15 Ed., Pearson, 2016, pp. 173-180.

[83]    Suneal Bedi and David Reibstein, "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review*, Vol. 73, No. 2, 2021, pp. 385-436, p. 403.

considered three other programs besides NYU: the University of the Arts in Philadelphia, the California Institute for the Arts, and Boston Conservatory at Berklee, all specialized schools for the arts and in large metropolitan areas, and did not consider in their decision-making any of the "competitor" universities included in the Proposed Gaskin Conjoint Survey.[84]

51.    Additionally, the Proposed Gaskin Survey will include a "Tuition per Semester" attribute in the survey, ranging from $25,000 to $30,000 per semester to calculate his purported "reduction in market value"[85] respondents are unlikely to view and react to a university profile's "price" in a common way, as sticker prices of tuition do not reflect the way real-world students pay tuition. For many, scholarships and grants offset some portion of these costs. Others take out student loans over the long-term, while others have family who pay for their tuition, as was the case for Named Plaintiff.[86] These individual circumstances will lend considerably greater variation to respondents' interpretation of the "Tuition per Semester" attribute, which suggests that a common basis for price considerations is unlikely.

### C.    The Proposed Gaskin Conjoint Survey Unrealistically Abstracts Away from the Covid-19 Pandemic and Its Heterogeneous Impact on Students, Leading to Unreliable Results

52.    The Proposed Gaskin Conjoint Survey will instruct respondents to ignore any personal considerations they may have around the Covid-19 pandemic, such that "it should not be a factor in your decisions,"[87] abstracting the results of the survey away from the specifics of Covid-

---

[84]    Hall-Landers Deposition, Vol.1, pp. 54-55, ("Q. And did you consider other dance programs besides Tisch? A. Yes. Q. Which ones? A. Boston Conservatory, Cal Arts, University of the Arts. Q. Anything else? A. Not that I can remember. Q. And when you were evaluating where to go among these different schools, what factors were most important to you? A. I really wanted to be at a school that had both the arts and academics available to me. Q. Anything else? A. Location. And I was excited by an accelerated program at NYU; that was three years as opposed to four years at Boston Conservatory, which I had previously committed to, when I was accepted off the wait list to go to NYU. Q. Was NYU the only option that had this accelerated program? A. Of my options, yes. Q. Did you get into all three of the schools that you just named? A. I did not end up applying for Cal Arts, but I got into the University of the Arts and Boston Conservatory. I was offered a scholarship to Cal Arts, but did not apply.").

[85]    Gaskin Declaration, p. 23.

[86]    Hall-Landers Deposition, Vol.1, "Q. Did you ever pay your father back that $41,609.09? … THE WITNESS: No. But can I say, my dad happily paid this on my behalf as a gift to me, as a gift of my education. He never expected me, nor did he require me, nor did I sign any contracts that I would have to say that I would have to pay him back." pp. 91-92.

[87]    Gaskin Declaration, ¶ 24 ("You are making your university choices prior to the COVID-19 pandemic, so it should not be a factor in your decisions.").

19, forcing respondents to ignore the realities of the Covid-19 pandemic, including how it impacted students' demand and value for education, particularly at a time when their outside options (employment, leisure, etc.) were limited by the restrictions associated with the pandemic. Therefore, Mr. Gaskin ignores proposed class members' real-world situations and heterogenous preferences during the Covid-19 pandemic, leading to unreliable estimates.

53.    Even if NYU had been able and had opted to keep its campus facilities open to students—which it could not have, due to Governor Cuomo's orders[88]— many students would not have made use of those facilities. First, even in the absence of Covid-19, some students who pay tuition and fees do not regularly access NYC facilities, either because they choose never to use some or all of those facilities, or because they are not able to or it is not convenient for them, such as those that study abroad or at other campuses, such as NYU's satellite campuses in Rockland County and Westchester.[89]

54.    Second, in the face of the Covid-19 pandemic, many students, including those impacted by travel restrictions, would have been unable to return to the NYU campus. Further, many of those that would have been able to return to campus may have preferred not being in New York City, not attending in-person classes, or not making use of campus amenities, given the widely known risks of Covid-19 transmission in New York City between March and May 2020.[90] Consistent with such preferences, as described in **Section IV.B**, in the Fall of 2020, when NYU offered a mix of in-person, remote, and blended courses, over 40% of undergraduate students

---

[88]    State of New York Executive Chamber, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," March 16, 2020, NYU_Hall-Landers_00002260–261 at 260 ("[E]very school in the state of New York is hereby directed to close no later than Wednesday, March 18, 2020[.]"; State of New York Executive Chamber, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," March 16, 2020, NYU_Hall-Landers_00002258–259 ("[A]ny gym, fitness centers or classes, and movie theaters shall also cease operation effective at 8 pm on March 16, 2020 until further notice"). See The Official Website of New York State, "Governor Cuomo Signs the 'New York State on PAUSE' Executive Order," March 20, 2020, www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order ("[E]ffective at 8PM on Sunday, March 22, all non-essential businesses statewide will be closed"). See also Dorph Deposition, pp. 225-226 ("[W]e were required by the state to not allow students to utilize certain spaces, and so we did not"); Shirky Deposition, p. 37 ("[I]t wasn't a policy because we didn't go through a policymaking -- we didn't go through the policymaking process. It was the decision ultimately by the president, but in conversation with the mayor and the governor and ultimately in response to a mandate by the governor.").

[89]    Dorph Deposition, 124-125 (students "pick and choose" the resources they access and it is "very much a school-by-school specific thing as to what any student would get access to").

[90]    Change.org, "Close NYU Washington square and Brooklyn Campuses due to COVID-19 in NYC," www.change.org/p/coronavirus-close-nyu-washington-square-and-brooklyn-campuses-due-to-covid-19-in-nyc.

elected to only partake in fully remote coursework,[91] despite tuition being the same as for in-person (or blended) coursework.[92]

55.    Third, the Proposed Gaskin Conjoint Survey will ask respondents to make choices and decisions, as detailed in **Section VII**, that were not available during the Covid-19 pandemic, when students' choice set was to either transition to remote instruction or abandon or pause their undergraduate studies until either in-person instruction became available again or they could transfer to another college offering in-person classes. The Proposed Gaskin Conjoint Survey will contradict real-world circumstances by artificially constructing unrealistic scenarios in which, for example, instruction at Columbia could be offered in-person but not at NYU. This is inconsistent with what happened in the Spring of 2020, when no alternative university was holding classes in person in the state of New York.[93]

## VII.    THE CONJOINT SURVEY DESIGN PROPOSED BY MR. GASKIN IS FUNDAMENTALLY FLAWED AND LIKELY TO OVERSTATE THE FAIR MARKET VALUE OF ACCESS TO NYU CAMPUS DURING THE COVID-19 PANDEMIC

56.    Even if a conjoint survey were adequate to value NYU campus access during the Covid-19 pandemic—which it is not—three design elements of the Proposed Gaskin Conjoint Survey are likely to inflate respondents' willingness to pay for the key "Class and Campus Format" attribute: the survey's target population, the survey's assumptions, and the survey's distractor attributes. This artificial focus would lead to Mr. Gaskin and Mr. Weir overestimating the fair market value of in-person instruction and NYU campus access during the Covid-19 pandemic.

### A.    The Proposed Gaskin Conjoint Survey's Target Population Is Flawed and Vulnerable to Biases Introduced by the Proposed Survey Design

57.    Survey experts widely recognize that the target population of a survey should consist only of respondents whose "state-of-mind is relevant to the particular legal issue involved

---

[91]    Knoll-Finn Declaration, ¶ 9; Shirky Declaration, ¶ 12.

[92]    Bonano Declaration, ¶ 10; Dorph Declaration, ¶ 16.

[93]    State of New York Executive Chamber, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," March 16, 2020, NYU_Hall-Landers_00002260–261.

in the case."[94] This requirement is detailed in *Reference Guide on Survey Research*, cited by Mr. Gaskin, and explains that the target population should be individuals "whose characteristics or perceptions the survey is intended to represent."[95] An inappropriate target population risks biasing survey results.

58.     According to the Gaskin Report, the Proposed Gaskin Conjoint Survey would target U.S. adults who "applied to New York University or one of its competitors for undergraduate education in the past 20 years."[96] However, this proposed target population would not be representative of members of the proposed class—i.e., Spring 2020 NYU students—and could not reflect actual or prospective students with relevant knowledge of NYU's programs, remote education generally, nor the underlying key attributes for students selecting a program in 2020. Mr. Gaskin conducted no analysis and provided no support to demonstrate the preferences of the target population—many of whom would be at least 10-15 years older than proposed class members—are representative of the preferences of the members of the proposed classes. There are several reasons to believe that the preferences and responses of his target population would not apply to the proposed classes. Further, each of these flaws in the target population selection are likely to further inflate the willingness to pay of the key "Class and Campus Format" and the implied fair market value associated with campus access to NYU during the Covid-19 pandemic.

*1.     Mr. Gaskin's Proposed Target Population Have Outdated and Irrelevant Experiences with Selecting an Educational Program*

59.     Mr. Gaskin's proposed target population would not be representative of members of the proposed class, as some respondents will have applied to undergraduate programs as far back as 2004 and will be up to 15 years removed from an active decision-making around undergraduate education, leaving them with outdated knowledge about the schools and attributes

---

[94]    William G. Barber, "The Universe," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, First Ed., edited by Shari S Diamond and Jerre Bailey Swann, American Bar Association, 2012, pp. 27-49, p. 27 ("[I]t is crucial to select a universe that corresponds with the group or groups of consumers whose state-of-mind is relevant to the particular legal issue involved in the case.").

