**EXHIBIT 1**

OBLRHALa

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   Casey Hall-Landers,

4                   Plaintiff,

5           v.                          20 Civ. 3250 (GBD)(SLC)

6   NEW YORK UNIVERSITY,
                                        Oral Argument
7
                Defendant.
8
    ------------------------------x
9                                       New York, N.Y.
                                        November 21, 2024
10                                      10:00 a.m.

11  Before:

12                      HON. SARAH L. CAVE,

13                                      U.S. Magistrate Judge

14                      APPEARANCES

15  BURSOR & FISHER P.A.
         Attorneys for Plaintiff
16  BY:  ANDREW OBERGFELL

17  DLA PIPER LLP (US)
         Attorneys for Defendant
18  BY:  KEARA M. GORDON
         COLLEEN GULLIVER
19       CONNOR D. ROWINSKI

20

21

22

23

24

25
```

OBLRHALa

```
 1              THE COURT:  Good morning, everyone.  Please be seated.
 2              (Case called)
 3              MR. OBERGFELL:  Good morning, your Honor.  Andrew
 4   Obergfell from Bursor & Fisher on behalf of the plaintiff,
 5   Casey Hall-Landers.
 6              THE COURT:  Good morning.
 7              MS. GORDON:  Good morning, your Honor.  Keara Gordon
 8   with DLA Piper on behalf of NYU.
 9              THE COURT:  Good morning.
10              MS. GULLIVER:  Good morning, your Honor.  Colleen
11   Gulliver from DLA Piper, also on behalf of NYU.
12              THE COURT:  Good morning.
13              MR. ROWINSKI:  Good morning, your Honor.  Connor
14   Rowinski of DLA Piper on behalf of the defendant.
15              THE COURT:  Good morning.
16              MS. GORDON:  Your Honor, may I also just mention that
17   Britt Schoepp-Wong is here from NYU.  Britt is the Assistant
18   Policy Advisor to the President and Associate General Counsel.
19              THE COURT:  Okay.  Very good.  Thank you.
20              So we're here this morning on the plaintiff's motion
21   for class certification, which Judge Daniels has referred to me
22   for a report and recommendation.  So Mr. Obergfell, it's your
23   motion.  You can proceed.
24              MR. OBERGFELL:  May I use the podium, your Honor?
25              THE COURT:  Yes, wherever you are comfortable.
```

OBLRHALa

1          MR. OBERGFELL:  Good morning, your Honor.  Andrew

2     Obergfell for the plaintiff, Casey Hall-Landers.  Before I

3     begin, if I may, I'd like to reserve five minutes for rebuttal?

4          THE COURT:  Of course.

5          MR. OBERGFELL:  Your Honor, this case is appropriate

6     for class certification because there was a common implied

7     contract between plaintiff and class members and NYU for the

8     provision of in-person and on-campus education in exchange for

9     tuition payments by the students.

10          THE COURT:  And if I could clarify, this is only a

11     tuition class; we're no longer including fees?

12          MR. OBERGFELL:  This is only a tuition class, your

13     Honor.

14          THE COURT:  Thank you.

15          MR. OBERGFELL:  And NYU breached that implied contract

16     as to all of its students when it closed its campus as of March

17     23, 2020, and then made a university-wide decision to fail to

18     refund any tuition to any students across NYU.  In deciding

19     this motion, we're guided by the Second Circuit's decision in

20     this case, and the Second Circuit has already held that there

21     are three forms of evidence that can form the basis of an

22     implied contract for in-person education.

23          The first is NYU's Albert portal, or online course

24     registration portal, which students used to register for their

25     spring 2020 classes in advance of the spring 2020 semester.

OBLRHALa