[95]    Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Ed., National Academies Press, 2011, p. 376 ("The target population consists of all elements (i.e., individuals or other units) whose characteristics or perceptions the survey is intended to represent."). See Gaskin Declaration, FN 11, FN 19.

[96]    Gaskin Declaration, ¶ 35.

being described, including costs of attendance. As just one example, NYU's Tandon School of Engineering, which offers undergraduate (and graduate) engineering degrees,[97] was not a school at NYU at the time when many of Mr. Gaskin's target population would have applied to undergraduate programs: it was created as part of a merger between NYU and Polytechnic University in 2014.[98] Further, their experience selecting a school to apply to will be up two decades in the past, therefore making it highly unlikely that they will find the choice tasks of the survey relevant to them. The academic literature on surveys acknowledges that, when respondents do not have a salient context or well-informed opinion on a topic, they are more likely to draw upon easily accessible information, such as the information and assumptions provided in the survey.[99] Such tendencies would make respondents particularly vulnerable to priming, demand artifacts, and focusing illusions of the survey's design. Demand artifacts occur when a study design suggests to respondents that they should provide a particular response that is "demanded" by the survey.[100] Focusing illusions (also known as focalism bias) are likely to occur when surveys draw respondents' attention to a handful of features when many exist, leading respondents to answer questions in ways that do not reflect their real-world behavior. [101]

> 2.    *Mr. Gaskin's Proposed Target Population Will Likely Include Irrelevant Respondents with No Experience at NYU or Other Potentially Relevant Institutions*

60.    The Proposed Gaskin Conjoint Survey's target population will also include respondents who merely *applied* to NYU or any one of Mr. Gaskin's selected "competitor" schools. First, Mr. Gaskin provides no support for his narrow selection of "competitor" schools and has provided no data or information that suggests that those who applied to any or even all of

---

[97]    New York University, "Tandon School of Engineering Academics Programs," https://engineering.nyu.edu/academics/programs.

[98]    New York University, "Our History: Roots of Greatness," https://engineering.nyu.edu/about/history.

[99]    Michael Parkin, "Priming," *Encyclopedia of Survey Research Methods*, Vol. 2, edited by Paul J. Lavrakas, Sage Publications, Inc., 2008, p. 612 ("[R]espondents may choose to instead reduce their cognitive effort by answering with whatever seemingly relevant information is immediately accessible, including information that may have been primed in earlier parts of the survey.").

[100]    For a discussion of demand artifacts, see, Alan G. Sawyer, "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4, 1975, pp. 20-30.

[101]    See David A. Schkade and Daniel Kahneman, "Does Living in California Make People Happy? A Focusing Illusion in Judgements of Life Satisfaction," *Psychological Science*, Vol. 9, No. 5, 1998, pp. 340-346.

the considered universities reflect the demographics, preferences, and experiences of the proposed class members.

61.    Importantly, respondents may have never been accepted by nor attended NYU. In fact, they may never have attended any of the "competitor" schools. As a result, such respondents are not only likely to face an out-of-date decision, but they will also be presented with a decision-making process around choosing to enroll at NYU or the "competitor" schools that they never had the opportunity to engage in. Mr. Gaskin also makes no attempt to establish whether these respondents could have been accepted to NYU or any of the "competitor" schools given their GPAs and credentials, and, therefore, it is likely that their preferences and responses would be uninformative as to those of proposed class members.

62.    I have seen no evidence that Mr. Gaskin will be able to test for or control for variation among respondents' application or acceptance realities based on data from the survey or the survey-panel company. He has provided no description of how many respondents would have actually attended or been accepted to NYU, nor provided any quotas or target counts for matriculation at any of the considered schools. Ultimately, Mr. Gaskin has provided no consideration for whether or how he could isolate proposed class members nor how he could replicate the experience of a prospective class member in 2020 considering whether to apply and/or attend NYU in a but-for world. The survey literature has recognized that such an overbroad sampling will "reduce the value of the survey."[102]

### 3.    Mr. Gaskin's Proposed Target Population Are Less Likely to Have Relevant Experience with Remote Education

63.    Many respondents to the Proposed Gaskin Conjoint Survey are likely to have little or outdated personal experience with remote education. Further, given that the proposed target population need not have attended or been accepted to NYU during the proposed class period or at all, nor is there any requirement that the respondents have any experience with NYU or its remote instruction programs, they will not have sufficient knowledge to appropriately infer the types or the quality of professors teaching remotely at NYU. University coursework taught

---

[102]    Shari Seidman Diamond, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Ed., National Academies Press, 2011, p. 379 ("If the relevant subset cannot be identified [within the sample of a survey], however, an overbroad sampling frame will reduce the value of the survey.").

remotely in the mid-2000s, or even in the early 2010s, is unlikely to be similar to the remote instruction environment that students encountered during the Covid-19 pandemic at NYU. As such, many respondents will be asked about their preferences for remote-only education, something they may have never experienced or encountered. Further, none would have ever faced the hypothetical options outlined in the Proposed Gaskin Conjoint Survey, making their responses susceptible to priming and the biased study design.

### B.    The Proposed Gaskin Conjoint Survey's Instructions Are Likely to Introduce Cognitive Dissonance and Would Likely Inflate the Estimate of the "Class and Campus Format" Attribute

64.    The Proposed Gaskin Conjoint Survey will ask respondents to make the following assumptions: (1) they have applied and been accepted to all five of the presented universities; (2) they are currently, actively considering enrolling as an undergraduate; (3) every presented attribute level shown for each university profile is true, "even if [respondents] know or think otherwise"; (4) universities "do not vary on any features other than the features that are shown to vary"; and (5) respondents are making choices "prior to the Covid-19 pandemic, **so it should not be a factor in [their] decisions**"" (emphasis added).[103,104] Additionally, the Proposed Gaskin Conjoint Survey will ask respondents to make choices based on the "Class and Campus Format" attribute, which indicates "whether classes are conducted online or in person at the university's campus," and "whether or not students have physical access to the university campus, its facilities, and the accompanying campus experience."[105]

65.    The conjoint literature warns that "survey experimental designs need to be carefully crafted to motivate respondents to seriously engage with hypothetical choice tasks to mimic the

---

[103]    Gaskin Declaration, ¶ 24.

[104]    After selecting a university profile in each choice task, respondents will be presented with the second and fifth assumptions again when they are asked to respond: "Given your knowledge of universities, would you or would you not **actually be willing to enroll at the university that you chose above with the tuition indicated?** As a reminder, please assume you are actually considering enrolling as an undergraduate at a college or university, and you are making your university choices prior to the COVID-19 pandemic, so it should not be a factor in your decisions" (emphasis in original). Gaskin Declaration, ¶ 48.

[105]    Gaskin Declaration, pp. 22-23.

incentives that they face when making the same choices in the real world,"[106] and that non-realistic scenarios and assumptions "can have an adverse effect on […] any resulting predictions,"[107] as respondents may answer survey questions "with whatever seemingly relevant information is immediately accessible, including information that may have been primed in earlier parts of the survey."[108]

66.     The assumptions of the Proposed Gaskin Conjoint Survey fail to motivate serious engagement from respondents, as virtually none will face a decision-making context that resembles their real-world university decision-making in at least five ways detailed below. As a result, these assumptions introduce demand artifacts and prime respondents to artificially focus on the "Class and Campus Format" attribute.

67.     First, the specific definition used by Mr. Gaskin for the "Class and Campus Format" attribute will introduce confusion among respondents and further emphasize the unrealistic choices respondents are asked to make. Mr. Gaskin defines the "Class and Campus Format" as indicating "whether classes are conducted online or in person at the university's campus" and "whether or not students have physical access to the university campus, its facilities, and the accompanying campus experience."[109] However, Mr. Gaskin states, "When classes are offered in person, students may have the option to (but not be required to) take them online instead."[110] Therefore, this attribute will ask respondents to choose between remote instruction, or in-person instruction when

---

[106]  Jens Hainmueller, Dominik Hangartner, and Teppei Yamamoto, "Validating Vignette and Conjoint Survey Experiments Against Real-World Behavior," *Proceedings of the National Academy of Sciences*, Vol. 112, No. 8, 2015, pp. 2395-2400, p. 2400 ("Taken together, our findings suggest, to maximize external validity about real-world causal effects, that survey samples need to be carefully chosen to match the target population and that survey experimental designs need to be carefully crafted to motivate respondents to seriously engage with hypothetical choice tasks to mimic the incentives that they face when making the same choices in the real world. The results indicate that merely matching the appearance of decision tasks is insufficient; the effect of better survey engagement seems to eclipse the impact of superficial similarity in questionnaires."). See also Bryan K. Orme, *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020, p. 131 ("Despite its popularity as a method of marketing research, standard CBC has many limitations: Product concepts in many conjoint surveys are not close to the respondent's ideal. This can create the perception that the interview is not focused or relevant to the respondent.").

[107]  Joel H. Steckel, Wayne S. DeSarbo, and Vijay Mahajan, "On the Creation of Acceptable Conjoint Analysis of Experimental Designs," *Decision Sciences*, Vol. 22, No. 2, 1991, pp. 435-442, p. 435.

[108]  Michael Parkin, "Priming," *Encyclopedia of Survey Research Methods*, Vol. 2, edited by Lavrakas, Sage Publications, Inc., 2008, p. 612.

[109]  Gaskin Declaration, p. 22.