```
1              THE COURT:  If I could just pause you there?  The
2   Second Circuit, as you said, which is what guides us, says that
3   in terms of focusing on the existence of an implied contract,
4   the court said:  The role is to ascertain the intention of the
5   parties at the time they entered into the contract.  When is
6   Ms. Hall-Landers alleging that they entered into a contract
7   with NYU?
8              MR. OBERGFELL:  Well, New York law states that at the
9   time of enrollment, the relationship between the student and
10  the university becomes contractual.
11             THE COURT:  Okay.
12             MR. OBERGFELL:  However, the terms of the implied
13  contract are informed by the bulletin, circulars, and other
14  written materials or oral statements from the university to the
15  students.  So the relationship between plaintiff and NYU became
16  contractual at the time of enrollment.  However, each of the
17  bulletins that were referenced by Second Circuit would assist
18  in forming the terms of the implied contract.
19             THE COURT:  Of course.  But the reason I asked that
20  question then was because you mentioned the Albert portal,
21  which is not something that a prospective student at the time
22  that they enrolled in NYU would have access to.  And so, I
23  understand that that was something that was alleged in the
24  pleadings.  The Second Circuit might not have had the facts at
25  the time in front of them not knowing that that is not
```

OBLRHALa

1    something that the prospective student, including the plaintiff

2    here, would have had access to at the time the contract was

3    formed.

4              MR. OBERGFELL:  That's actually factually incorrect,

5    your Honor --

6              THE COURT:  Okay.

7              MR. OBERGFELL:  -- because there is a public version

8    of the Albert portal.  You cannot actually register for

9    classes, but all of the information that is available on the

10   Albert portal is available publicly on NYU's course search page

11   on their public website.  And that was testified by Mr. Clay

12   Shirky, NYU's 30(b)(6) witness.

13             THE COURT:  Okay.

14             MR. OBERGFELL:  So that did exist at the time of

15   enrollment, but I don't think there was any basis in New York

16   law to suggest that when students specifically enrolled for

17   their classes for the spring 2020 semester that those terms

18   would not be part of the implied contract.  I see no basis in

19   New York law to reach that conclusion.

20             THE COURT:  Well, that could change the nature of the

21   contract.  You would then be suggesting that the terms of the

22   contract would change over time.

23             MR. OBERGFELL:  Well, there's an ongoing relationship

24   between NYU and the students.  Just like NYU could change its

25   policies vis-a-vis the students, which would presumably become

OBLRHALa

1   part of the implied contract over a student's tenure, obviously

2   representations that are made by NYU to the student could add

3   to the terms of the implied contract.

4          So just focusing on the Albert portal for a moment,

5   right, and we would argue, your Honor, that the Second Circuit

6   has determined that this is something that we can look at for

7   purposes of defining the terms of the implied contract.  But

8   Mr. Shirky, who was, as I mentioned, NYU's 30(b)(6) witness, he

9   gave us a couple of important pieces of information regarding

10  this Albert portal.



OBLRHALa



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15          THE COURT:  The class definition uses the phrase "New

16    York campuses."  What are the New York campuses that that

17    refers to?

18          MR. OBERGFELL:  That would be the Washington Square

19    campus and the Brooklyn campus.

20

21

22

23          THE COURT:  Thank you.

24          MR. OBERGFELL:  Going back to Mr. Shirky's testimony

25    just to kind of put a period on this——and this is document

OBLRHALa

1    122-1, exhibit 1 to the Westcot declaration— ████████████████

2    ███████████████████████   ████████████████████████████████

3    ████████████████████████████████████████████████████

4    ████████████████████████████   ████████████████████████████

5    ██████████   ██████████████████████████████

6            █████████████████████████████████████

7    ████████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ██████████   █████████████████████████████████████████

10   ████████████████████████████████████████████

11   █████████████   ████████████████████████████

12          However, there's more.  The Second Circuit also

13   instructed that we can look at the marketing materials that

14   were made available to the student.  ████████████████████████

15   ████████████████████████████████████   ████████████████████████

16   ████████████████████████   ████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████

19   ████████████████████████████████████████

20          The first is what I'll call university-wide marketing

21   materials, and those are materials that are not addressed to

22   any specific school, program, or area of study.  They talk

23   about NYU broadly and what a student can expect when they

24   enroll at NYU.  The second tier are school-specific or

25   program-specific marketing materials.  For example, if I'm a

OBLRHALa

1    student who is planning to enroll in the College of Arts and

2    Sciences as an undergraduate, I will get both these

3    university-wide marketing materials and specific information

4    regarding the College of Arts and Sciences.

5            So for purposes of this discussion, I'd like to just

6    point the Court to two of these university-wide marketing

7    materials, which we contend forms the basis of an implied

8    contract.  The first one is exhibit 6 to the Westcot

9    declaration.  This is document 122-6.  This is a welcome

10   pamphlet from NYU which is entitled:  You've Made It.  On the

11   very first page of that booklet, and this is on——I'm using

12   Bates numbers now——NYU_Hall-Landers_1066.  It says in large

13   capital letters:  NYU and New York City are waiting for you.

14   And then, in the small print on the same page, it says:  Here's

15   a glimpse of what your life will be like at NYU.  So this

16   marketing material sent to all admitted students is clearly

17   sign posting to the student that they will receive what is

18   contained in this booklet.

19           Flipping through the booklet, for example, looking to

20   page 1067, there's a large heading that states:  It's your city

21   now, with an image of students convening together in a park,

22   which obviously refers to New York City because if you were to

23   flip to the next pages, 1068 and thereafter, the booklet

24   discusses specific resources in New York City, and more than

25   that, specific resources both in Greenwich Village and in

OBLRHALa

1    Downtown Brooklyn, which is where NYU's two main undergraduate

2    campuses are located.

3         And there's more in this booklet that conveys to

4    students what they can expect.  For example, on page 1075, it

5    states:  Find your favorite places to eat, join a club, play

6    intramurals, and volunteer.  Just look around and you'll see

7    NYU communities that suit your interests.  This is clearly

8    referring students to an in-person experience at NYU, talking

9    about the various resources both on NYU's campus and in New

10   York City.

11        THE COURT:  Some of the cases refer to puffery and

12   kind of generalized language about the overall experience at a

13   university.  This is what NYU is saying about New York City

14   here, you would probably see in Harvard's materials about

15   Boston, and, you know, UCLA's materials about being near

16   Hollywood.  So how is this not just general puffery about what

17   the university atmosphere is like?

18        MR. OBERGFELL:  The first thing I would say is the

19   issue of puffery is itself a class issue; whether or not these

20   materials can be considered puffery, or a term of an implied

21   contract, is itself a class issue with no differentiation among

22   students, but it's not puffery, your Honor.  As we indicated in

23   our papers, puffery is a subjective statement that suggests

24   that, you know, something is the best or, you know, the

25   greatest or something that could not -- it's a subjective claim

OBLRHALa

1    that could not be objectively proven.

2            Here what NYU is conveying to the student is here a

3    glimpse of what your life will be.  And then, it lays out not

4    only resources in New York City but information as to specific

5    clubs, intramural sports, cultural things such as sports and

6    recreation activities, basically painting this picture of what

7    their college life will be at NYU.  And then, NYU took all of

8    that away when it closed its campus in March of 2020.

9    ██████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ██████  ████████████████████████████████████████████

12   ██████████  █████████████████████████████████████████

13   ████████████████████████████████████████████████████

14   ████████████████████████  ███████████████████████████

15   ████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████

17   ████████████████████████    So for NYU to put that out there

18   and then pull it away, we think is by no means puffery.

19           Just going back to exhibit 6, you know, I think

20   page 1081 also draws the point that I'm talking about here.  It

21   says:  Now that we've shown you what college life is like at

22   NYU.  Join us and see for yourself.  This is clearly conveying