[110]  Gaskin Declaration, p. 22.

students also have the option to take those classes remotely. This definition of the "Class and Campus Format" attribute introduces artificial flexibility that did not exist in the Spring of 2020, leading to unrealistic choices and unreliable estimates of respondents' willingness to pay for this attribute.

68.     Second, respondents will be asked to assume they have applied and been accepted to all five of the selected universities by Mr. Gaskin, ignoring actual experiences. This assumption will not reflect a realistic scenario for many if not most respondents. As discussed in **Section VII.A**, the target population includes individuals that merely *applied* to one of these schools—but were not necessarily accepted,[111] and these universities are five of the top 100 most selective universities in the U.S.,[112] each with undergraduate admission rates between 4% (Columbia University) and 10.9% (Boston University).[113] It would also be unrealistic for many respondents to have applied to all five schools, because these five schools would not be considered comparable for all respondents. For example, students admitted to one of NYU's dance programs would be unlikely to consider Boston University, which does not have a dance major (only a minor), as a comparable school.[114] Named Plaintiff is such an example, as they did not consider any of Mr. Gaskin's "competitor" schools and instead only considered schools with arts-focused curricula.[115] Similarly, a prospective student interested in majoring in Film and Television at NYU's Tisch School of the Arts is unlikely to view Cornell University, where film studies is offered only as a minor, as a comparable school,[116] and a student who wants to become a special education teacher

---

[111]   Gaskin Declaration, ¶ 35.

[112]   See U.S. News, "Top 100 - Lowest Acceptance Rates," www.usnews.com/best-colleges/rankings/lowest-acceptance-rate.

[113]   See IvyWise, "Class of 2028 Admission Rates," June 17, 2024, www.ivywise.com/blog/college-admission-rates/.

[114]   See New York University, "Arts & Media," www.nyu.edu/admissions/undergraduate-admissions/majors-and-programs/arts-and-media.html; Boston University, "Majors by School and College," www.bu.edu/admissions/why-bu/academics/majors/; Boston University, "Dance Minor," www.bu.edu/cfa/academics/degrees-programs/dance/.

[115]   Hall-Landers Deposition, Vol.1, pp. 54-55.

[116]   See New York University, "Arts & Media," www.nyu.edu/admissions/undergraduate-admissions/majors-and-programs/arts-and-media.html; Cornell University, "Film," www.as.cornell.edu/major_minor_gradfield/film.

may not find the B.S. in Childhood Special Education at NYU comparable with the more general Education Studies major offered at Columbia University (within Barnard College).[117]

69.    Even if respondents had applied to NYU, the large majority (between 80% and 91%, for example, based on NYU admission rates between 2018 and 2023) would be expected to have received a rejection from NYU. Reminding them of that experience, or simply asking them to assume something they know not to be true, may result in some degree of cognitive dissonance that reduces their engagement with the survey, ultimately biasing their responses.

70.    Third, respondents will be asked to assume that universities "do not vary on any features other than the features that are shown,"[118] which asks them to ignore the multiple and varied qualities of the universities they considered in their real-world enrollment decisions, and instead focus on Mr. Gaskin's chosen set of seven attributes. By drawing respondents' attention to these features, respondents are likely to suffer from focusing bias, and answer questions in ways that do not reflect their real-world behavior. [119]

71.    Fourth, I expect that the assumptions that (i) "[e]ach of the features shown about each university is true, even if you know or think otherwise, including the cost of tuition" and (ii) "the universities do not vary on any features other than the features that are shown to vary in the exercise"[120] will confuse respondents, often by creating non-sensical and unrealistic scenarios. For example, are respondents supposed to assume that the athletics departments and extracurricular activities in two universities are the same, even if a respondent knows otherwise? Are respondents supposed to assume that Columbia University is a top 30-50 school in the U.S., even if a respondent knows otherwise? Is the quality of instruction assumed to be the same across universities, or the same within a certain *U.S. News & World Report* ranking, or the same for university profiles with the same certain student-faculty ratio? Are the majors and degree programs offered at all schools

---

[117]   New York University, "Childhood Education and Childhood Special Education," www.steinhardt.nyu.edu/degree/bs-childhood-and-special-education-grades-1-6; Columbia University, "Majors, Minors, and Special Programs," www.college.columbia.edu/academics/programs; Columbia University, "Requirements for the Education Studies Major," www.bulletin.columbia.edu/columbia-college/departments-instruction/education/#requirementstextrequirementstext.

[118]   Gaskin Declaration, ¶ 24.

[119]   David A. Schkade and Daniel Kahneman, "Does Living in California Make People Happy? A Focusing Illusion in Judgements of Life Satisfaction," *Psychological Science*, Vol. 9, No. 5, 1998, pp. 340-346.

[120]   Gaskin Declaration, ¶ 24.

assumed to be the same? Respondents are likely to resolve this confusion by narrowly relying on the attributes included in the survey and therefore artificially focus on the "Class and Campus Format" attribute.

72.     Finally, the Proposed Gaskin Conjoint Survey instructs respondents that "[y]ou are making your university choices prior to the COVID-19 pandemic, so it should not be a factor in your decisions" and reminds them of this instruction in each of the 12 choice tasks' follow-up questions.[121] This assumption creates a demand artifact by explicitly instructing respondents to disregard their personal, real-world decision-making around Covid-19 and its impact on their hypothetical university enrollment decisions. In addition, this assumption can prime respondents to recall any associations they have between the Covid-19 pandemic and remote environments for school or work.[122] This assumption also signals to respondents that remote education is less desirable in the survey's hypothetical scenario where Covid-19 has been excluded as a potential material consideration. Therefore, by instructing respondents to try to remove Covid-19 from their decision-making, the survey is likely to further lower any associated valuation of the "Classes held online; no access to campus or facilities" attribute level, artificially inflating any estimate of the "Class and Campus Format" attribute. Finally, by asking respondents to ignore their real-life experiences associated with the Covid-19 pandemic, this assumption may prime them to assume a lower willingness to pay for remote programs, as some or many of these respondents may have preferred to continue with their education remotely in the event of the Covid-19 pandemic (but not if they are instructed to ignore it), as did many NYU students in the Fall of 2020, when both options were available.

---

[121]    Gaskin Declaration, ¶¶ 24, 48.

[122]    E. Tory Higgins, William S. Rholes, and Carl R. Jones, "Category Accessibility and Impression Formation," *Journal of Experimental Social Psychology*, Vol. 13, No. 2, 1977, pp. 141-154, p. 143 ("Exposure to a trait term should activate its trait category meaning, and this meaning will then 'prime,' or further activate, closely associated trait categories […] In fact, verbal exposure may affect subjects' responses to the stimulus even when subjects cannot recall any of the priming words.").

**C.    The Proposed Gaskin Conjoint Survey's Attributes Will Ask Respondents to Make Uninformative Trade-offs Among the Four Distractor Attributes, Which Is Likely to Further Inflate Any Value Associated with the "Class and Campus Format" Attribute**

73.    Mr. Gaskin selects four distractor attributes in the Proposed Gaskin Conjoint Survey, which he claims "would be recognizable to a common audience and would simulate an undergraduate education choice experience":[123]

1.  The "Best National University Ranking" attribute describes the university as a top-10, top 11-20, top 21-30, or top 31-50 university in the U.S., per *U.S. News & World Report*;

2.   The "Student Faculty Ratio" attribute can take the values 14:1, 12:1, 10:1, 8:1, or 6:1;

3.  The "4-Year Graduation Rate" attribute can take the values 75%, 80%, 85%, or 90%;

4.  The "Ethnic Diversity Index" attribute can take the values .65, .7, .75, or .8.[124]

74.    Although Mr. Gaskin claims that these distractor attributes "help disguise our chief interest in respondents' reactions…to the Class and Campus Format attribute,"[125] these attributes are significantly different from the "Class and Campus Format" attribute in two ways detailed below. I expect these differences to bias the estimates of the willingness to pay for campus access to NYU during the Covid-19 pandemic upward, rendering the Proposed Gaskin Conjoint Survey and Mr. Weir's damages calculation unreliable.

75.    First, each of the four distractor attributes describe summary statistics about the university *overall or in aggregate*—i.e., where does it rank nationally *overall*, what is its *average* student-faculty ratio, what is its *aggregate* 4-year graduation rate and *aggregate* ethnic diversity index score—which may or may not be informative to the real-world decision-making of many prospective students. If that's the case, only the key "Class and Campus Format" attribute will

---

[123]    Gaskin Declaration, ¶ 30.

[124]    Gaskin Declaration, ¶ 46.

[125]    Gaskin Declaration, ¶ 27.

stand out as a source of meaningful variation for the situation of *actually enrolling in and attending the university*, which is what respondents will be asked to imagine.[126]

76.      For example, a prospective student interested in pursuing a biology degree may be more interested in the specific ranking of the university's biology department or research output than the university's overall national ranking. A student interested in pre-med may be more interested in understanding 4-year graduation rates and medical school placement rates for pre-med students than the university's aggregate 4-year graduation rate. A student planning to study French and comparative literature may be more interested in the specific size of those departments' student cohorts, specific coursework, and student-faculty ratio than the university's average student-faculty ratio. In response to facing attributes that may be uninformative to their imagined university experience or attributes without meaningful variation for the day-to-day experience of attending a university, respondents are likely to focus on the attributes where meaningful variation exists, which is distinctly found in the "Class and Campus Format" attribute.

77.      Second, while the "Class and Campus Format" attribute offers three levels of campus access and class instruction type—remote with no campus access, remote with campus access, and in-person instruction with campus access—the four distractor attributes are each sliding scales of rankings, indices, or ratios, which is also likely to bias survey responses. The two Northeastern University profiles excerpted from the example choice task in the Gaskin Declaration, shown in **Figure 3**, illustrate this phenomenon.