23   to an admitted student that is what's conveyed in these

24   marketing materials is what their life would be like if they

25   chose to enroll at NYU.

OBLRHALa

1          THE COURT:  Can we focus for a minute on the paid

2     tuition component of the class definition?

3          MR. OBERGFELL:  Sure.

4          THE COURT:  And can you talk a little bit more about

5     what that means to say "paid tuition"?  As we know, the

6     plaintiff here, the plaintiff's father and I think grandmother

7     paid some or all of the tuition for them.  What about a student

8     whose tuition is paid, you know, from a 529 program or from an

9     external grant or scholarship?  What does paid tuition mean,

10    and how is that common to the class and not an individualized

11    question?

12         MR. OBERGFELL:  It's not an individualized question,

13    your Honor, because the class is people who paid, meaning

14    people who paid in the form of tuition payments to themselves

15    and to NYU and who are in privity of contract with NYU.  So the

16    means how the student obtained the funds to pay the tuition is

17    not particularly relevant.  So here, for example, plaintiff

18    testified that the money was a gift from their father.

19         THE COURT:  Right.

20         MR. OBERGFELL:  Well, a gift has a very specific legal

21    definition.  It means a voluntary transfer without

22    consideration, and we've cited authority for that in our

23    papers.  So legally speaking, the money was transferred from

24    the father to Hall-Landers, and then Hall-Landers paid that

25    money to NYU in consideration for tuition.  It's the same if

OBLRHALa

1   you get a loan and it's paid; you have a repayment obligation.

2   Obviously, we would not encompass people who got financial aid

3   or a free ride.  That would not be included, but I don't think

4   it's a relevant consideration as to how the student came up

5   with the money in order to pay the tuition so long as they

6   paid.

7        THE COURT:  How is it not relevant to the remedy

8   though?  Because if Hall-Landers were able to recover from NYU

9   and got $41,000 back, Hall-Landers was not out of pocket

10  $41,000.  The father was out-of-pocket $41,000.  So isn't it a

11  windfall to Hall-Landers to give an award of the tuition that

12  was paid by the father?

13       MR. OBERGFELL:  Two things to say on that, your Honor.

14  Based on the legal definition of a gift, that is not how it

15  would work.  Because If someone gave me a gift, that money is

16  now mine.  If I choose to take it to the store and purchase a

17  product and I'm harmed by that product, I have every right to

18  recover what I paid for it based on the legal definition of a

19  gift, number one.

20       Number two is that this whole argument by NYU, I

21  think, is a little bit disinguous because at the motion to

22  dismiss stage, if the Court will recall, NYU at length argued

23  that parents did not have standing in order to seek recovery

24  for any tuition money that they paid.  They specifically

25  represented to this Court in their MTD brief that any contract

OBLRHALa

1    is between the student and the university.

2            So now they want to argue that the parent doesn't have

3    standing and the student doesn't have an injury, so NYU gets to

4    keep the money.  To me, that's the only possible windfall

5    outcome is if NYU gets to company the money based on what we

6    would think is an unfair form of immunity for NYU, especially

7    because plaintiff and NYU are in privity of contract, and

8    plaintiff has every right to enforce the terms of contract

9    against NYU.  Just as, your Honor, NYU had every right to

10   enforce the contract against plaintiff.  So if plaintiff did

11   not pay their tuition for some reason, it wasn't plaintiff's

12   father or somebody else who was going to be on the hook.  NYU

13   would have a cause of action against plaintiff.  So it can't be

14   that NYU can enforce the contract but plaintiff can't.  So I

15   think that's an unfair argument.

16           THE COURT:  Okay.  Thank you.

17           MR. OBERGFELL:  Just turning back, if I may, to the

18   university-wide marketing materials?  I would like to just

19   point the Court to another example that I think is really

20   important, and that is exhibit 8 to the Westcot declaration.

21   It's document 122-8.  It's called:  NYU is.  And we'll see some

22   very similar representations in this booklet that were made in

23   the You've Made It booklet.  But I'd like to point the Court to

24   the first page, the very first page of the booklet, Bates

25   number 1474.  It says:  NYU and New York City are waiting for

OBLRHALa

1    you in bold capital letters with an image of students in front

2    of NYU's buildings in New York City.

3           The next page, Bates number 1475, says, You applied to

4    NYU because of the wealth of opportunities that are available

5    to you in New York City, and there's a picture behind that text

6    of students in Washington Square Park where NYU is located.

7    And this booklet, much like the You've Made It booklet, conveys

8    very similar information about NYU's location in New York City,

9    the benefits of being in New York City, specifically the

10   benefits of being in Greenwich Village and Downtown Brooklyn

11   where its campuses are located, and provides very specific and

12   detailed products and services that will be available as a

13   full-time student at NYU, including access to clubs, including

14   access to physical campus facilities.  In fact, they even

15   defined it as university-wide resources.

16          Again, an admitted student reading this book has every

17   reason to believe that these representations are true and that

18   if they show up and choose to purchase an education at NYU,

19   that they'll receive what is being conveyed by NYU.

20          THE COURT:  Can I ask you just to go back to tuition

21   for a moment?

22          MR. OBERGFELL:  Yes.

23          THE COURT:  Did all NYU undergraduate students pay the

24   same tuition for spring 2020?

25          MR. OBERGFELL:  For most of the schools and colleges,

OBLRHALa

1   they are very similar.  There are, I think, a handful of

2   schools that have slightly different tuition.  However, your

3   Honor, I don't think that's really relevant to the class motion

4   because it runs to damages.  And it's the black letter law of

5   the Second Circuit, as we noted in our papers, that

6   individualized damages considerations do not defeat class

7   certification.  That's the Roach case as well as the *Sejas v.*

8   *Argentina* case that's cited in our brief.

9           To circle back very quickly to the final thing that

10  the Second Circuit told us to look at, and that's NYU's prior

11  course of dealing with its students.  And we've learned in

12  discovery that in the 188 years that New York University was a

13  going concern between 1831 and March of 2020, it always offered

14  in-person and on-campus education to its students.  ██████████

15  ████████████████████████████████████████████████████████████████

16  ██████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████

18          ████████████████████████████████████████████

19  ██████████████████████████████████████████████████████████████

20  ████████████████████████          So the Second Circuit said that we can

21  look to prior course of dealing to inform the basis of the

22  implied contract, and here, we have clear evidence, class-wide

23  that evidence, NYU has always held courses in person and on

24  campus up until the time for the first time that they dispersed

25  their entire campus for approximately half of the semester in

OBLRHALa

1    the spring of 2020.  We would consider that an implied term and

2    then a breach of that implied term.

3          Your Honor, I have presented now three forms of

4    evidence that the Second Circuit specifically said can form the

5    basis of the implied contract, and I think I've tried to prove

6    to you that each of those forms of evidence are common to every

7    single class member and there's no individualized inquiry that

8    would need to be undertaken to determine that.  And in its

9    brief, by the way, NYU does not deny that all students are

10   exposed to the representations on Albert.  It does not deny

11   that it sends these university-wide marketing materials to all

12   students, and it does not deny that its prior course of conduct

13   was such that it was always an in-person and on-campus

14   instruction for students.

15         Instead, I expect that you will hear that, well,

16   there's a lot of students and a lot of different types of

17   mailers at issue.  But this Court does not need to even get

18   there.  If you find that the Albert portal is common, which I

19   believe I've shown that it is; if you find the university-wide

20   marketing materials are common, which I believe I've shown that

21   it is; and if you find that there was a prior course of dealing

22   such that students could reasonably expect and on-campus and

23   in-person educations, which I believe I have shown, this Court

24   need look no further for the terms of the implied contract for

25   in-person and on-campus education.  So we can disregard most of

OBLRHALa

1    NYU's argument regarding commonality and predominance.

2              THE COURT:  What about injury though?  Obviously, it

3    doesn't seem to be disputed that all of NYU went remote in

4    March of 2020.  But the level of injury to each student, how is