---

[126]   Respondents will be presented with the instruction "As a reminder, please assume you are actually considering enrolling as an undergraduate at a college or university" prior to selecting a university profile in each of the 12 choice tasks. Gaskin Declaration, ¶ 48.

**Figure 3**
**Adjacent Northeastern University Profiles in the Proposed Gaskin Conjoint Survey[127]**

| | Northeastern University | Northeastern University |
|---|---|---|
| **University** | | |
| **Best National University Ranking** | Ranked in the top 10 Top Universities in the US according to the U.S. News and World Report | Ranked in the top 21-30 Top Universities in the US according to the U.S. News and World Report |
| **Student-Faculty Ratio** | 12:1 student-faculty ratio | 10:1 student-faculty ratio |
| **4-Year Graduation Rate** | 90% Graduation Rate | 80% Graduation Rate |
| **Ethnic Diversity Index** | The Ethnic Diversity Index is a .75 out of 1 | The Ethnic Diversity Index is a .7 out of 1 |
| **Class and Campus Format** | Classes are offered in person; have access to campus and facilities | Classes held online; no access to campus or facilities |
| **Tuition per Semester** | $25,000 | $26,250 |
| | Select | Select |

78.    While respondents may not be able to readily interpret, for example, what the difference between a 12:1 and a 10:1 overall average student-faculty ratio would mean for the undergraduate program they are being asked to state their preferences for, or what the difference between a .7 and a .75 Ethnic Diversity Index score means, respondents are much more likely to be able to imagine the competing scenarios on offer in the "Class and Campus Format" attribute: that is, whether the coursework is in-person on campus or remotely. As such, respondents are expected to focus in on the "Class and Campus Format" attribute, and the Proposed Gaskin Conjoint Survey is likely to find an overstated willingness to pay for the "Class and Campus Format" attribute as a result.

---

[127]    Gaskin Declaration, p. 7.

## VIII.  MR. WEIR'S PROPOSED ESTIMATION OF AN "OVERPAYMENT" RELIES ON INVALID ASSUMPTIONS AND UNPLAUSIBLE MEASURES OF WILLINGNESS TO PAY FROM THE PROPOSED GASKIN CONJOINT SURVEY

79.     Mr. Weir's proposed estimation of an "overpayment calculation" relies on the estimates of the Proposed Gaskin Conjoint Survey. However, as explained in **Sections IV-VII** and summarized below, the Proposed Gaskin Conjoint Survey suffers from many flaws and will provide unreliable and inflated results. As a result, Mr. Weir's estimation of purported damages[128] will also be unreliable and inflated.[129]

80.     First, as discussed in **Section IV** and **Section V**, any conclusions about an "overpayment for University Tuition" and damages stemming from the Proposed Gaskin Conjoint Survey and Mr. Weir's damages estimation will contradict real-world outcomes. Real-world tuition data shows that tuition prices for NYU remote education, both before, during, and after the Spring of 2020, were the same as for in-person education.[130] In addition, enrollment data and acceptance rates contradict Mr. Weir's assertion that, in the absence of a lower but-for price, "the economic outcome would be that many or all of the students would not have enrolled at all."[131]

81.     Second, as I explained in **Section VI**, the data generated by the Proposed Gaskin Conjoint survey would, at most and if properly designed, measure changes in students' individualized willingness to pay for an NYU education and would not reflect any changes in tuition prices. Neither Mr. Gaskin nor Mr. Weir have shown that these changes would be sufficient to affect tuition prices. In fact, given the competitive nature of the university enrollment, resulting in excess demand for education at NYU, and the limited enrollment offered at this university, any

---

[128]   See Weir Declaration, ¶¶ 41-45.

[129]   See also Tomlin Declaration, ¶ 8. Jonathan T. Tomlin has also submitted an Expert Declaration conducting an "economic analysis of the Declarations of Mr. Gaskin and Mr. Weir," which concluded that "Mr. Gaskin's and Mr. Weir's proposed methodology cannot reliably determine damages[.]"

[130]   Shirky Declaration, ¶ 10; New York University, "NYU Registration and Service Fees," NYU_Hall-Landers_00009374. See also Shirky Deposition, pp. 126 ("[A]re you familiar with any difference in tuition between an online program or an in-person program? A. We, New York University, has online and in-person tuitions are set through the same process. There can be some variance by school, but within school, there's not variance by degrees, if that makes sense[.]"); Bonano Declaration, ¶ 10.

[131]   Weir Declaration, ¶ 6.

*CONFIDENTIAL*

alleged reduction in willingness to pay for NYU education would be expected to result in no changes in tuition prices.

82.     Finally, as I discussed in **Section VII**, the Proposed Gaskin Conjoint Survey suffers from serious design flaws that will likely artificially inflate the willingness to pay and implied fair market value of NYU campus access during the Covid-19 pandemic, and render the results biased and unreliable.

Signed on September 18, 2024.

Rebecca Kirk Fair

*CONFIDENTIAL*

**APPENDIX A**

**CV & EXPERT TESTIMONY**

*CONFIDENTIAL*

# REBECCA KIRK FAIR
**Managing Principal**

Phone: 617 425 8256                                                                111 Huntington Avenue
Fax: 617 425 8001                                                                            14th Floor
rebecca.kirkfair@analysisgroup.com                                          Boston, MA 02199

Ms. Kirk Fair has extensive experience leading the development of economic and market analyses, assessing class certification and damages, evaluating consumer behavior, and testifying in a wide range of matters in the US, Canada, and Europe. She has been deeply involved in merger investigations and major antitrust litigation, as well as intellectual property (IP), false advertising, and tax matters. She also is a founder of the Analysis Group's Surveys & Experimental Studies practice.

Ms. Kirk Fair specializes in evaluating competition and substitution patterns to examine potential competitive effects in mergers and "but-for" outcomes in antitrust litigation. She has significant analytical and testifying experience in cartel matters, notably in a number of prominent cases in the technology, consumer products, and financial services industries. She also has evaluated competition, pricing, and outputs in connection with merger investigations in the US, Canada, and the EU. In addition to having served as a compliance monitor for several years, she has supported the US Department of Justice (DOJ), the Federal Trade Commission (FTC), and the Canadian Competition Bureau (CCB) in a variety of merger investigations.

Ms. Kirk Fair also has particular expertise in the development, administration, and analysis of consumer surveys for use in antitrust, false advertising, and IP matters, as well as merger reviews and strategy cases. She has testified in arbitration, deposition, and trial in matters involving the design and implementation of consumer surveys, as well as the evaluation of opposing parties' surveys and of statistical sampling and analyses. Her work has been used to support and critique damages models and to provide insights into the role of consumer choice in market definition.

Ms. Kirk Fair serves as a Vice-Chair to the American Bar Association (ABA) Antitrust Law Section's Pricing Conduct Committee. She has received numerous awards for her accomplishments, including the W@ "40 in Their 40s: Notable Women Competition Professionals" and the Concurrences Antitrust Writing Award for her coauthored article "The Tyranny of Market Shares: Incorporating Survey-Based Evidence into Merger Analysis" (*Corporate Disputes*).

## EDUCATION

M.B.A.          MIT Sloan School of Management, Cambridge, MA

B.A.             Economics (with honors), Middlebury College, Middlebury, VT

## SELECTED EXPERT TESTIMONY

- **▪ *Maximilian Klein, et al. Meta Platforms, Inc.***
  *US District Court, Northern District of California, San Francisco Division*
  Expert rebuttal witness on behalf of Meta Platforms in a class action matter related to the collection and/or use of personal data. Submitted an expert rebuttal report evaluating survey design of Plaintiff's expert. Testified at deposition.

- ***Jenale Nielsen v. Walt Disney Parks and Resorts U.S., Inc.***
  *US District Court, Central District of California*
  Expert witness on behalf of Disney in a breach of contract class action litigation. Submitted an expert rebuttal report in response to the damages assessment conducted by the plaintiff's expert. Testified at deposition.

- ***In the Matter of Intuit, Inc.***
  *Before the FTC*
  Expert witness on behalf of Intuit in an administrative proceeding before the FTC. Conducted a materiality survey and submitted an expert report on consumer choices for online tax preparation support. Testified at deposition and trial.

- ***Earl L. McClure, et al. v. State Farm Life Insurance Company***
  *US District Court, District of Arizona*
  Expert witness on behalf of State Farm Life in a class action matter related to consumer decision making when purchasing life insurance. Submitted an expert report and testified at deposition.

- ***District of Columbia v. Maplebear, Inc. d/b/a Instacart***
  *Superior Court of the District of Columbia – Civil Division*
  Expert witness on behalf of Instacart. Submitted an expert rebuttal report analyzing consumer behavior following interface design changes and the materiality of the at-issue fees. Testified at deposition.

- ***Pegasystems Inc. v. Appian Corporation and Business Process Management, Inc.***
  *US District Court, District of Massachusetts*
  Expert witness on behalf of Pegasystems. Assessed disgorgement damages resulting from false advertising claims. Submitted an expert rebuttal report in response to counterclaims of Appian. Testified at deposition.

- ***Gettys Bryant Millwood, et al. v. State Farm Life Insurance Company***
  *US District Court, District of South Carolina, Spartanburg Division*
  Expert witness on behalf of State Farm Life in class action breach of contract litigation. Submitted expert report describing and assessing the ways in which consumers evaluate information and make decisions to purchase life insurance policies. Testified at deposition.