5    that not an individualized inquiry?  I know you've already

6    spoken about damages, but understanding the difference between

7    an econ student and a visual arts student going in-person is

8    quantifiably different; is that not?

9              MR. OBERGFELL:  No, your Honor.  That's not what we're

10    speaking to prove.  And as our expert declarations, I think,

11    set forth, what we're trying to prove is that for that

12    particular aspect of the education, the in-person and on-campus

13    aspect of the education, that there was an objective market

14    value to that feature of the education that was applicable to

15    all students.  So our experts will seek to prove that when NYU

16    closed and moved to its remove form of instruction, that that

17    form of instruction was objectively less valuable, less of a

18    fair market value, than the education that was bargained for

19    the spring 2020 semester.

20              THE COURT:  Okay.  But all of the universities across

21    the country, I think maybe 99 percent, went remote.  So the

22    market value in March and April of 2020, it arguably plummeted

23    for everybody, right?

24              MR. OBERGFELL:  Potentially.

25              THE COURT:  So if what we have to look at as the

OBLRHALa

1    market, there was no market for in-person undergraduate

2    instruction in March and April of 2020.

3              MR. OBERGFELL:  I don't think that's the correct way

4    to look at it, your Honor, and the reason is because that we

5    have to look at what the terms of the contract were at the time

6    when they were entered into.  So the students were taking a

7    form of education, which was in-person and on-campus up; until

8    the time of the closure, right.  And so, the relevant inquiry

9    is that education has a certain value, right, what was

10   bargained for has a certain value.  When there's been a switch

11   to a fully remote form of instruction, our argument is—our

12   theory is—that now that this new education that's being

13   provided has an objectively less value than the one that was

14   provided for the first couple weeks of the semester, and

15   students should be able to recoup the difference in that market

16   value and that can be done on a class-wide value as our experts

17   have shown.  I would like to speak very briefly on the breach

18   element, your Honor, or the breach of implied contract.  And I

19   touched on this before, but there's no individualized inquiry

20   necessary for breach.  And the reason for that is because there

21   was one agreement at issue here:  Tuition in exchange for

22   in-person and on-campus education.  And there is no dispute

23   that NYU, as you've said, closed its campus in March of 2020.

24   ████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████

OBLRHALa

1          ████████████          There was no individualized inquiry even

2   done by NYU to determine whether a tuition refund should be

3   appropriate for students.

4          Instead, the position that NYU took was, well, we gave

5   you the credits at the end of the semester, and therefore, you

6   know, we're not going to lower our tuition.  So that decision

7   was either correct or incorrect, but that's a class issue.

8   That's not an individualized issue.

9          Before I move on to unjust enrichment, your Honor, I

10  would like to address some of the other cases cited in our

11  brief.  We cited numerous examples where tuition refund cases

12  have been certified both for breach of contract and for unjust

13  enrichment.  We've cited the *Ninivaggi v. The University of*

14  *Delaware*.  We've cited *In re Pepperdine*, and we've cited *In re*

15  *University of Southern California*; all of which certified

16  classes, tuition classes, based on very similar types of common

17  evidence that is available here, namely, course catalogs,

18  course of dealing, and each of those judges -- and those

19  universities are every bit as complex and diversified as NYU.

20  But each of those judges, three different judges, found that a

21  tuition class could properly be certified and that a plaintiff

22  was able to represent these common issues and seek to vindicate

23  the rights of the class.

24          THE COURT:  What about the cases where the judges have

25  not certified the classes?  *Suffolk University* in Boston, I

OBLRHALa

1   think is one, where the court declined to certify a tuition

2   class.

3           MR. OBERGFELL:  There are cases in which tuition

4   classes have not been certified for various reasons.  However,

5   we think that the *Ninivaggi* case, the *Pepperdine* case, and the

6   *University of Southern California* case are most applicable here

7   because it is the same forms of common evidence that we are

8   seeking to use to certify our tuition class.  Not only that,

9   your Honor, but in *USC* as well, the Court accepted the very

10  same damages model that I'm proposing here and certified the

11  class based on that damages model.  That is a choice-based

12  conjoint to determine the objective overpayment of the tuition

13  for the time when the university moved to remote format.  And

14  that's a very published opinion from the Central District of

15  California.

16          THE COURT:  Right.  I have read it.

17          MR. OBERGFELL:  Okay.  Which we think should be very

18  persuasive here.

19          So I would like to briefly touch on the unjust

20  enrichment claim, if I may?  So the unjust enrichment claim

21  goes hand in hand with the breach of implied contract claim in

22  the sense that they're based on the same facts, obviously, and

23  the same wrongdoing.  Basically, this notion that students were

24  going to get an in-person and on-campus experience and then

25  were deprived of that by NYU for approximately half of the

OBLRHALa

1    spring semester in 2020.  The reason that certification of the

2    unjust enrichment claim is appropriate is because it's the same

3    objective inquiry.  Students were all deprived of the objective

4    value of the loss of the in-person education that they had

5    bargained for, and because that decision was made at the

6    university level and because there was no individualized

7    inquiry into the equities of the situation, then certification

8    and predominance can be met.  And New York courts have

9    routinely certified unjust enrichment cases in the circumstance

10    where the equities can be judged on a class-wide basis, which

11    we think they can here.

12        THE COURT:  NYU cites a number of cases from this

13    district from their brief where the courts have declined to

14    certify classes of unjust enrichment claims.  How are those not

15    binding on me?  I'm looking at page 27 of NYU's brief, the

16    *Weiner* case, *Tropical Sails*, *Crab House*, and *Student A*.

17        MR. OBERGFELL:  Well, those cases did not hold that

18    it's categorically prohibited to certify --

19        THE COURT:  I didn't say they did.  I said the courts

20    in each of those cases declined to certify a class based on

21    unjust enrichment claims.

22        MR. OBERGFELL:  Correct, they did, and obviously,

23    every case depends on its own facts.  But I think that the

24    law -- for example, we're looking at *Jermyn v. Best Buy Stores*.

25    That is 256 F.R.D. 418, 436, which is a published SDNY decision

OBLRHALa

1    where the court did find that predominance was met for an

2    unjust enrichment claim, and that was based on an undisclosed

3    policy by Best Buy that was common to all class members which

4    deprived the class members of value.  So it really depends on

5    the individual facts of the case.

6         I would also note that the other cases that I've

7    discussed, the *Ninivaggi v. University of Delaware* case, the *In

8    re USC* case, and *Pepperdine* all certified restitution classes

9    or unjust enrichment classes.  Here is the bottom line as to

10   why it's so important, your Honor.  If, for whatever reason,

11   NYU is successful on a particular contract offense, say

12   impossibility for example, that doesn't mean that the plaintiff

13   and the class members' claims go away.  It means that the claim

14   is converted for a claim for restitution because NYU is still

15   holding the tuition money that it should have refunded.  And

16   that's a matter of New York law, and it was also explained *In

17   re USC* case as well.

18         THE COURT:  I'm mindful of time.  If you have one more

19   point you want to make, and then save time for rebuttal as

20   well?

21         MR. OBERGFELL:  Yes, your Honor.  I would like to

22   briefly touch on adequacy, if I may, on the last point?

23         THE COURT:  Sure.

24         MR. OBERGFELL:  And I know if I haven't gotten to

25   everything and to the extent I haven't gotten to it, we

OBLRHALa

1    definitely rely on our papers on that issue.

2            THE COURT:  Of course.

3            MR. OBERGFELL:  But here, I have to say that plaintiff

4    has done everything that is required of a class representative.

5    Plaintiff has reviewed the operative complaints.  Plaintiff has

6    produced over 2,000 pages of documents ESI.  Plaintiff has been

7    in constant contact with us on a regular basis.  And plaintiff

8    sat for their deposition for over eight hours, vigorous

9    questions from Ms. Gordon, and plaintiff is prepared to carry

10   this case through to trial.

11           Plaintiff has a strong command of the case, and we

12   cited in our reply brief numerous aspects of plaintiff's

13   deposition testimony, which shows that plaintiff has a good