- ***Eric Fishon, et al. v. Peloton Interactive, Inc.***
  *US District Court, Southern District of New York*
  Expert witness on behalf of Peloton. Conducted consumer perception and materiality surveys and submitted an expert report analyzing survey results and evaluating the survey design of the plaintiff's expert. Testified at deposition.

- ***Jennifer Hasemann and Debbie Hoth v. Gerber Products Company***
  *US District Court, Eastern District of New York*
  Expert rebuttal witness on behalf of Gerber. Submitted an expert rebuttal report in response to the survey conducted by the plaintiff's expert, addressing the survey's theoretical framework and design. Testified at deposition.

- ***Kieran O'Hara et al. v. Diageo-Guinness UAS Inc. et al.***
  *United States District Court District of Massachusetts*
  Expert witness on behalf of Diageo. Conducted a purchase intent survey and submitted an expert report analyzing the survey results and the heterogeneity in consumer beer purchasing decisions. Testified at deposition.

- ***Bond v. Berkshire Bank, et al.***
  *US District Court, District of Massachusetts, Western Division*
  Expert witness on behalf of Berkshire Bank. Conducted a survey and testified at deposition on banking consumers' purchase decisions and heterogeneity in consumer banking behaviors, specifically with regard to overdraft services. Testified at deposition.

- ***YETI Coolers, LLC., v. RTIC Coolers, LLC***
  *US District Court, Western District of Texas*
  Testified at deposition on an experiment designed to evaluate the likelihood of confusion in the high-end cooler market. Testified at deposition.

- ***PersonalWeb Technologies LLC and Level 3 Communications, LLC. v. International Business Machines Corporation***
  *US District Court, Northern District of California*
  Expert witness on behalf of IBM in a patent infringement case. Conducted an online survey of IT professionals and analyzed the survey results in an affirmative report. Testified at deposition.

- ***United States of America and the States of California, Illinois, North Carolina, and Ohio v. DISH Network, LLC***
  *US District Court, Central District of Illinois*
  Expert witness on behalf of Dish. Submitted an expert report evaluating the sampling methodology and statistical analysis put forth by the plaintiffs' expert witness. Testified at deposition and at trial.

- ***Sterling Jewelers Inc. v. Artistry Ltd.***
  *US District Court, Northern District of Ohio, Eastern Division*
  Expert witness on behalf of Sterling Jewelers in a trademark infringement case. Assessed whether Artistry Ltd. suffered damages and determined whether Sterling had been enriched by the alleged infringement in an affirmative report. Testified at deposition.

## SELECTED CONSULTING EXPERIENCE

**Antitrust Litigation**

- **Damages litigation in the gig-worker/delivery platform industry**
  Assisted in economic analyses assessing the impact of allegedly misleading conduct on consumer and gig-worker behavior. Supported analyses of driver transaction data and consumer tipping patterns in connection with a government investigation. Developed damages models related to consumer tipping behavior. Filed a rebuttal report related to a consumer survey.

- **Google litigations in various forums**
  Supported economic experts in qualitative analyses and industry research to evaluate competition and data privacy in the search engine market. Supported an economic expert in the evaluation of market definition and market power in the digital content transaction market. Supported an economic expert in the assessment of competition within evolution of the US advertising industry.

- ***Watson v. Bank of America Corporation***
  *Supreme Court of British Columbia*
  Provided consulting support to several banks in a class action brought by merchants in British Columbia alleging that they were forced to pay excessive interchange fees because of anticompetitive agreements between Visa, MasterCard, and various banks.

- **Large price-fixing cases in the airline travel industry**
  Worked with multiple airlines in a joint defense group to provide analytical support in litigation matters in which the plaintiffs claimed that the airlines conspired to limit domestic air travel capacity below competitive levels.

- ***In re: Transpacific Passenger Air Transportation Antitrust Litigation***
  *US District Court, Northern District of California*
  Assisted ANA and Japan Airlines International Co., in a class action in which ANA was accused of colluding with Japan Airlines to fix prices for flights and set fuel surcharges. Case settled favorably for the defendant.

- ***Dahl, et al. V. Kohlberg Kravis Roberts & Co., et al.***
  *US District Court, District of Massachusetts*
  Worked with the joint defense group in support of numerous experts on issues of class certification and damages for group and individual private equity firms in a matter involving allegations of collusion.

- **Large price-fixing cases in IT manufacturing industries**
  Assisted in quantitative analysis and industry research to evaluate competition, pricing, and outputs in connection with two separate international price-fixing investigations in IT manufacturing industries.

- **Large price-fixing cases in various sectors of the financial service industry**
  Assisted in quantitative analysis and market research to examine consistency of plaintiffs in multiple class certification matters.

- ***GO Computer v. Microsoft***
  *Superior Court of California, County of San Francisco*
  Supported Professor Catherine Tucker of the Massachusetts Institute of Technology in an analysis of competition among operating systems and computing platforms.

- **Microsoft litigations in various forums**
  Economic analysis on behalf of Microsoft in numerous competitor and consumer litigations on issues of competition, pricing, and damages. Supported survey design and research related to server

software. Developed and critiqued damages models related to computer security, software pricing, and product development.

## Class Certification Litigation

- ***Jeffrey Koenig v. Vizio, Inc.***
  *Superior Court of California, County of Los Angeles*
  Supported experts Tülin Erdem and Christopher Knittel in a consumer class action regarding the impact of Vizio Inc.'s marketing of the refresh rates of its televisions on consumer behavior. Case work included the evaluation of a conjoint survey conducted by the plaintiff's expert. Case settled favorably for the defendant.

- **State Farm Life Insurance litigation matters**
  Expert witness on behalf of State Farm Life in class action breach of contract litigations. Submitted expert reports describing and assessing the ways in which consumers evaluate information and make decisions to purchase life insurance policies.

- ***Elizabeth A. Bally v. State Farm Life Insurance Company***
  *US District Court, Northern District of California*
  Served as expert witness on behalf of State Farm in a class certification matter. Submitted an expert report describing and evaluating the ways in which consumers make decisions to purchase life insurance policies.

- ***Kenneth Hobbs, et al. v. Brother International Corporation, et al.***
  *US District Court, Central District of California*
  Supported marketing expert Joel Steckel in a consumer class action regarding alleged misrepresentations in the marketing and sale of multi-function printers.

- **Financial exchange cartel litigation**
  Supported multiple experts on issues of class certification, marketplace analyses, and damages models for the defendant in a matter alleging collusion related to a financial instrument exchange platform.

- **Air cargo litigations**
  Evaluated industry dynamics, transaction data, and damages exposure for several Air Cargo defendants, including an evaluation of impact of plea agreements. Marketplace analysis included comparison of pricing patterns in areas covered and excluded from plea agreements.

- **Antitrust litigation in the transportation sector**
  Case work included assisting with settlement negotiations and developing affirmative analyses in connection with ongoing class certification proceedings, on behalf of the defendants.

- **Auto parts litigation**
  Supported affirmative and rebuttal analyses for an indirect purchaser class action in an auto filters

cartel case. Analyzed wholesale and retail transaction data, evaluated pass-through, and calculated firm and product profitability.

▪ **Light cigarettes marketing litigations**
Worked with plaintiffs in class action lawsuits in California, Massachusetts, and Missouri filed against the makers of "light" cigarettes. Supported marketing expert Joel Steckel to conduct conjoint analyses of consumer preference of light tobacco and nicotine in connection with a damages analysis.

▪ **MasterCard litigations**
Assisted in economic analysis on behalf of MasterCard in government and consumer litigations, including several class actions in the US and Canada. Supported design and analysis of consumer survey regarding the use of various payment methods. Supported counsel in all phases of trial, including the development of direct testimony, trial demonstratives, and cross-examination questions.

**Intellectual Property and Commercial Litigation**

▪ **Major pandemic MAE litigation**
Supported industry expert Pat Moran to examine the appropriate "industry" definition to evaluate economic performance of a commercial payments company per a merger agreement in the context of a material adverse event merger dispute.

▪ ***MillerCoors, LLC v. Anheuser-Busch Companies, LLC***
*US District Court, Western District of Wisconsin*
Supported survey expert John Hauser in designing and implementing a survey in a false advertising litigation in which MillerCoors alleged that TV advertisements by Anheuser-Busch violated the Lanham Act.

▪ **Major yogurt trademark litigation**
Supported marketing expert Joel Steckel in a trademark litigation in which the plaintiff claimed that the defendant had infringed on their specific trademark with the use of its campaign. Assisted in the implementation and analysis of a forward confusion study and a reverse confusion study.

▪ ***TS Media, Inc., et al. v. Public Broadcasting Service***
*Superior Court, District of Columbia*
Supported expert Tülin Erdem in the determination of the importance of the PBS brand and the reputational harm that the network would likely suffer as a result of its association with Tavis Smiley's alleged actions.

▪ ***MBIA Insurance v. Credit Suisse Securities***
*Supreme Court of New York, New York County*
Supported expert Antoinette Schoar in a rebuttal report of Joseph Stiglitz, evaluating the relationship between economic and contractual incentives in mortgage-backed securities. Supported expert Arnold Barnett in a rebuttal report evaluating the statistical relationship among a sample of loans on prediction of overall loan performance.

- **Front-Loading Washers litigations**
  *Multiple jurisdictions*
  Supported conjoint study and economic analysis in support of multiple damages analyses in product defect litigations against several manufacturers of front-loading washing machines.