14   command of what this case is about and what they and the class

15   are seeking.  So I would just note that none of the arguments

16   that were made by NYU get even close to establishing a conflict

17   of interest between the plaintiff and the class, which is the

18   standard for adequacy in the Second Circuit.

19           So with that, your Honor, thank you very much.

20           THE COURT:  Just one final question for you.  This is

21   just a math question.  In the plaintiff's declaration, they say

22   that they paid in total "$41,609.09" for spring 2020.  The math

23   that is in that paragraph doesn't add up for me, and

24   Mr. Dorph's declaration has a different number from NYU's

25   records.  I don't think it's a material difference, but just

OBLRHALa

1    for purposes of my understanding, is there a dispute about what

2    Hall-Landers paid in tuition for spring 2020?  Or can I just

3    pick one of those numbers to use for purposes of writing the

4    report and recommendation?

5              MR. OBERGFELL:  No.  The tuition is not disputed.

6    It's $27,900 and something, I believe.  The rest was a

7    combination of fees and other charges that were ultimately

8    aggregated to that other value.

9              THE COURT:  Okay.  All right.  Thank you,

10   Mr. Obergfell.

11             Ms. Gordon?

12             MS. GORDON:  Thank you, your Honor.  I'm just going to

13   stay here if that's okay?

14             THE COURT:  Wherever is fine as long the court

15   reporter can hear you.

16             MS. GORDON:  Can you hear me, Madam Court Reporter?

17   Fantastic.

18             Good morning, your Honor.  Keara Gordon for DLA Piper

19   for defendant, NYU.  Class certification should be denied here

20   for many of the same reasons that Judge McMahon denied class

21   certification in *Garcia De Leon v. NYU*; a case that the

22   plaintiff's counsel did not mention to you this morning, but a

23   case where there, like here, the plaintiff failed to establish

24   commonality, typicality, adequacy, or predominance.

25             We do have a PowerPoint—thank you, your Honor, for

OBLRHALa

1    letting us bring it——which I'll pass up in a minute.  But

2    before I do, I would just like to touch on the three main

3    reasons that we believe class certification should be denied.

4    They are:

5           Number one, there are individualized issues of breach

6    and injury, and those overwhelm and prevent commonality,

7    typicality and predominance.

8           Number two, there are individualized issues of

9    contract formation that also overwhelm and prevent commonality,

10   typicality, and predominance.

11          And number three, the plaintiff has not shown that

12   they are an adequate class representative.

13          So first, here as in *Garcia*, the plaintiff cannot

14   demonstrate both breach and injury with common proof.  As the

15   Court knows, in *Garcia*, just like here, there was a plaintiff

16   who was a student at NYU, and after COVID forced the transition

17   to online instruction, the student sued for refunds, asking for

18   tuition and fees back.  And there, as here, the Court analyzed

19   those claims, and after class discovery, determined that the

20   issue of whether injury was common to everybody was a very

21   fact-specific injury.

22          In that case, for example, one of the things that

23   Ms. Garcia complained about was she said she wasn't able to

24   access student health services following the pandemic.  And the

25   Court reviewed that, and the Court determined that Ms. Garcia

OBLRHALa

 1   had not shown any proof that everybody at NYU, all NYU

 2   students, had had the same alleged inability to access health

 3   services and to try and figure that out was going to require

 4   tens of thousands of individual very fact-specific

 5   determinations.  That very well-reasoned opinion is equally

 6   applicable here.

 7           Now, the plaintiffs didn't mention *Garcia*, and in

 8   their reply brief, they relegate it to a footnote.  They say,

 9   your Honor, don't look at it.  It's irrelevant.  It doesn't

10   have anything to do with this case.  Because they made the

11   strategic decision at the 11th hour to just abandon their

12   fees claim.  But what you just heard and what's in the brief,

13   they are still at issue.  They are absolutely still at issue.

14           When you look at what they're claiming are the

15   promises that they're asking your Honor to enforce, they were

16   things like services and programs like you heard this morning:

17   I didn't get access to clubs.  I didn't get access to

18   intramurals.  Those are the same things that are at issue as

19   *Garcia*.  They can't have their cake, your Honor, and eat it,

20   too.

21           Similar to Ms. Garcia's complaint, when you look at

22   what the plaintiff is complaining about, ███████████████████

23   ████████████████████████████████████████████████████████

24   ████████████████████  ████████████████████████  ████████

25   ████████████████████████████████████████████████████████

OBLRHALa

1    █████████████████████████████████████████

2    █████████    Well, in order to determine whether there was a

3    breach in injury, your Honor would have to look at the facts

4    surrounding the promise and the facts surrounding whether they,

5    the plaintiff, was actually denied access to that service.

6    We'll get to those facts in a minute, but that is super clear

7    that that is not common evidence.  That is a fact-specific

8    determination, and the evidence to help you make that

9    determination varies by member to member, which is the

10    definition of an individualized question.

11        Second, individualized issues of contract formation

12    overwhelm commonality, typicality, and predominance.  There's

13    no formal contract here.  This isn't the case where everybody

14    got the exact same materials and everybody signed up for the

15    same thing at the same time.  Remember, too, you've got a

16    putative class of four years of students who saw different

17    marketing materials at different times and that changed over

18    time.

19        When we looked to define what the implied contract is

20    we go to what the plaintiff said, and the plaintiff is not

21    pointing to just one thing.  And not even just the three things

22    that counsel mentioned this morning, but when you look at the

23    plaintiff's testimony, it's a mosaic.  They are saying you've

24    to look at the enrollment materials.  You've got to look at

25    website statements.  You've got to look at Tisch's bulletin.

OBLRHALa

1    And Tisch is only one of ten undergraduate schools.  You've to

2    look at Tisch's policies and procedures document.

3          And most vividly demonstrating that there is no

4    class-wide proof, ████████████████████████████    ████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ███████████████████████████████████████████    It

8    is only physical therapy that's specific to the dance program.

9    It is not university wide.  So there is no common proof of this

10   contract that they are formulating.

11         THE COURT:  Well, but what I understand the plaintiffs

12   to be arguing is that the focus is on the in-person piece.  You

13   could put physical therapy.  You could put music studio.  You

14   could put classroom.  You could put seminar, whatever it is

15   that follows in person.  The promise is whatever service NYU is

16   going to provide, it's going to do it in an in-person format in

17   New York City.  And that's what I understand them to be saying

18   is the common question about that.  Was that promise made

19   across the board to all of the NYU students regardless of which

20   program they were in?  So how is that not a common question

21   focusing on that in-person piece?

22         MS. GORDON:  So obviously, it became illegal and

23   unsafe for NYU to deliver in-person instruction.

24         THE COURT:  Sure.  But that goes to your defense.

25   That's not the promise.

OBLRHALa

1          MS. GORDON:  True.  But focusing on injury, if you

2    were going to be given, for example, career counseling

3    services, and you could get them just as effectively remotely

4    as in person, then you haven't been injured.  If you could get

5    instruction for classes as effectively in person as remotely,

6    as it seems like this plaintiff did because we're going to look

7    at all the gushing praise that they had for their professors,

8    you haven't been injured.  If you wanted mental health

9    counseling and you could get that remotely just as effectively,

10   you have not been injured.  And all of this is so subjective.

11         There is no -- I haven't seen any common proof from

12   the plaintiff that that particular inability to deliver all of

13   these myriads of things in an in-person versus a remote

14   instruction, where is the evidence that that affected all

15   26,000 NYU students in the same way?  There is none.

16         So, if I may, I'm going to quickly touch on adequacy,

17   and then I'll hand out the handouts?

18         THE COURT:  Yes.

19         MS. GORDON:  So Ms. Hall-Landers is an inadequate

20   class representative for three reasons.  First of all, they are

21   not knowledgeable about the fundamental aspects of their claim.

22   Number two, they lack credibility on key issues.  Number three,

23   the contemporaneous evidence contradicts their claim that they

24   didn't get the education they deserved.

25         And just by way of example, one of the things that the

OBLRHALa