- ***Burst.com v. Microsoft Corp.***
  *US District Court, District of Maryland*
  Assisted in an analysis of both patent and trade secrets damages and antitrust damages in a case involving software used for streaming media. Responded to the plaintiff's claim of lost profits damages and unjust enrichment arising from the misappropriation of trade secrets.

**Merger Analyses**

- **Meta acquisition of Within**
  Supported counsel and Meta in the FTC's antitrust review of Meta's acquisition of Within. Supported an industry expert in the evaluation of the digital applications industry.

- **LANXESS acquisition of Emerald Kalama Chemical**
  Supported economic analyses and antitrust review in Lanxess global acquisition of Emerald Kalama Chemical. Both companies are manufacturers of specialty chemicals. The transaction was approved in all jurisdictions.

- **AbbVie Inc. acquisition of Allergan PLC**
  Supported AbbVie in its acquisition of Allergan, as well as securing clearance for two distinct divestiture transactions of Allergan assets to Nestlé and AstraZeneca, by providing economic analyses to evaluate potential concerns that the transaction would stifle competition and increase prices. The client obtained unconditional clearance from the FTC.

- **PSAV acquisition of Encore Event Technologies**
  Supported Blackstone Capital Partners and its portfolio company, PSAV, in the acquisition of Encore Event Technologies by providing economic analysis to assess the competitive effects of the merger. The client obtained unconditional clearance from the FTC.

- **Merger of Chewy Inc. and PetSmart**
  Supported expert Edward Snyder in analyzing the potential competitive effects of the merger between Chewy, an online pet supply company, and PetSmart, a retail pet supply and services company. The client obtained unconditional clearance from the FTC.

- **WEX acquisition of EFS**
  Supported both parties through the second request and the FTC's inquiry into the potential unilateral and coordinated effects of the merger of two of the country's largest fleet card companies. The transaction was consummated.

- **Zimmer's acquisition of Biomet**
  Supported Biomet in its second request compliance and an analysis of product comparability, substitution rates, and customer loyalty using transaction and market data.

- **Archipelago/NYSE Merger**
  Supported Professor Robert Pindyck of the Massachusetts Institute of Technology in his economic analysis on behalf of the parties, related to ease of entry, order internalization, and technological advancements. The transaction was consummated.

- **Cintas Corporation acquisition of G&K Services**
  Supported both parties through the second request phase of the FTC merger review process to evaluate the potential competitive effects of the acquisition. The transaction was consummated with no remedies or divestitures.

- **Discovery Communications acquisition of Scripps Networks**
  Supported Scripps Networks in its acquisition by Discovery Communications to evaluate potential competitive concerns in negotiations with multichannel video programming distributors (MVPDs) for bundled programming. The transaction was consummated with no remedies or divestitures.

## Survey-Related Litigation

- ***Lucent v. Amazon, et al.***
  *US District Court, Eastern District of Texas*
  Supported John Hauser in the design, implementation, and analysis of a survey to demonstrate that patented technologies provided substantial value to online retailers.

- **Commercial litigation and damages case in the online retail industry**
  Assisted in the assessment of the impact on consumer purchase behavior and price recall of allegedly misleading measures, including advertising language, in a commercial litigation and damages case. Supported field experiments, lab experiments, and analysis to assess consumer interpretation of comparison pricing language.

- ***State of Washington v. Comcast Corporation***
  *Superior Court of Washington, King County*
  Supported marketing expert John Hauser in a consumer class action in which Comcast was accused of violating the Consumer Protection Act.

- **Antitrust and intellectual property litigations on behalf of Microsoft**
  Assisted Microsoft in various IP and antitrust matters in the assessment of the impact on consumer behavior, product adoptions, and functionality usage. Matters involved desktop media, browser, office productivity, and security software, as well as server software. Supported lab experiments, qualitative interviews, and web-scraping studies to assess consumer behavior and usage amongst end-customers and IT professionals.

- **Trademark infringement matter of athletic apparel company**
  Supported marketing expert Joel Steckel in a trademark infringement case in which an athletic apparel company claimed that a sports drink maker infringed on its trademark and diluted its brand.

▪ **Trademark infringement matter of a candy company**
Supported marketing expert Joel Steckel in a trademark infringement case in front of the TTAB in which a candy company was trying to bar entry of a foreign competitor that had infringed on its trademark and may have diluted its brand.

▪ **Trademark infringement matter between two apparel companies**
Supported marketing expert Joel Steckel in designing and implementing a reverse confusion survey in a trademark infringement case in which an apparel company claimed that an athletic company infringed on its design mark.

▪ ***American Express v. Visa and MasterCard* and related litigation**
Supported marketing expert John Hauser in rebutting an opposing expert's survey by showing that small methodological improvements to the original survey led to substantial differences in results, in a case involving credit card payment procedures.

▪ ***Fox Broadcasting Company, et al. v. DISH Network LLC, et al.***
*US District Court, Central District of California*
Supported marketing expert John Hauser in designing and implementing two surveys pertaining to use of television services, as well as in analyzing an array of industry data. After more than two years of litigation, a California federal judge found that Analysis Group client DISH's Hopper DVR does not infringe Fox's copyrights.

▪ **Trademark infringement matter in the food industry**
Supported marketing expert Joel Steckel in designing a forward confusion and two reverse confusion surveys and implementing the forward confusion survey in a trademark infringement case in which an author / speaker claimed that the title of his book was inappropriately used in a TV commercial of a packaged food product.

▪ **Confusion matter in the entertainment industry**
Supported marketing expert Joel Steckel in a trademark infringement case in which a TV company used a name for its show (and a company featured in the show) that was similar to the name of an existing company; assisted with design of forward and reverse confusion surveys.

**Transfer Pricing Litigation**

▪ **Confidential hard disk drive (HDD) manufacturer**
Supported experts in the examination of an HDD maker's Asian manufacturing arm to assess evidence of its contributions to overall revenue and profit of the firm.

▪ ***Glaxo Americas, et al. v. Internal Revenue Service***
*US Tax Court*
Supported expert in econometric analysis and evaluation of pharmaceutical marketing in the pharmaceutical industry. Case settled.

- ***AstraZeneca, et al. v. Her Majesty's Revenue and Customs***
  *US Tax Court*
  Supported consulting expert team on pharmaceutical valuation and licensing issues. Case settled.

## SELECTED PRESENTATIONS AND SPEAKING ENGAGEMENTS

"Price Gouging, Global Markets, and Uncertainty," American Bar Association (ABA) Pricing Conduct Committee panel (May 2, 2022)

"Platform Economics and Unilateral Conduct Cases," USC Marshall School of Business (April 26, 2022)

"The Economics of Consumer Class Actions in Food Products," UCLA Law School (April 25, 2022)

"2020 Vision: Post-Pandemic Merger Review," ABA Virtual Spring Meeting (March 24, 2021)

"The Future of Economics in Antitrust," ABA Virtual Fall Forum (November 12, 2020)

"Are You Down with APP (Algorithmic Pricing)," ABA Pricing Conduct Committee/Cartel Committee Panel (November 3, 2020)

"Market Research Methods in Litigation," Consumer Class Action CLE webinar (May 19, 2020)

"Fighting Unconscious Bias in the Quest for Authentic Leadership," 2019 MIT Sloan Global Women's Conference (October 3, 2019)

"Fall 2018 iLead Speaker Series: Analysis Group," MIT Sloan School of Management and the MIT Leadership Center (September 7, 2018)

"Antitrust in the Amazon World," ABA webinar (May 31, 2018)

"Practical Issues in Counseling at the Intersection of IP and Antitrust," New York State Bar Association Antitrust Law Section Meeting (January 25, 2018)

"Legal Challenges to State Laws Prohibiting Surcharges on Credit Card Transactions: Implications for the Industry," ABA (July 14, 2016)

"The Use of Survey Evidence in Class Litigation," California Bar Association (May 25, 2016)

"The Next Frontiers: Social Media and Other Cutting Edge Issues in Advertising and Marketing," Canadian Bar Association Competition Law Fall Conference (October 2, 2015)

"Is False Advertising Anticompetitive," ABA Antitrust Section Spring Meeting, Washington DC (April 17, 2015)

"Antitrust Enforcement and the Bazaarvoice Case," New York State Bar Association Antitrust Law Section panel (May 21, 2014)

"Branding & Brands in Law, Accounting & Marketing," The Kenan Institute, University of North Carolina (April 12, 2012)

"Reverse Payments – Balancing IP and Antitrust Concerns," Boston Bar Association (May 20, 2009)

Discussion and guided case study analysis on strategic planning and financial analysis with an emphasis on the use of historical financial data in monitoring a public company, DirectWomen Board Institute (February 22, 2008)

"Survey Analysis Report," First Annual Business Technology Outlook, North Dallas Chamber of Commerce (October 24, 2007)

"Patent Holding Company Panel," Streaming Media East Show, New York City (May 15, 2007)

"Innovative Application of Economic Methods," Analysis Group seminar on patent damages (March 2007)

"Data & Discovery – The Economist's Perspective," Analysis Group seminar (May 10, 2005)

**PUBLICATIONS**

"Non-Price Effects of Mergers," with Emily Cotton and Philipp Tillmann, *Competition Policy International Antitrust Chronicle*, (January 2024)

 "Choice Experiments: Reducing Complexity and Measuring Behavior Rather than Perception," with Joel H. Steckel, K. Shampanier and A. Cai, *The Cambridge Handbook of Marketing and the Law*, edited by Jacob E. Gersen and Cambridge University Press, Cambridge, 2023, pp. 207–220. Cambridge Law Handbooks.