```
1    plaintiff says that they want as damages is the money they
2    spent to buy a ballet bar, and they said that they had to buy
3    this in spring of 2020 because of the transition to remote
4    instruction.  But when we asked for the proof as to how much is
5    this, what are the specifics around it, it turns out they
6    didn't buy that until June.  So it was after spring.  And the
7    fact there that is troubling is that they didn't know the basis
8    of their claims when they made their complaint and then
9    subsequently when they continued to seek that.
10          So with that, if I may pass up --
11          THE COURT:  Sure.
12          MS. GORDON:  I'm giving two to the plaintiff's counsel
13   as well.
14          MR. OBERGFELL:  Thank you.
15          MS. GORDON:  If I may, your Honor, ask you to go to
16   the second page?
17          THE COURT:  Yes.
18          MS. GORDON:  So I just touched on the first three
19   issues here, and then briefly this morning, I'll also touch on
20   damages and unjust enrichment.
21          But going to the first reason, if you turn the page,
22   as Judge McMahon found in Garcia, individualized issues of
23   breach and injury overwhelm commonality, typicality, and
24   predominance.  If you go to the fourth page, as I was talking
25   about before, the definition of individualized injury, as your
```

OBLRHALa

1    Honor knows, and this is from the Supreme Court's opinion in

2    *Tyson Foods*, is individualized injuries are where the evidence

3    that you will have to consider is going to vary from member to

4    member and is not common to the class.

5          If you look at page 5 of the document, we've put in

6    there some of Judge McMahon's specific findings in *Garcia*

7    because we believe they are equally pertinent here.  There,

8    Judge McMahon found that the plaintiff had not demonstrated and

9    could not demonstrate that she suffered the same injury as

10   every other NYU student.  And remember there, it was also, I

11   couldn't get access to things that I wanted because of the

12   shift to remote.

13         THE COURT:  I asked Mr. Obergfell a follow-up question

14   about tuition across different NYU programs.  Can I ask the

15   same question of you?  Is it set differently for different

16   programs?

17         MS. GORDON:  It is, your Honor.  The tuition amounts

18   are different at the different schools.  There are ten

19   different schools within NYU.  The tuition varies depending on

20   the curriculum.  And there are also different offerings at the

21   different schools, so there will be different school-based

22   programs, different facilities, different things that are

23   offered because, for example, you know, a visual arts student

24   is different from an econ student.  So what Tisch needs as arts

25   and that is going to be very different from Stern, which is the

OBLRHALa

1    business school, or the nursing school or other schools.

2           So the offerings are different.  Like Tandon, for

3    example, is the engineering school.  That is priced

4    differently.  It's on a different campus in Brooklyn.  So

5    there's many, many differences among them.  So when you are

6    looking at this -- you know, the next quote was essentially

7    different people paid different amounts for different things.

8    That still holds true here in a tuition case.

9           The judge also found there that in order to determine

10   injury, which we were just talking about a minute ago, if you

11   weren't provided this particular service that you say you

12   wanted, were you actually harmed?  In order to determine that,

13   what Judge McMahon said is that you are going to have to do a

14   search and inquiry into what each of the, you know, over 26,000

15   students did or did not do with regard to availing themselves

16   of those.

17          On the next page, this just shows you some of the

18   services, facilities, and programs that are at issue here as

19   were in *Garcia*.  So if you turn to the next page.  We're now at

20   7, the left-hand quote is a quote from the plaintiff's opening

21   brief.  And that is to show you that when describing the

22   promises that they are seeking to enforce, when you look at

23   what they said, it is things like studios, laboratories,

24   athletic facilities, student centers, clubs, and organizations;

25   all of the same things that were at issue in *Garcia* and all of

OBLRHALa

1  the same things that were held there to require fact-specific

2  determinations to determine breach and injury.

3           And if you look at slide 8, that's the *Student A v.*

4  *Liberty United* Case that your Honor mentioned earlier.  What

5  all of this amounts to, your Honor, is hopelessly

6  individualized issues because you really can't—as the Court

7  there found, too—you can't determine injury unless you've

8  looked the at whether and to what extent the student could use

9  the service, wanted to, and did use the service.

10          So if you go to page 9, when you think about the fact

11  that your Honor is going to have to make fact determinations

12  about 26,000 students and what they were promised and what they

13  could access and what they couldn't access, that is very

14  individualized.  ███████████████████████████████

15  ████████████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ███████████████████████████  First of all, that was not common

18  to the university.  That was a program specifically for dance

19  students, so no common evidence there.

20          Number two, there's no evidence of breach.  We put in

21  declarations from Sean Curran -- Professor Curran, and from the

22  ███████████████  Professor Zujko.  Both of them attest in their

23  declarations ████████████████████████████████████████████,

24  albeit remotely, to the dance students who wanted it in the

25  same way.  ████████████████████████████████████████████████

OBLRHALa

1

2

3 ████████████      There's no basis for them to say under oath that

4 what they would have gotten wasn't as good as what they

5 expected because they never tried.

6         When you look at some of these other examples here and

7 in our brief, it's the same thing.  They complain about not

8 being able to be involved in student government.  They never

9 ran for student government.  They never participated in student

10 government.  Same thing we heard today.  There were all these

11 clubs offered to me, and I was really hurt because I didn't get

12 to participate in any of those clubs.  The plaintiff never

13 signed up for any clubs.  If you never signed up for a club,

14 you never went before, during, or after COVID, how have you

15 been harmed?  You haven't.

16         So that you'll see on page 10, we'll just see that

17 very, very quickly.  This analysis is replicated over thousands

18 of students.  There's what?  Over 400 clubs, and many of these

19 services, programs, and facilities continued after COVID.  That

20 is undisputed.

21         As Judge Parker of the Second Circuit observed in

22 *Rynasko*——and that is page 11——class allegations are implausible

23 because commonality and predominance would have to be found

24 among the extremely heterogeneous class, and he's right.  If

25 you look at page 12, this is even more glaring here with regard

OBLRHALa

1    to this plaintiff because their grievances are particularly

2    atypical and unique.  We asked them.  We asked them, Tell us in

3    what way you were deprived of what you thought you were getting

4    when the pivot of instruction went from in-person to remote?

5    And this is what they said.  They said:  I had to buy a ballet

6    bar.  Of course, that's not correct, but certainly everybody at

7    NYU did not buy a ballet bar.  I had to dance in different time

8    zones.  Again, no common proof that that was applicable to

9    everybody, and then certain things that are quite unique.  For

10   example, "I had to choose whether to show my feet, my torso, or

11   my arms on camera."  They were upset because professors

12   couldn't provide physical cues and feedback by actually

13   touching our bodies.  Dancing space was "limited," and they

14   were upset that they didn't have a live audience.  Now, these

15   types of unique alleged injuries are certainly not applicable

16   to everybody at NYU.  Most econ majors, most education majors,

17   most other majors are not going to have these kinds of

18   concerns.  These are unique to the named plaintiff.

19           And if you turn to page 13, just as in *Garcia*, these

20   facts are "peculiar to our named plaintiff."  There's no

21   evidence that any of them have anything to do with any other

22   NYU student.  On page 14, we just have the quote that your

23   Honor is familiar with that predominance is an even higher

24   burden than commonality.  Since they can't meet commonality and

25   typicality, they cannot meet predominance.  On page 15, we just

OBLRHALa

1    provide the quote from *Garcia* where *Garcia* found that, again,

2    there was no predominance because of these specific

3    individualized injuries that were necessary.

4            With that, I'll move to page 17 and our second point,

5    which is contract formation is an individualized issue.  And if

6    you look here on page 17, in *Garcia* Judge McMahon quoted the

7    Second Circuit in *In re Foodservice*, and that court -- those

8    courts acknowledged that while where the claims require

9    examination of individual contract language, it is appropriate

10   to decline to certify a breach of contract action.  Also in the

11   *Nguyen* case, in the absence of form agreements, class members

12   will have to prove their case with individualized proof, and

13   that is the case here.

14           On page 18, just a couple of specifics.  As we've

15   talked about, ten undergraduate stools with very, very

16   different offers to their students, over 230 areas of study,

17   over 26,000 undergraduate students, more than 5,000 faculty

18   members teaching nearly 5,000 classes.  There is no proof that

19   the quality of those 5,000 classes all were the same before

20   COVID or were less than what people intended after COVID.

21           So, you know, then if we move to page 19, going back

22   to what are the terms of contract that's alleged here, the

23   plaintiff defines their complaint.  So at their deposition, we

24   asked them:  What is it that are the elements of your

25   complaint?  What promises were made to you, and what promises

OBLRHALa

1    do you think were broken?  And on page 19, we have what they

2    said.  As I said, it's a mosaic.  They said that the contract

3    consisted of course descriptions varied by courses.  The

4    enrollment information of Albert --

5         THE COURT:  Well, I think what Mr. Obergfell was

6    saying was the in-person, the field, whether it was the course

7    search or Albert, the field area, said that the class would be

8    in person.  That's what they were relying on.

9         MS. GORDON:  Yes, we'll get to that in one second, but

10   I would just like to clarify that that's not it.  They are

11   relying on a number of different things, and strategically

12   plaintiff's counsel is just pointing out a couple today that he