"Recent Cases on 'Green' Messaging in Food and Beverage Company Advertising," with Rene Befurt, Anne Cai, and Helene Rowland, *Top Food and Drug Cases, 2022, & Cases to Watch, 2023*, ed. August T. Horvath (June 2023)

"Reading (New and Old) Tea Leaves: U.S. Agencies' Request for Information May Give Insights into the Future of Merger Review," with Cecilia Caliandro and Aaron Yeater, Antitrust Report (June 2022)

"Moore v. Trader Joe's Co.," with Genna Liu and Rene Befurt, *Top Food and Drug Cases, 2021, & Cases to Watch, 2022*, ed. August T. Horvath (June 2022)

"Economic Evidence and Modern Antitrust," with Emily Cotton and Philipp Tillmann, *Competition Policy International Antitrust Chronicle* (March 2021)

"Survey Says: Tips on Getting Over the Daubert Hurdle," with Peter Hess and Vendela Fehrm, *Law Journal Newsletters: The Intellectual Property Strategist* (July 2020)

"Why Does the Consumer Welfare Standard Work? Matching Methods to Markets," with James Bernard and D. Daniel Sokol, *Competition Policy International Antitrust Chronicle* (November 2019)

"Hilsley v. Ocean Spray Cranberries, Inc.," with Rene Befurt, *Top Food and Drug Cases, 2018 & Cases to Watch, 2019*, ed. August T. Horvath (May 2019)

"United States – E-commerce Economics: Market Power and Enforcement in Vertical Markets," with Nikita Piankov and Emmanuel Frot, chapter in *GCR Insights: E-Commerce Competition Enforcement Guide*, ed. Claire Jeffs (January 2019)

"The Ability to Achieve Lost Sales as a Consideration in Damages Analyses under Different Legal Frameworks," with Aaron Yeater, *American Bar Association Section of Intellectual Property Law, Landslide*, Vol. 11 No. 2 (November/December 2018)

"Trademark Confusion And The Confusing Eveready Survey," with Stephen Cacciola and Maggie Hadley, *Law360* (October 23, 2018)

"The Tyranny of Market Shares: Incorporating Survey-based Evidence into Merger Analysis," with Rene Befurt and Emily Cotton, *Corporate Disputes* (July–September 2018)

"Singleton v. Fifth Generation, Inc.," with August T. Horvath, chapter in *Top Food and Drug Cases, 2017, & Cases to Watch, 2018*, ed. August T. Horvath (May 2018)

"Avoiding bias: ensuring validity and admissibility of survey evidence in litigations," with Laura O'Laughlin, chapter in *Handbook of Marketing Analytics*, eds. Natalie Mizik and Dominique M. Hanssens (April 2018)

"How To Interpret A Contract? Ask Those Who'd Sign It," with Omri Ben-Shahar, Lior Strahilevitz, Duo Jiang, and Kristina Shampanier, *Law360* (March 21, 2018)

"Estimating Lost Sales Damages in Antitrust Cases: Can't Count on Success," with Aaron Yeater, *The Witness Chair*, Issue 71 (Winter 2018)

"The Ability to Achieve Lost Sales as a Consideration in Damages Analyses," with Aaron Yeater, chapter in *Lost Profits Damages: Principles, Methods, and Applications*, eds. Everett P. Harry, III and Jeffrey H. Kinrich (2017)

"Managing Multiple Expert Witnesses: Best Practices and Pitfalls," with Laura Comstock, Andrea Okie, and Carletta Wong, *American Bar Association Section of Litigation, The Woman Advocate* (August 17, 2017)

"Survey And Real-World Data: A Winning Combination," with Peter Simon, Kristina Shampanier, and Riddhima Sharma, *Law360* (July 14, 2017)

"What Consumers Really Think About Reference Price Labels," with Joel Steckel, Kristina Shampanier, Laura O'Laughlin, and Jesse Shea, *Law360* (March 21, 2017)

"Ensuring Validity and Admissibility of Consumer Surveys," with Laura O'Laughlin, *American Bar Association Section of Litigation Consumer Litigation Newsletter* (Winter 2017)

"Antitrust Enforcement in Two-Sided Markets," with Juliette Caminade, Federico Mantovanelli, and David Toniatti, *American Bar Association Section of Antitrust Law Economics Committee Newsletter* (Winter 2016)

"3 Questions to Ask When Using Surveys in Litigation," with Laura O'Laughlin, *Law360* (May 15, 2015)

*Is It Worth Anything? Using Surveys in Intellectual Property Cases*, with Joel Steckel and Rene Befurt, white paper (2013)

"Tools for Handling Mortgage-Based FCA Claims," with David Mishol, *Law360* (September 26, 2012)

"Digital Media Patents for Profit," with Dan Rayburn and Almudena Arcelus, *Streaming Media Magazine: Industry Sourcebook 2007*

## PROFESSIONAL AFFILIATIONS AND AWARDS

### Affiliations

American Bar Association (ABA)
- Section of Antitrust Law
  - Vice Chair of the Pricing Conduct Committee: 2020–Present

- Section of Intellectual Property Law

American Marketing Association (AMA)

Women's Competition Network (WCN)

LexisNexis
- *Antitrust Bulletin*
  - Editorial role: 2022–Present

**Awards**

Concurrences
- Antitrust Writing Awards: Business Articles, Economics (2019)
  - For "The Tyranny of Market Shares: Incorporating Survey-Based Evidence into Merger Analysis" *Corporate Disputes*, July–September 2018

*Global Competition Review* (*GCR*)
- *GCR*'s Merger Control Matter of the Year – Americas (2020)

W@
- 40 in Their 40s – Notable Women Competition Professionals (2019)

Who's Who Legal
- Competition: Future Leaders – Economists (2018–2019)
- Consulting Experts: Future Leaders – Competition Economists (2018–2019)

**REBECCA KIRK FAIR**
**Managing Principal**

Phone: 617 425 8256                                111 Huntington Avenue
Fax: 617 425 8001                                              14th Floor
rebecca.kirkfair@analysisgroup.com                     Boston, MA 02199

## EXPERT TESTIMONY

- ***The State of Texas v. Meta Platforms, Inc. f/k/a Facebook, Inc. (043364)***
  *Texas District Court, 71st Judicial District, Harrison County*
  Expert witness on behalf of Meta in a litigation filed by the State of Texas related to privacy. Submitted an expert report and testified at deposition. Conducted materiality and perceptions surveys and archival analysis.

- ***Steven Benanav v. Healthy Paws Pet Insurance, LLC***
  *US District Court, Western District of Washington*
  Expert witness on behalf of Healthy Paws in a class action litigation. Submitted an expert report and testified at deposition.

- ***Maximilian Klein, et al. Meta Platforms, Inc.***
  *US District Court, Northern District of California, San Francisco Division*
  Expert rebuttal witness on behalf of Meta Platforms in a class action matter related to the collection and/or use of personal data. Submitted an expert rebuttal report evaluating survey design of Plaintiff's expert. Testified at deposition.

- ***Jenale Nielsen v. Walt Disney Parks and Resorts U.S., Inc.***
  *US District Court, Central District of California*
  Expert witness on behalf of Disney in a breach of contract class action litigation. Submitted an expert rebuttal report in response to the damages assessment conducted by the plaintiff's expert. Testified at deposition.

- ***In the Matter of Intuit, Inc.***
  *Before the FTC*
  Expert witness on behalf of Intuit in an administrative proceeding before the FTC. Conducted a materiality survey and submitted an expert report on consumer choices for online tax preparation support. Testified at deposition and trial.

- ***Earl L. McClure, et al. v. State Farm Life Insurance Company***
  *US District Court, District of Arizona*
  Expert witness on behalf of State Farm Life in a class action matter related to consumer decision making when purchasing life insurance. Submitted an expert report and testified at deposition.

- ***District of Columbia vs. Maplebear, Inc. D/B/A Instacart***
  *Superior Court of the District of Columbia – Civil Division*
  Expert witness on behalf of Instacart. Submitted an expert rebuttal report conducting analyses assessing consumer behavior following interface design changes and materiality of at-issue fees. Testified at deposition.

- ***Pegasystems Inc. vs. Appian Corporation and Business Process Management, Inc.***
  *US District Court, District of Massachusetts*
  Expert witness on behalf of Pegasystems. Assessed disgorgement damages resulting from false advertising claims. Submitted an expert rebuttal report in response to counterclaims of Appian. Testified at deposition.

- ***Gettys Bryant Millwood, et al. v. State Farm Life Insurance Company***
  *US District Court, District of South Carolina, Spartanburg Division*
  Expert witness on behalf of State Farm Life in class action breach of contract litigation. Submitted expert report describing and assessing the ways in which consumers evaluate information and make decisions to purchase life insurance policies. Testified at deposition.

- ***Eric Fishon, et al. v. Peloton Interactive, Inc.***
  *US District Court, Southern District of New York*
  Expert witness on behalf of Peloton. Conducted consumer perception and materiality surveys and submitted an expert report analyzing survey results and evaluating survey design of Plaintiff's expert. Testified at deposition.

- ***Jennifer Hasemann and Debbie Hoth v. Gerber Products Company***
  *United States District Court for the Eastern District of New York*
  Expert rebuttal witness on behalf of Gerber. Submitted an expert rebuttal report in response to the survey conducted by Plaintiff's expert, addressing the theoretical framework and survey design. Testified at deposition.

- ***Kieran O'Hara et al. v. Diageo-Guinness UAS Inc. et al.***
  *United States District Court District of Massachusetts*
  Expert witness on behalf of Diageo. Conducted a purchase intent survey and submitted an expert report analyzing the survey results and the heterogeneity in consumer beer purchasing decisions. Testified at deposition.