13   thinks help him more.  But when you look at what the contract

14   is according to the plaintiff and how they have defined it, it

15   is not just Albert.  But we will get to Albert in just one

16   second.

17        Okay.  So on page 20, that's just all of the

18   different -- it shows you just how different the marketing

19   material is, and it changes over time.  So let's get to Albert

20   since we were just talking about it.  That's on page 21.

21        THE COURT:  Right.

22        MS. GORDON:  So the plaintiff, in their brief and

23   today, is heavily relying on Albert and the in-person statement

24   there, but there's a couple of problems with that.  Number one

25   is, as your Honor acknowledged, the plaintiff admitted that

OBLRHALa

1    they did not see that before when the plaintiff says the

2    contract was formed.  The contract was formed according to the

3    plaintiff when the university accepts the student for

4    enrollment and they enroll.  At that point in time, there's no

5    evidence they saw Albert.  There is no evidence everybody saw

6    Albert.  We heard evidence this morning that, well, yeah, maybe

7    it's online, and people could go look at it.  But where is the

8    evidence that all 26,000 undergraduates students actually took

9    the initiative to go look at Albert before they enrolled at

10   NYU?  There's no evidence -- I haven't heard any evidence cited

11   to you of commonality of that.

12           Also, the plaintiff admitted that they themselves

13   didn't see it.  So in any event, there couldn't be proof of

14   that.  If you go to the next slide, we heard in the brief and

15   we heard this morning, oh, your Honor, don't worry about this.

16   The Second Circuit in *Rynasko* already said that Albert is part

17   of the contract.  Well, that's just not so.  When you look at

18   what *Rynasko* said, and it's here in the slide, they said the

19   question is not whether the allegations necessarily establish

20   an implied contract.  But the question before them -- remember

21   this was at the pleading stage.  They had to accept everything

22   as true, and they didn't have the benefit of the named

23   plaintiff's testimony saying I never saw this before I

24   contracted.  Without the benefit of anything, they said the

25   question is going to be -- the question is whether a reasonable

OBLRHALa

1    fact finder could conclude that the plausible allegations

2    demonstrate an implied contract.  Here, we know on the basis of

3    the plaintiff's testimony that they can't because the plaintiff

4    never saw it.

5         We also heard——and if you look at the next

6    page——plaintiff is now talking about course of conduct.  Again,

7    at their deposition, the plaintiff did not mention course of

8    conduct.  That was something that was raised later.  When you

9    hear today from the plaintiff's counsel, the evidence of course

10   of conduct is all based on what NYU produced in discovery.

11   There is no evidence that at the time of contracting this is

12   what the plaintiff is focusing on and this is what the

13   plaintiff is thinking.

14        Also, the Second Circuit has not held that course of

15   conduct necessarily means there was an implied contract for

16   in-person.  Once again, the Second Circuit was looking at the

17   pleading stage at a variety of different things, course of

18   conduct being one of them, and saying maybe at some point later

19   in the proceeding, the fact finder may or may not find this.

20   So that has not been determined.  Instead, individualized

21   review is going to be necessary of what the different schools,

22   what the different students saw, and, as I said, that changes

23   over time.

24        Some terms -- this is on page 24, which we'll just go

25   quickly.  Some of the terms are clearly not enforceable, and

OBLRHALa

1      your Honor, I think, picked out a good example.  It's your city

2      now.  You know, it's your city now.  How is that an enforceable

3      contract term?  It simply is not.  The other thing that we

4      heard about this morning was the welcome packet, exhibit 6.

5      That also is not anything that the plaintiff mentioned during

6      their deposition.  That was not a document that was produced by

7      the plaintiff, and frankly, it's unlikely the plaintiff ever

8      saw it.  That welcome packet goes out to admitted students at

9      admission time.  This particular named plaintiff was not

10     admitted regular -- admitted during the regular process.  They

11     were waitlisted, and they would not have received this

12     material.  There's no evidence that they did.

13             So moving then to adequacy, if you could direct your

14     Honor to page 26, there are three fundamental adequacy failures

15     here.  Number one, the plaintiff is not credible.  Number two,

16     the plaintiff is not knowledgeable about their case, and

17     contemporaneous evidence contradicts their claims.

18             As your Honor knows that in assessing adequacy, one of

19     the things that you will look at is the honesty and

20     trustworthiness of the named plaintiff.  That's the *Savino*

21     case, among others.  Page 26.  I'm not going to belabor the

22     point given the time.  We already talked about it, the ballet

23     bar.

24             If you turn to page 30, there's a disconnect between

25     what the plaintiff said about paying tuition and what actually

OBLRHALa

 1    happened.  The plaintiff in the second amended complaint said

 2    that they paid tuition.  They admitted at their deposition, in

 3    fact, that was not true.  Undeterred in a declaration with this

 4    Court subsequent to that, they nevertheless said, I paid, and

 5    that is just not correct.  As your Honor pointed out, there are

 6    issues with the fact that the named plaintiff did not pay.

 7    They are not part of the class as they have defined it.

 8          We heard today that, well, it was a gift, and the

 9    money was transferred to Hall-Landers and then Hall-Landers

10    then transferred it to NYU.  That is not correct.  Factually,

11    it is wrong.  We have put in our papers the proof from NYU that

12    shows that it was the father that paid, and that does have

13    ramifications, including for whether this plaintiff would

14    receive a windfall if they got money back to them that they had

15    not personally paid.

16          Quickly looking at page 32.  The plaintiff here sued

17    without knowing that they had actually been refunded money that

18    they were suing NYU to get.  And they should have known, and

19    they should have bothered to check.  So here on page 32, the

20    second amended complaint at paragraph 8 said NYU continued to

21    charge full tuition and fees as if nothing had changed.  That

22    is not true.  All of the fees, the four fees, housing, meal

23    plan, insurance and equipment, and production fee had all been

24    refunded in 2020, and a lot had changed because in that spring

25    semester of 2020, NYU actually paid $61 million to students in

OBLRHALa

1    refunds.  So all of that is there.

2            On slide 33, I'll just direct your attention to

3    exhibit 62 because that's a document that the plaintiff

4    produced.  And that document shows that the plaintiff was told

5    on March 30 of 2020 that their refunds had been processed, and

6    they were in the bank.  And the plaintiff saw that because they

7    flipped it to their parents on April 1, 2020, but nevertheless,

8    they testified years later that they had not gotten the

9    tuition -- or they had not gotten the refunds.  Apologies.

10           Lastly on adequacy, I'll direct your attention to

11   page 36, and here, you know, one of the adequacy considerations

12   is:  Is this named plaintiff particularly vulnerable to

13   cross-examination?  And here they are for a bunch of the

14   reasons we've already talked about and for the reasons visibly

15   demonstrated on this page.  The fundamental tenet of the claim

16   is:  I didn't get the education I paid -- they didn't pay.  I

17   didn't get the education my father paid for you.  But if you

18   look at the quotes and the contemporaneous evidence of what

19   they were saying at the time, they're saying, I truly loved

20   your class.  They are saying, You're an amazing professor.

21   You're an awesome professor.  Thank you.  And, You're an

22   amazing professor "in-person and online."

23           So just briefly talking on damages for a second,

24   because I know we're short on time, I would just like to go to

25   page 39.

OBLRHALa

1          THE COURT:  I guess, one thing if you could focus

2     on --

3          MS. GORDON:  Of course.

4          THE COURT:  -- in particular, as Mr. Obergfell pointed

5     out, that the *USC* case, Judge Gee, before her was the same

6     damages model that the plaintiff was advocating for here.  So

7     why is this case different than that?

8          MS. GORDON:  So this case, it's very clear, your

9     Honor, that before, during, and after COVID, there was no

10    market price differential between the cost of an NYU in-person

11    education and the cost of NYU online education.  We have

12    provided to you your Clay Shirky's declaration.  Mr. Shirky is

13    a vice provost at NYU, and he says since he got to NYU in 2001,

14    there has been no price differential.  Indeed, NYU does not

15    consider the modality of the instruction when setting tuition

16    rates.  So I don't think it could be disputed that the

17    real-world evidence, what we should look at, there is no market

18    value differential.

19          There are a number of cases that we have cited in our

20    brief that in circumstances like this where there is no real

21    world market differential, it is improper to hire some expert

22    who does conjoint analyses for a living to try and cook one up.

23    The fact is there is no prince differential, and as your Honor

24    mentioned, I also don't understand what they think the

25    alternative was.  Every single school went remote because it

OBLRHALa

1    was illegal and unsafe to do anything otherwise.  And the

2    damages model they're proposing just completely ignores all of

3    that.  So we don't think it should be -- we think it should be

4    rejected.

5              And I could mention unjust enrichment or I could sit.

6    Thank you, your Honor.

7              THE COURT:  What I'd like to do is just take a short

8    two-minute recess, and, Mr. Obergfell, I'll let you do your

9    rebuttal.

10             MR. OBERGFELL:  That's fine.

11             THE COURT:  Okay.  Thank you very much.  We'll be

12    right back.

13             (Recess)

14             THE COURT:  You can be seated.  Thank you.

15    Mr. Obergfell?

16             MR. OBERGFELL:  Good.  Thank you, your Honor.

17             A couple things to be said, and I'll start with the

18    first overtly false statement that was made by NYU.  NYU just

19    represented in its papers and before this Court that plaintiff

20    made no reference of partial refunds in their second amended

21    complaint.  That is a false statement, and NYU, I guess, didn't