- ***Bond v. Berkshire Bank, et al.***
  *US District Court, District of Massachusetts, Western Division*
  Expert witness on behalf of Berkshire Bank. Conducted a survey and testified at deposition on banking consumers' purchase decisions and heterogeneity in consumer banking behaviors, specifically with regard to overdraft services.

*CONFIDENTIAL*

# APPENDIX B

# MATERIALS RELIED UPON

**Legal Documents**

Declaration of Anthony Bonano, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 10, 2024.

Declaration of Colin B. Weir, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, June 21, 2024.

Declaration of Martin S. Dorph, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 13, 2024.

Declaration of MJ Knoll-Finn, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 16, 2024.

Declaration of Sean Curran, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 12, 2024.

Declaration of Steven P. Gaskin, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, June 21, 2024.

Declaration of William Clay Shirky, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, September 16, 2024.

Deposition of Martin Dorph, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, May 21, 2024.

Deposition of William Clay Shirky, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, May 16, 2024.

Expert Declaration of Jonathan T. Tomlin, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD, September 18, 2024.

Hall-Landers Deposition Vol. 1, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, April 12, 2024.

"New York University Tuition and Institutional Aid - Spring 2020," Bonano Deposition, Exhibit 7, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, May 11, 2020.

Plaintiff's Notice of Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD-SLC, June 21, 2024.

Second Amended Class Action Complaint and Demand for Jury Trial, *Casey E. Hall-Landers v. New York University*, 1:20-cv-03250-GBD, September 18, 2023.


**Bates-Stamped Documents**

New York University, "Fall 2020 Course Registrations," NYU_Hall-Landers_00001808–816.

New York University, "Major Categories of Revenue - Fiscal Year 2020," NYU_Hall-Landers_00009358–359.

New York University, "NYU Registration and Service Fees," NYU_Hall-Landers_00009374.

New York University, "NYU Registration and Services Fees Explanation," NYU_Hall-Landers_00000964.

New York University, "NYU Tandon School of Engineering 2018-2020 Bulletin," NYU_Hall-Landers_00008768–9154.

New York University, "Remote Learning Cohort Text Outreach Report," NYU_Hall-Landers_00009281.

New York University, "Summary of NYU's Response to the Latest COVID-19-related Developments," March 24, 2020, NYU_Hall-Landers_00000936–943.

New York University, "A Summary Update on COVID-19 Developments," April 11, 2020, NYU_Hall-Landers_00000347.

New York University, "Summer 2020 Course Registrations," NYU_Hall-Landers_00001841–845.

New York University, "Taking Stock - The Impact of COVID-19 and Looking to the Future," April 27, 2020, NYU_Hall-Landers_00000946-953.

State of New York Executive Chamber, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," March 16, 2020, NYU_Hall-Landers_00002258–259.

State of New York Executive Chamber, "Continuing Temporary Suspension and Modification of Laws Relating to the Disaster Emergency," March 16, 2020, NYU_Hall-Landers_00002260–261.


**Academic Papers**

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Economic Valuation of Product Features," *Quantitative Marketing and Economics*, Vol. 12, No. 4, 2014.

Allenby, Greg M., Jeff D. Brazell, John R. Howell, and Peter E. Rossi, "Using Conjoint Analysis to Determine the Market Value of Product Features," *Proceedings of the Sawtooth Software Conference*, 2013.

Bedi, Suneal, and David Reibstein, "Damaged Damages: Errors in Patent and False Advertising Litigation," *Alabama Law Review*, Vol. 73, No. 2, 2021, pp. 385-436.

Ellickson, Paul B., Mitchell J. Lovett, and Bhoomija Ranjan, "Product Launches with New Attributes: A Hybrid Conjoint-Consumer Panel Technique for Estimating Demand," *Journal of Marketing Research*, Vol. 56, No. 5, 2019, pp. 709-731.

Hainmueller, Jens, Dominik Hangartner, and Teppei Yamamoto, "Validating Vignette and Conjoint Survey Experiments Against Real-World Behavior," *Proceedings of the National Academy of Sciences*, Vol. 112, No. 8, 2015, pp. 2395-2400.

Higgins, E. Tory, William S. Rholes, and Carl R. Jones, "Category Accessibility and Impression Formation," *Journal of Experimental Social Psychology*, Vol. 13, No. 2, 1977.

Sawyer, Alan G., "Demand Artifacts in Laboratory Experiments in Consumer Research," *Journal of Consumer Research*, Vol. 1, No. 4, 1975, pp. 20-30.

Schkade, David A., and Daniel Kahneman, "Does Living in California Make People Happy? A Focusing Illusion in Judgements of Life Satisfaction," *Psychological Science*, Vol. 9, No. 5, 1998.

Steckel, Joel H., Wayne S. DeSarbo, and Vijay Mahajan, "On the Creation of Acceptable Conjoint Analysis of Experimental Designs," *Decision Sciences*, Vol. 22, No. 2, 1991, pp. 435-442.


**Books**

Barber, William G., "The Universe," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*, First Ed., edited by Shari S Diamond and Jerre Bailey Swann, American Bar Association, 2012.

Diamond, Shari Seidman, "Reference Guide on Survey Research," *Reference Manual on Scientific Evidence*, Third Ed., National Academies Press, 2011.

Kotler, Philip, and Kevin Lane Keller, *Marketing Management* 15 Ed., Pearson, 2016.

Orme, Bryan K., *Getting Started with Conjoint Analysis* Fourth Ed., Research Publishers LLC, 2020.

Parkin, Michael, "Priming," *Encyclopedia of Survey Research Methods*, Vol. 2, edited by Paul J. Lavrakas, Sage Publications, Inc., 2008.

Rao, Vithala R., *Applied Conjoint Analysis*, Springer, 2014.


**Other Publicly Available Sources**

Boston University, "Dance Minor," www.bu.edu/cfa/academics/degrees-programs/dance/.

Boston University, "Majors by School and College," www.bu.edu/admissions/why-bu/academics/majors/.

Change.org, "Close NYU Washington square and Brooklyn Campuses due to COVID-19 in NYC," www.change.org/p/coronavirus-close-nyu-washington-square-and-brooklyn-campuses-due-to-covid-19-in-nyc.

Columbia University, "Majors, Minors, and Special Programs," www.college.columbia.edu/academics/programs.

Columbia University, "Requirements for the Education Studies Major," www.bulletin.columbia.edu/columbia-college/departments-instruction/education/#requirementstext.

Cornell University, "Film," www.as.cornell.edu/major_minor_gradfield/film.

Garrett, Richard, and Bethany Simunich, *CHLOE 6: Online Learning Leaders Adapt for a Post-Pandemic World*, Quality Matters and Eduventures Research, 2021.

IvyWise, "Class of 2028 Admission Rates," June 17, 2024, www.ivywise.com/blog/college-admission-rates/.

National Bureau of Economic Research, "Common Application Has Had Wide-Ranging Effects on College Admissions," November 1, 2019, www.nber.org/digest/nov19/common-application-has-had-wide-ranging-effects-college-admissions.

National Center for Education Statistics, "Number of Applications for Admission from First-Time, Degree/Certificate-Seeking Undergraduate Students Were Received by Postsecondary Institutions in the Fall by Admission/Enrollment Status," www.nces.ed.gov/ipeds/TrendGenerator/app/answer/10/101?cid=102.

National Center for Education Statistics, "Number of Degree-Seeking Undergraduate Students Enrolled in Postsecondary Institutions for the First-Time in the Fall," https://nces.ed.gov/ipeds/TrendGenerator/app/answer/2/5.

New York University, "About NYU," www.nyu.edu/about.html.

New York University, "Arts & Media," www.nyu.edu/admissions/undergraduate-admissions/majors-and-programs/arts-and-media.html.

New York University, "Childhood Education and Childhood Special Education," www.steinhardt.nyu.edu/degree/bs-childhood-and-special-education-grades-1-6.

New York University, "Factbook and Common Data Sets," www.nyu.edu/employees/resources-and-services/administrative-services/institutional-research/factbook.html.

*CONFIDENTIAL*

New York University, "A Letter from NYU President Andrew Hamilton," April 13, 2022, www.nyu.edu/about/leadership-university-administration/office-of-the-president/communications/a-letter-from-nyu-president-andrew-hamilton-041222.html.

New York University, "NYU at a Glance," www.nyu.edu/about/news-publications/nyu-at-a-glance.html.

New York University, "Our History: Roots of Greatness," https://engineering.nyu.edu/about/history.

New York University, "Tandon School of Engineering Academics Programs," https://engineering.nyu.edu/academics/programs.

New York University, "Tuition," www.nyu.edu/students/student-information-and-resources/bills-payments-and-refunds/tuition-and-fees.html.

New York University, "Waitlist FAQ," www.nyu.edu/admissions/undergraduate-admissions/how-to-apply/wait-list-faq.html.

The Official Website of New York State, "Governor Cuomo Issues Guidance on Essential Services Under The 'New York State on PAUSE' Executive Order," March 20, 2020, www.governor.ny.gov/news/governor-cuomo-issues-guidance-essential-services-under-new-york-state-pause-executive-order.

The Official Website of New York State, "Governor Cuomo Signs the 'New York State on PAUSE' Executive Order," March 20, 2020, www.governor.ny.gov/news/governor-cuomo-signs-new-york-state-pause-executive-order.

U.S. News, "Top 100 - Lowest Acceptance Rates," www.usnews.com/best-colleges/rankings/lowest-acceptance-rate.