22    read paragraph 93 of the second amended complaint, which states

23    that NYU did not issue a refund of tuition but did issue a

24    partial refund as to certain mandatory fees.  So this notion

25    that plaintiff misrepresented something in their complaint is

OBLRHALa

1    utterly false.

2              The second thing is NYU claims that plaintiff doesn't

3    have a command of her own case.  Yet Ms. Gordon asked

4    plaintiff, and this is at plaintiff's deposition, page 28, line

5    13 and 22.

6    "Q.  Is the contract that you just described memorialized in

7    writing?

8    "A.  In the course descriptions in Albert, courses were

9    described as being set in-person instruction giving specifics

10   as to the location on campus.  In addition, we paid a specific

11   itemized amount of tuition, and that was paid for in-person

12   courses."

13             So what plaintiff conceives of the bargain is totally

14   consistent with the evidence that I presented to this Court in

15   my affirmative argument, and that is that they had this

16   representation of an in-person instruction that was not

17   provided.  Full stop.

18             THE COURT:  I want to just go back to when the

19   contract was formed because I'm guided, again, by what the

20   Second Circuit has instructed me to do in terms of that issue.

21   And I know that the plaintiff testified in their deposition,

22   "When I hit enroll on the enrollment website for the courses

23   and paid tuition..." that's when they said that the contract

24   was formed.

25             Again, I'm coming back to enrollment versus are there

OBLRHALa

1   multiple contracts?  Are there contracts formed every semester?

2   Is there an individual contract for every course that a student

3   signs up for?  What is the point in time that I'm supposed to

4   be looking at?

5          MR. OBERGFELL:  Well, I think the answer is that once

6   plaintiff enrolled in NYU as a student, New York law would say,

7   at that time, the relationship between the university and the

8   plaintiff has become contractual.

9          THE COURT:  Sure.

10          MR. OBERGFELL:  Right.  But that doesn't answer the

11  question of what are the terms of contract.

12          THE COURT:  Exactly.

13          MR. OBERGFELL:  And obviously the student and the

14  university have a relationship that spans multiple years.  And

15  like any other contract, if I enter into a contract with

16  someone today, other terms could be added.  It's the same

17  contract, but new terms could be added or not added.

18          THE COURT:  Okay.  Then how do I determine a breach?

19  If the terms of the contract change over time, how do I

20  determine when NYU breached the contract?

21          MR. OBERGFELL:  Even if you look just at the time of

22  the enrollment, as I indicated before and NYU equivocated on

23  this, ████████████████████████████████████████████████████

24  ████████████████████████████████████████████████████████████

25  ████████████████████  NYU is seeking to make an argument, oh, well,

1    maybe they didn't see it.  Maybe some people didn't see that.

2    But last time I checked, contracts are objective.  We don't

3    look to, oh, did somebody review a particular term or a

4    particular portion of the contract.

5           Contracts are objective based on their terms.  So if

6    these documents existed at the time of enrollment, then New

7    York law would say they are part of the contract.  Think of the

8    reverse, your Honor.  Imagine NYU is bringing a claim against

9    one of its students.  Would it be a defense for the student to

10   say, oh, I didn't see that particular part of the bulletin so

11   you can't enforce it against me.  That's simply not how

12   contracts work.  It's not just me saying it, your Honor.  If

13   you look at the *Ninivaggi* decision, Judge Bibas is very clear

14   on this.

15          Contracts are objective.  It doesn't matter if someone

16   saw something or didn't see something.  But then, there wasn't

17   a good answer in terms of just course of dealing, and your

18   Honor referenced the *USC* decision.  The *USC* court rejected the

19   very same argument made by NYU here that it doesn't matter

20   whether people saw different things as long as there was a

21   common promise, which we think we show that there is.  Then the

22   court went on to say, and regardless, the course of dealing is

23   such on that alone, I can make a determination as to the

24   implied contractual term for in-person instruction.  I think

25   the Second Circuit was getting at the very same thing.  These

OBLRHALa

1    things were sufficient on their own for an implied contractual

2    term.

3            THE COURT:  Ms. Gordon didn't focus too much on it

4    today, but I read in NYU's materials that students could seek a

5    tuition refund.  Is that correct that students could make an

6    individualized claim why they were entitled to a refund of

7    tuition?

8            MR. OBERGFELL:  So let me be clear on this.  So the

9    timeline is as follows:  NYU has a specific refund deadline as

10   part of its academic calendar.  That deadline had passed by the

11   time that NYU had closed, okay, and from there, students were

12   not allowed a refund as a matter of course.  I think there's

13   always a means to make a particular petition or something under

14   specialized circumstances, but there was certainly no refund

15   issued as a matter of course.

16           THE COURT:  Notwithstanding the deadline, did the

17   plaintiff here make any application for a tuition refund

18   explaining why they felt that their education was deficient?

19           MR. OBERGFELL:  Other than filing this lawsuit, I'm

20   not aware of a specific request.

21           THE COURT:  Okay.  Thank you.

22           MR. OBERGFELL:  The other thing I would like to say,

23   your Honor, is on the question of damages.  Because it's

24   puzzling to me how in NYU's view damages can be both subjective

25   and objective at the same time.  If you read the declaration of

OBLRHALa

1    Ms. Kirk Fair and Mr. Tomlin, who are NYU's experts, their

2    position that the value of tuition is objective, and Ms. Gordon

3    said it during her presentation.  She said every student got

4    what they bargained for.  It was the same price, right.  So

5    they are taking an objective standard as to damage, but on the

6    other hand, when it suits them, they say, oh, no, we have to

7    look at how each individual subjectively valued the education

8    to determine damages.

9         Well, it's one or the other.  It's either objective or

10    it's not.  So we're saying it's objective because it was

11    objectively less valuable as a matter of economics.  NYU

12    appears to be saying through its experts that it's objectively

13    the same price because of the prices of the market, but it's a

14    battle of the experts and that's a matter of economics.  That's

15    not a matter of predominance for class classification.  And the

16    *EZ Seed* case is very clear on this and the Second Circuit's

17    interpretation of *Comcast*.  Plaintiff only needs to propose a

18    damages model that is consistent with the theory of liability.

19    Plaintiff's theory of liability is that the education from

20    March 23 to May 11 was objectively worth less and that they

21    should be refunded that fair market value, and that is

22    consistent with both the implied contract claim and the unjust

23    enrichment claim.  And that's full stop for predominance black

24    letter law of the Second Circuit.

25         THE COURT:  Okay.  One final point, and then I have a

OBLRHALa

1    final question for Ms. Gordon as well.

2            MR. OBERGFELL:  Yes.  A lot of Ms. Gordon's

3    presentation was about *Garcia De Leon*, and I just want to

4    briefly touch on that before I sit down.  And it is my position

5    that *Garcia De Leon* is completely distinguishable by this case,

6    and I'll tell you why.  There was no tuition claim in *Garcia De*

7    *Leon*.  It was only a fees claim.  Why is that significant?

8    Okay, it's significant because the way NYU charges their

9    particular fees, it's on a school-by-school and

10   program-by-program basis.  There's one universal fee, but most

11   of them diversified, and not only that but the determination as

12   to whether those fees should be refunded was not made by NYU

13   leadership, it was made by the individual schools at the

14   individual level, which for obvious reasons presents a much

15   more difficult class situation than an exchange of tuition for

16   in-person instruction.

17           Every single student paid tuition.  None of them got

18   the in-person instruction they bargained for, and NYU's

19   leadership was the one who decided carte blanche——this was

20   undisputed in Ms. Gordon's presentation and in their

21   brief——that no student would get a tuition refund as a matter

22   of course.  So we're going to put in front of the jury in this

23   case all common evidence if we're able to.  The common evidence

24   is the implied terms.  It's the common evidence of the breach

25   and then the common evidence of the damages, and that is all

OBLRHALa

1    that is required for class certification.

2              Thank you, your Honor.

3              THE COURT:  Okay.  Thank you.

4              Similar question I asked Mr. Obergfell.

5    Notwithstanding the deadline Mr. Obergfell just mentioned about

6    seeking tuition refunds in a normal year, was there either a

7    path or did students generally apply for tuition refunds, and

8    did any students get tuition refunds?

9              MS. GORDON:  Yes.  So that was the subject of

10   testimony -- sorry.  Yes, that was the subject of testimony at

11   the depositions, and it's also in our declaration.  So there

12   was a process, and it's at the school level and determined by

13   the different schools.  So a student, subsequent to the

14   deadline, could seek a refund from the school, and the school

15   would take all of the individual facts into account and

16   determine whether or not to issue refunds.  My understanding,

17   based on the deposition testimony, is yes.  There were some

18   refunds that were issued.

19             THE COURT:  Okay.  Thank you very much.

20             MS. GORDON:  You're welcome.

21             THE COURT:  All right.  If we could ask you,

22   Ms. Gordon, since you provided these slides to the Court, they

23   should be part of the record.  So if you would just submit a

24   letter on the docket by attaching the slides so they become

25   part of the case record --

OBLRHALa

1          MS. GORDON:  Yes.

2          THE COURT:  -- and we will take the motion under

3   advisement and issue a report and recommendation in due course.

4   But I appreciate everybody coming in today for the helpful

5   presentations.  I hope you have a nice Thanksgiving holiday,

6   and we'll be adjourned.  Thank you.

7          MR. OBERGFELL:  Thank you, your Honor.

8          MS. GORDON:  Thank you.  Happy Thanksgiving to you,

9   too, your Honor.

10          (Adjourned)

11                              o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25