UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CASEY E. HALL-LANDERS, <u>individually and on behalf of all others similarly situated</u>,

                              Plaintiff,

          -v-

NEW YORK UNIVERSITY,

                              Defendant.

CIVIL ACTION NO. 20 Civ. 3250 (GBD) (SLC)

**<u>REPORT AND RECOMMENDATION</u>**

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE GEORGE B. DANIELS**, United States District Judge:

The COVID-19 virus set off this dispute, one of many in which a university student wants their tuition money back.  After Defendant New York University ("NYU") continued to collect and keep most of its students' tuition when it moved to solely online classes for part of the Spring 2020 semester, Plaintiff Casey E. Hall-Landers seeks to hold NYU liable on theories of breach of implied contract, unjust enrichment, and money had and received.  After some discovery and a trip to the Second Circuit and back, Hall-Landers now moves for class certification and appointments of class representative and class counsel.  (ECF No. 117 (the "Class Motion")).  NYU vigorously opposes its own student's attempt to certify a class of undergraduates who seek a refund of tuition.  Because Hall-Landers fails to establish predominance and superiority under Federal Rule of Civil Procedure 23(b)(3), we respectfully recommend that the Class Motion be denied.

## I. BACKGROUND

### A. Factual Background

The Second Circuit, Judge Daniels, and the undersigned have summarized the factual background of this action at different stages of the case, and those summaries are incorporated by reference.  See generally, Rynasko v. New York Univ., No. 20 Civ. 3250 (GBD) (SLC), 2021 WL 1565614 (S.D.N.Y April 21, 2021) ("Rynasko I") (dismissing Plaintiff Christina Rynasko for lack of Article III standing and denying leave to amend complaint to include Hall-Landers as futile), aff'd in part and reversed in part by Rynasko v. New York Univ., 63 F.4th 186 (2d Cir. 2023) ("Rynakso II") (affirming dismissal of Rynasko for lack of Article III standing, vacating denial of leave to amend complaint, and remanding for further proceedings); Hall-Landers v. New York Univ., No. 20 Civ. 3250 (GBD) (SLC), 2023 WL 8113243 (S.D.N.Y. Nov. 22, 2023) (granting in part and denying in part request to bifurcate class and merits discovery).[1]  What follows will focus on the facts pertinent to the Class Motion.

#### 1.  The Parties

##### a.  Hall-Landers

Hall-Landers is a citizen and resident of California, and they are a graduate of NYU's Tisch School of the Arts where they majored in dance and enrolled in classes "[d]uring and leading up to the Spring Semester 2020[.]"[2]  (ECF Nos. 66 ¶ 16; 118 ¶ 3).  Before enrolling at NYU, Hall-Landers attended an open house where NYU representatives described the resources that would

---

[1] Internal citations and quotation marks are omitted throughout unless otherwise noted.

[2] The Court employs Hall-Landers's preferred pronouns "they" and "them."  (See, e.g., ECF No. 66 ¶¶ 18, 24–26, 98).

be available to them "as an in-person student." (ECF No. 134-1 at 10–11). In addition, on a campus tour, a dance student "made clear" to Hall-Landers that they would have access to physical therapy services. (ECF No. 134-1 at 20). Hall-Landers ultimately "enrolled at NYU to obtain the full experience of live, in-person courses and direct interactions with instructors and students[,]" and even though NYU offers online courses, Hall-Landers "purposefully did not apply to those programs" during the Spring 2020 semester, opting instead for "an on-campus experience" that provided a "variety of educational and extracurricular opportunities and benefits that only an in-person program can provide." (ECF No. 66 ¶ 17; see ECF No. 118 ¶ 9).

During the Spring 2020 semester, Hall-Landers "took seven classes (totaling 19 credits), all of which were to be taught in-person and on campus[,]" and chose those classes specifically because NYU's Course Catalog described each of them as "Instruction Mode: In Person[.]" (ECF Nos. 66 ¶¶ 18–19; 118 ¶¶ 5–7). They "paid approximately $27,964 in tuition" to NYU, plus "a $1,312 fee for a Tisch School of Arts Undergraduate Registration and Services Fee, a $38.50 liability insurance fee, and a $92.50 production fee, as well as other mandatory fees that were directly and proximately related to on-campus resources provided at NYU" for the Spring 2020 semester. (ECF Nos. 66 ¶ 20; 118 ¶ 4; see also ECF No. 149 ¶ 11).

The tuition and fees were allegedly "predicated on access to and constant interaction with and feedback from peers, mentors, professors, and guest lecturers[,]" together with other resources and facility access that accompanied on-campus, in-person learning. (ECF No. 66 ¶ 21). Hall-Landers "would not have paid as much, if any, tuition and fees for the Spring 2020 semester at NYU had they known that the courses would not, in fact, be taught in person." (Id. ¶ 18). NYU's move to fully remote education during the Spring 2020 semester deprived Hall-Landers of several

specific in-person, on-campus resources related to their course of study.  (Id. ¶¶ 3–5, 22–27; see ECF No. 118 ¶¶ 8, 10).  For example, Hall-Landers alleges they were "deprived access to the dance studio" when, previously, their "dance major cohort would meet each weekday for three hours in NYU's dance studio"; they "had to purchase a ballet bar out-of-pocket for their instruction at home, whereas at NYU they had access to one on [] campus"; they could not access "physical therapy services related to their dance instruction"; and, they were "deprived of vital collaborations with other students that were part of their classes[,]" like working together on "set, lighting, and costume" design for a student-produced show that NYU pulled funding for when it moved to fully remote education.  (ECF No. 66 ¶¶ 22–26; see ECF No. 134-1 at 71 (Hall-Landers describing being "limited in terms of our space" during remote dance classes)).

### b.  NYU

NYU is "a nonprofit educational institution" (ECF No. 148 ¶ 10), and, during the Spring 2020 semester, it "had ten distinct undergraduate schools at its New York campuses, which offered nearly 5,000 undergraduate courses across more than 230 areas of study taught by more than 5,000 faculty members."[3]  (ECF No. 146 ¶ 4).  At that time, "a total of 26,264 students were enrolled at NYU's New York campuses[, including] degree (e.g. bachelor's, associate's, certificates) as well as non-degree students (e.g. visiting undergraduate students, precollege credit-bearing program students)."  (ECF No. 147 ¶ 4.)  Of course, not all NYU students have identical undergraduate experiences; for example, "[s]ome undergraduate students in Spring 2020 took classes that were not taught by NYU faculty, such as NYU's language exchange programs with

---

[3] At oral argument, Hall-Landers's counsel clarified that NYU's New York campuses include its locations in Manhattan and Brooklyn.  (ECF No. 184 at 7).

Columbia University and students who signed up for internships in exchange for credit." (ECF No. 146 ¶ 4).

To attract students and administer its many curricula, "NYU and its various colleges, schools, and programs publish and disseminate" myriad "admissions materials, bulletins, recruitment materials, and other publications, which make different representations about the activities, services, and opportunities available at NYU generally or available to students enrolled in a particular college, school, or program[.]" (ECF No. 148 ¶ 4; see ECF Nos. 135-2–135-12 (bulletins and marketing materials for NYU's several schools); 148 ¶¶ 5–9 (comparing and contrasting the publications across various NYU schools)). According to NYU Executive Vice President Martin Dorph, those "publications and the descriptions of the activities, services, and opportunities contained therein change over time; thus, students who apply to enroll at NYU at different times and/or to different colleges, schools, or programs will be exposed to different publications." (ECF No. 148 ¶ 4). The various marketing materials and informational bulletins describe NYU generally and each of NYU's schools and programs more specifically. (Compare ECF Nos. 122-6 (describing "what your life will be like at NYU") and 122-7 (enticing prospective students to "Picture Yourself at NYU") with 122-9 (describing NYU's College of Arts and Science specifically) and 135-1 (describing NYU's Tisch School of the Arts specifically)).

To run each year, "NYU determines an operating budget to cover its various costs[.]" (ECF No. 148 ¶ 11). Tuition and student fees make up a portion of the overall budget. (Id. ¶ 18). When setting tuition rates for an academic year, NYU "considers its operating budget and other sources of revenue[] and determines a tuition rate that will allow it to meet its budgetary needs while also reflecting its affordability priorities." (Id.) The "modality of instruction"—whether in-person,

online, or a hybrid—is not considered "when setting tuition rates for a particular program" because "NYU has offered certain online degree programs at the undergraduate and graduate levels" before, during, and after the Spring 2020 semester. (ECF No. 146 ¶¶ 10–11). On top of tuition, "NYU's schools, colleges, institutes, and programs charged over 60 different school- and course-based fees for a wide variety of different purposes" during the Spring 2020 semester. (ECF No. 148 ¶ 18).

The largest component of NYU's budget is its salaries for "professors, administrators, and staff[.]" (ECF No. 148 ¶ 18). Approximately "70 percent of NYU's budget is made up of people . . . who provide . . . [and] support [] education, and people who maintain the campus and facilities." (Id.) NYU "has never used a conjoint analysis to set tuition prices[,]" and "[t]uition and fees net of financial aid is the largest source of funding for NYU's operating budget[,]" accounting for "58% of NYU's operating budget" in fiscal year 2020. (Id. ¶¶ 13–14). Tuition "does not cover the full cost of operating NYU[,]" and it draws other funding from "(1) student housing and dining; (2) sponsored research; (3) sponsored educational programs; (4) endowment distribution and other investment income; (5) contributions; (6) real estate; (7) all other revenue; (8) dental patient care; and (9) all other auxiliary operations." (Id. ¶ 14). Any funds left over in the budget after the fiscal year is "often reinvest[ed] [] back into capital costs" "to be able to replace facilities and invest in upgrades (classrooms, spaces for students, student housing, etc.)." (Id. ¶ 15).

Once NYU sets the budget and the tuition and fees rates for an academic year, "[s]tudents are charged tuition based on the particular college, school, and/or program in which they are enrolled, as well as the number of credits they take in a given semester." (ECF No. 149 ¶ 6). Students enrolled for "12–18 credits," for example, are often "charged a flat rate tuition amount

regardless of how many credits they take within that designated range; this flat rate is not, however, uniform across all schools." (Id.)  Students may pay their tuition "in any number of ways, including: (1) by the student; (2) federal grants; (3) NYU scholarships; (4) state scholarships; (5) private scholarships (including some that may not be reported to NYU); (6) tuition remission (i.e., free or reduced tuition for NYU employees and their children); (7) federal loans; (8) private loans; (9) by a parent, other family member, or other third-party; (10) by an employer; or (11) some combination thereof." (Id. ¶ 7).  NYU accepts payments by check, wire, or cash, but "[e]ach semester, some percentage of students do not actually pay the amounts that were invoiced to them." (Id.)  In short, all here agree that tuition rates vary across NYU's schools. (ECF No. 184 at 16, 32).

For the Spring 2020 semester, 7,997 undergraduate students were enrolled at NYU's New York campuses. (ECF No. 147 ¶ 6).  When the time comes for students to register for classes, they log onto NYU's Albert Portal, as they did during the Fall 2019 semester for classes in the Spring 2020 semester. (ECF No. 122-1 at 4–5).  The Albert Portal is used across all of NYU's schools and colleges, and in some cases where students register for classes by alternative means, the registration information presented remains the same.  (Id. at 5–6).  During course registration, students see and select several fields describing each course, among them:  the class name and number; which academic session the course will occur in; where and when classes will be held; the name of the instructor(s); the number of credits; the "Instruction Mode" (in-person, virtual, hybrid, etc.); the grading scale; whether the course is "Repeatable"; the number of total seats in the class and the number of open seats available to register for; and, whether the course is accepting registrations, waitlist applicants, or is closed to registration. (See ECF No. 122-38 at 3–

9).  With that information, students have some discretion to decide when, where, and how they will complete a necessary course-load in any given semester.  For example, some students built their Spring 2020 course schedule with both classes offered in person and others offered online. (ECF No. 146 ¶ 11).  Before NYU transitioned to fully remote learning during the Spring 2020 semester, many—but, crucially, not all—of NYU's undergraduate programs were offered in person on campus.  (See ECF No. 122-5 at 16).

  **2.  Transition From In-person to Online Instruction in Spring 2020**

  **a.  University-wide changes**

In January 2020, as the COVID-19 virus spread across China, some NYU instructors started teaching their courses remotely to accommodate students located in China, who were adhering to travel restrictions.  (ECF No. 146 at ¶ 6).  In March 2020, the Governor of the State of New York declared a state of emergency in the wake of the COVID-19 pandemic and ordered certain public health measures that, in part, required institutions to assess alternatives to in-person work and gatherings and prohibited in-person gatherings of certain sizes.  (ECF Nos. 135-15–135-17).  In response, NYU initially informed all faculty, staff, and students of its preparations and precautionary measures, and it launched a webpage to keep the NYU community up-to-date on COVID-related news at the university.  (See ECF No. 135-22).

By March 16, 2020, NYU had transitioned to fully remote courses and examinations for the remainder of the Spring 2020 semester, and it ordered students to vacate all university-provided student housing on the New York campus "by no later than March 22, [2020]" and to "return home for the remainder of the semester."  (ECF No. 135-47 at 2).  NYU provided certain accommodations for students in "exceptional" circumstances who could not vacate student

8

housing and it told all students that they would be refunded pro-rated "[r]oom and board costs" "for the remainder of the semester." (Id. at 3). In addition to student housing, NYU shuttered all its libraries, sports facilities, and certain other large venues and retail locations. (Id. at 4; ECF No. 122-23 at 3).

On April 11, 2020, NYU informed students that it had completed housing refunds for those required to vacate university housing for the remainder of the Spring 2020 semester, and had "reviewed dozens" of individual requests for "school- and course-based fees" refunds—"which [were] based on whether or not students received all or part of the services, supplies, or equipment associated with the fee"—telling students that the refunds would "be processed automatically[,]" starting on April 15, 2020, even if students did not "apply for refund[s they were] owed[.]" (ECF Nos. 135-49 at 2; 135-50 at 2; 135-59 at 2; 148 ¶ 19). "In total, NYU refunded in whole or in part more than 25 fees totaling more than $1 million." (ECF No. 148 ¶ 19).

Refunds of tuition, however, were not awarded as a general matter, but "individual students could petition the particular school in which they were enrolled to refund their individual tuition based on the student's particular extenuating circumstances[,]" and each "school[] had discretion to issue such refunds if [it] found a refund warranted under the circumstances." (ECF No. 149 ¶ 8).

By April 27, 2020, the "entire University [was] operating remotely[,]" and NYU reported about $100 million in expenses for the Spring 2020 semester, including $60 million in "housing and meal refunds"; "numerous school- and course-based fees" refunds; $3 million in financial assistance to help students return home from "Study Away" programs; $4 million "in emergency aid to students at [the] New York campus"; and "funds to double [NYU's] internet capacity[,]"

cover COVID-19 testing costs and "unlimited sick leave for those infected[,]" among other things. (ECF Nos. 135-48 at 2–3; 148 ¶¶ 19, 30–35; <u>see also</u> ECF No. 147 ¶ 11).  NYU posted the "School and Course Based Fee Refund Determinations" on one of its webpages.  (ECF No. 135-60).

As a result of the transition to remote education, NYU "canceled seven courses during the Spring 2020 semester because they could not effectively be transitioned to remote instruction[,]" and it "issued refunds of tuition for those courses[,]" but if "a student who was enrolled in one or more of the seven canceled classes nonetheless remained within the applicable flat rate tuition range of credits, they would not have received a refund because their tuition obligation did not change."  (ECF No. 149 ¶ 9; <u>see also</u> ECF No. 146 ¶ 7).  Courses that transitioned to remote instruction in Spring 2020 "continued to be taught by the same instructors who had been teaching them in-person."  (ECF No. 146 ¶ 8).  Course instructors were given some discretion on how best to transition their course to remote instruction.  (<u>See</u> <u>id.</u>)  Once the transition to remote instruction was announced, "NYU offered and provided laptops and WiFi hotspots free of charge to students who requested them to complete their courses remotely."  (<u>Id.</u> ¶ 9).

During the Spring 2020 semester, NYU received $25 million in relief funding under the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, half of which went "toward the cost of housing refunds" and the other half of which went "directly to students[.]"  (ECF No. 148 ¶ 36). Later, NYU received $12.8 million under the Coronavirus Response and Relief Supplemental Appropriations Act ("CRRSA") that "passed directly to students[,]" and $24.5 million that was "used to further offset losses from the housing refunds[.]"  (<u>Id.</u> ¶¶ 37–38).  Then, $33.5 million in funds awarded to NYU under the American Rescue Plan Act of 2021 ("ARP") "were passed directly to students[,]" while another "$33.4 million in ARP funds were used to offset lost revenue from

academic sources and toward practices to monitor and suppress Covid transmission and related direct outreach efforts to students." (Id. ¶ 39).

In addition to providing remote instruction and course-related services, NYU continued to provide other services and resources to students during the Spring 2020 semester, including, for example, physical therapy (ECF Nos. 136 ¶ 5; 138 ¶ 10); reasonable accommodations for those with "hearing, visual, mobility, attention, chronic illness, and or psychological" impairments through the Moses Center for Student Accessibility (ECF No. 137 ¶¶ 2, 4–5); academic advising and career counseling (ECF Nos. 138 ¶ 9; 148 ¶ 23); "virtual medical appointments, virtual [mental health] counseling appointments and virtual drop-in counseling hours, virtual psychiatric medication services, and virtual weekly wellness workshops and group therapy sessions" (ECF No. 139 ¶ 7); grant and research services (ECF No. 148 ¶ 25); library services (id. ¶ 26); athletics and fitness resources (id. ¶ 27); religious and spiritual services (id. ¶ 29); technological support (id. ¶ 30); and "billing, collecting, refunding, and cashiering functions" through the Office of the Bursar (ECF No. 149 ¶¶ 4, 14).

#### b. **Hall-Landers**

For their part, Hall-Landers alleges NYU's transition to fully remote education in Spring 2020 "deprived [them] of the opportunity to collaborate with their dance major peers and with students in other departments and [] also deprived [them] of the full scope of their training as a dance major." (ECF No. 66 at ¶ 26). Because Hall-Landers did not receive all the benefits of in-person education on NYU's New York campus for the remainder of the Spring 2020 semester, after March 2020, they seek a refund for tuition they allegedly did not receive. (See generally ECF No.

66).  For most of the remainder of the Spring 2020 semester, Hall-Landers studied at NYU remotely from San Diego.  (See ECF No. 134-1 at 48).

According to NYU's records, Hall-Landers's total tuition and fees for the Spring 2020 semester amounted to $41,205.00, "consisting of $27,964.00 in tuition, $6,694.00 for housing, $2,568.00 for a meal plan, a $185 Production Fee, a $77 Liability Insurance Fee, a $1,312.00 Tisch Undergraduate Registration and Services Fee, and $2,405.00 for health insurance."  (ECF No. 149 at ¶ 11).  After the transition to fully remote education, NYU refunded Hall-Landers's "housing by $3,347.00, their meal plan by $1,306.14, their Production Fee by $92.50, and their Liability Insurance Fee by $38.50, resulting in a total refunded amount of $4,784.14."[4]  (Id.; see also ECF No. 148 at ¶ 19).  Again, according to NYU's records, Scott A. Landers, Hall-Landers's father, paid their tuition and fees for the Spring 2020 semester.  (ECF No. 149 at ¶ 12).  Hall-Landers did not seek or receive "a refund of any tuition [they] paid for [the] Spring Semester 2020."  (ECF No. 118 at ¶ 11; see ECF No. 184 at 79 ("THE COURT: Notwithstanding the deadline, did [Hall-Landers] make any application for a tuition refund explaining why they felt that their education was deficient? [Hall-Landers's Counsel]: Other than filing this lawsuit, I'm not aware of a specific request.")).

Moreover, after NYU transitioned to remote education and services, Hall-Landers scheduled but missed appointments for reasonable accommodations and for non-academic services (e.g., ECF Nos. 136 ¶ 6; 137 ¶ 6; 138 ¶ 11; 139 ¶ 8), or otherwise did not utilize extra-

---

[4] These amounts conflict with those Hall-Landers provided in their Statement of Account for the Spring 2020 semester (ECF No. 122-37), but both accounts state that NYU refunded Hall-Landers at least $4,653.14 in housing, meal, and other fees for the Spring 2020 semester.

curricular services and resources that NYU offered during the remainder of the Spring 2020 semester.

### 3. The Proposed Class

Hall-Landers seeks certification of a class of students described as follows: "All undergraduate students enrolled in classes at New York University at one of NYU's New York campuses during the Spring 2020 semester who paid tuition."  (ECF No. 117 at 1 (the "Proposed Class")).  They also seek appointment as class representative for the Proposed Class, and the appointment of Bursor & Fisher, P.A. as class counsel.  (Id.)

### 4. Expert Opinions

To support certification of the Proposed Class, Hall-Landers engaged Steven P. Gaskin, an "independent survey expert" to:

> design and describe a market research survey and analysis that would enable [him] to assess the extent of any reduction in market value resulting from the [c]losure of [NYU's] campus (measured in dollars and/or percentage terms), meaning the difference in market value between in-person classes and full access to [NYU's] campus and facilities, compared to the market value of online classes and no access to [NYU's] campus or facilities, at the time and point of acceptance.

(ECF No. 119 ¶¶ 2, 10).

Hall-Landers also engaged Colin B. Weir, "President at Economics and Technology, Inc." to:

> ascertain whether it would be possible to determine damages on a class-wide basis using common evidence, and if so, to provide a framework for the calculation of damages suffered by the proposed class . . . [and] work with Steven Gaskin to help design (from an economic perspective), and to evaluate the economic suitability of a conjoint survey (to be designed, implemented, and analyzed by Mr. Gaskin) to measure the overpayment of [NYU's tuition] resulting from the switch from in-person classes and access to [NYU's] campus to online classes and not having access to [NYU's] campus.

(ECF No. 120 at 2 ¶ 1; 4 ¶ 6; 15).

To calculate class-wide damages, Gaskin intends to conduct a web-based conjoint analysis, by way of a survey, that will—in short—allow him to analyze the data collected from at least 300 students and arrive at a figure he describes as "the difference in market value between in-person classes and full access to [NYU's] campus and facilities, compared to the market value of online classes and no access to [NYU's] campus or facilities, at the time and point of acceptance." (ECF No. 119 ¶¶ 14–57). Weir believes "that it is possible to determine class-wide damages in this case using [NYU's] own available records, third-party records, industry resources, and the conjoint analysis that is to be conducted, and analyzed by Mr. Gaskin." (ECF No. 120 ¶ 6). Weir reviewed Gaskin's Declaration, worked with him "to develop part of the survey[,]" and concluded that "Gaskin's conjoint survey is properly designed to measure overpayment for [NYU's] in-person classes and access to [NYU's] campus compared to the online classes that [NYU] provided and not having access to [NYU's] campus." (Id. ¶¶ 9, 25–29). Gaskin intends to calculate a specific percentage that represents the market value difference described above, and, in his view, it "will apply equally to all class members." (ECF No. 119 ¶ 55). Weir provided the proposed formula to calculate class-wide damages: "%Overpayment Factor x $Tuition x %Prorate = Damages" (ECF 120 ¶ 44 (emphasis omitted)). Hall-Landers intends to rely on Gaskin's and Weir's opinions to calculate damages for the Proposed Class. (See ECF No. 121 at 27–28).

In rebuttal, NYU engaged Rebecca Kirk Fair, "Managing Principal with Analysis Group, Inc., a consulting firm headquartered in Boston, Massachusetts" (ECF No. 135-71 at 1, 5), and Jonathan T. Tomlin, "an economist and Senior Managing Director in the Los Angeles office of Ankura Consulting" (ECF No. 135-72 at 1, 4).

Fair reviewed and evaluated "(1) the conjoint survey proposed by Mr. Gaskin and the proposed reliance on this conjoint [survey] by Mr. Weir . . . if designed and implemented[] and (2) [whether] the proposed damages methodology used by Mr. Weir would produce reliable and scientifically adequate calculations of an alleged 'overpayment'" of tuition as a result of the transition to fully remote education during the Spring 2020 semester. (ECF No. 135-71 at 6). She provided several opinions, summarized as follows:

- "Real-world data on tuition, applications, and enrollment for NYU programs both before, during, and after the Spring of 2020 do not support [Hall-Landers's] allegations of a reduction of the fair market value of their education and a tuition overpayment as a result of NYU transitioning to remote education in the Spring 2020 semester." Fair asserts that Gaskin and Weir did not take into account that NYU's tuition and fee rates do not change based upon the mode of education; that students voluntarily enrolled in online courses before, during, and after the Spring 2020 semester; and Hall-Landers "took a mix of remote, blended, and in-person courses."

- "These real-world outcomes, which are not considered by Mr. Gaskin and Mr. Weir, directly contradict their study design, their articulation of the expected results and projected outcomes of" the proposed conjoint analysis, which "would reflect [a] biased an unreliable survey design."

- "[A] conjoint [analysis] cannot be used as designed to measure any purported decrease in fair market value of the education received by proposed class members in this case for three reasons. First, conjoint analysis would, at best, measure changes in respondents' willingness to pay, not actual changes in tuition prices. For the results of a properly designed conjoint survey to measure changes in prices, one would need to show that the changes in willingness to pay would result in an equivalent change in market prices, and that would require a consideration of both demand and supply factors, including competitor universities' responses and NYU's cost structure. Neither Mr. Gaskin nor Mr. Weir have considered any of these factors. Second, conjoint analysis is not an appropriate tool to study market prices or aggregate willingness to pay for a multi attribute, bespoke product such as higher education. Third, the extraordinary circumstances surrounding the Covid-19 pandemic cannot be appropriately modeled or described by a conjoint study, particularly when the target population did not experience the challenge of advancing their education in the midst of a pandemic."

- "Gaskin introduces three design elements that would materially inflate the biased and irrelevant measures of willingness to pay for the key 'Class and Campus Format' attribute:

(1) the survey's target population cannot be representative of members of the proposed class, as it will include respondents who may have never attended or been accepted to NYU or any of the other schools included in the survey; (2) regardless of when target respondents attended college, none of the survey's target population could have faced the question presented regarding on-campus or remote instruction, leading to minimal engagement from respondents; and (3) the survey's distractor attributes, which will ask respondents to make uninformative trade-offs, are likely to inflate any estimates of the fair market value associated with the 'Class and Campus Format' attribute.  These flaws would lead [Hall-Landers's] experts to overestimate the fair market value of in-person instruction and NYU campus access during the Covid-19 pandemic."

- Because Weir's damages calculation "relies on the estimates of" Gaskin's survey, Weir's estimation of damages will be "unreliable and inflated."

(ECF No. 135-71 at 7–9).

NYU engaged Tomlin "to perform an economic analysis of" Gaskin's and Weir's proposals.

(ECF No. 135-72 at 6).  Tomlin's opinions are summarized as follows:

- "Actual tuition pricing at NYU does not support the existence of a price premium paid by students for in-person instruction compared to remote instruction during the Spring of 2020."  Neither Gaskin nor Weir "examines actual tuition prices at NYU[,]" and do not mention that the mode of education (whether in-person, online, or hybrid) did not change the tuition rates before and after Spring 2020.

- Gaskin's and Weir's "proposed methodology cannot reliably determine damages for any putative class member (or on a classwide basis) because it (1) "incorrectly assumes a single university with a single tuition amount"; (2) "ignores how NYU actually sets tuition prices"; (3) "proposes surveying individuals, including those who did not and never could have attended NYU"; and, (4) "overlooks the fact that there was no 'market' for in-person classes at NYU or at other comparable colleges and universities across the country in the latter part of Spring 2020."

(ECF No. 135-72 at 6–7).

**B.  Procedural Background**

    **1.  Pre-Answer Proceedings**

On April 24, 2020, plaintiff Christina Rynasko filed the Complaint (ECF No. 1), and then, on

September 1, 2020, filed the First Amended Complaint (ECF No. 25)  Judge Daniels later granted

NYU's motion to dismiss, concluding that Rynasko lacked Article III standing to pursue her claims and denying as futile her motion to amend to add Hall-Landers as a plaintiff.  (ECF No. 57 at 4–8); Rynasko I, 2021 WL 1565614 at *2–4.  The case was then closed.  (ECF No. 58).  On appeal, the Second Circuit affirmed Judge Daniels's dismissal of Rynasko's claims for lack of Article III standing but held it would not be futile to amend the complaint to include Hall-Landers because "the [Second Amended Complaint] states plausible claims for breach of contract, unjust enrichment, and money had and received[,]" aligning itself with three other circuits that "have recognized the plausibility of implied breach of contract claims brought by students seeking partial tuition reimbursements in the COVID-19 context."  (ECF No. 62 at 12, 21).  See Rynasko II, 63 F.4th at 193, 197.

Following remand, on September 19, 2023, Hall-Landers filed the Second Amended Complaint.  (ECF No. 66).  NYU filed its Answer on November 2, 2023.  (ECF No. 72).  Judge Daniels referred the case for general pretrial supervision and settlement.  (ECF No. 75).  The Court granted in part and denied in part NYU's opposed motion to bifurcate class action and merits discovery and set a briefing schedule for the Class Motion (ECF No. 83), which it later extended to give the parties additional time to complete class discovery.  (ECF No. 96).

### 2.  **The Class Motion**

On June 21, 2024, Hall-Landers filed the Class Motion, seeking certification of the Proposed Class.  (ECF No. 117).  Among other papers, they submitted their own declaration together with declarations from Gaskin and Weir.  (ECF Nos. 118–24).  On September 18, 2024, NYU filed its opposition, including eleven declarations from NYU's counsel, various NYU employees, and its two rebuttal experts—Fair and Tomlin.  (ECF Nos. 134–49 (the "Opposition")).

On October 30, 2024, Hall-Landers filed a reply that includes deposition excerpts and rebuttal reports from Gaskin and Weir. (ECF Nos. 163–69). The written submissions include deposition excerpts, NYU marketing materials, financial records, and documents relating to university operations during the COVID-19 pandemic. On November 21, 2024, the Court heard oral argument on the Class Motion. (See ECF min. entry Nov. 21, 2024; ECF No. 184).

## II. DISCUSSION

### A. Legal Standards

#### 1. Federal Rule of Civil Procedure 23

Federal courts do not certify a class lightly. In fact, because class actions are the "exception to the usual rule that litigation is conducted by and on behalf of the individual named parties[,]" we engage in a "rigorous" review of the Class Motion under Federal Rule of Civil Procedure 23. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 348, 350–51 (2011); Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013). See also In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d 108, 117 (2d Cir. 2013) (affirming class certification where "district court conducted a rigorous analysis based on the relevant evidence"). The movant bears the burden to meet the required elements by a preponderance of the evidence, see Sykes v. Mel Harris & Assocs. LLC, 285 F.R.D. 279, 286 (S.D.N.Y. 2012), aff'd, 780 F.3d 70 (2d Cir. 2015), and they must submit "enough evidence, by affidavits, documents, or testimony" to satisfy the Rule, Shahriar v. Smith & Wollensky Rest. Grp., Inc., 659 F.3d 234, 251 (2d Cir. 2011). "[N]otwithstanding the[] overlap with merits issues[,]" we "must resolve material factual disputes relevant to each Rule 23 requirement[.]" In re U.S. Foodservice, 729 F.3d at 117.

Two hurdles stand in the way of class certification. <u>First</u>, the movant must show that "[i] the class is so numerous that joinder of all members is impracticable; [ii] there are questions of law or fact common to the class; [iii] the claims or defenses of the representative parties are typical of the claims or defenses of the class; and [iv] the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These factors "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." <u>Dukes</u>, 564 U.S. at 349. On top of these four factors, "the Second Circuit [] recognizes an implicit 'ascertainability' requirement, which commands that the proposed class be defined using objective criteria that establish a membership with definite boundaries." <u>Martínek v. AmTrust Fin. Servs.</u>, No. 19 Civ. 8030 (KPF), 2022 WL 326320, at *3 (S.D.N.Y. Feb. 3, 2022). The ascertainability inquiry assesses whether the class is "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." <u>Brecher v. Republic of Arg.</u>, 806 F.3d 22, 24 (2d Cir. 2015).

<u>Second</u>, if the proposed class meets the Rule 23(a) prerequisites, the movant must then show that "the action can be maintained under Rule 23(b)(1), (2), or (3)." <u>In re Am. Int'l Grp., Inc. Sec. Litig.</u>, 689 F.3d 229, 238 (2d Cir. 2012). Plaintiffs seeking certification under Rule 23(b)(3), as Hall-Landers does here (ECF No. 121 at 23), "must establish that (i) 'questions of law or fact common to class members predominate over any questions affecting only individual members' and (ii) 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" <u>Martínek</u>, 2022 WL 326320, at *4 (quoting Fed. R. Civ. P. 23(b)(3)).

In the end, we have "broad discretion in deciding how and whether to certify a class, arising from [district courts'] 'inherent power to manage and control pending litigation.'" <u>In re</u>

Aluminum Warehousing Antitrust Litig., 336 F.R.D. 5, 37 (S.D.N.Y. 2020) (quoting Myers v. Hertz Corp., 624 F.3d 537, 547 (2d Cir. 2010)).

**B.  Application**

As we noted at the outset, a small universe of cases sprung up across the country in the wake of the COVID-19 pandemic, each involving students seeking refunds from educational institutions that transitioned to fully remote instruction during the Spring 2020 semester.  The reasoning across those cases is as diverse as the courts that considered them and as varied as the unique records in each case.  Reasonable minds arrived at opposite conclusions on substantially similar issues.

Some of the cases involved motions to certify classes that fall into two generalized categories: (i) a class seeking a refund of fees, e.g., Garcia De León v. NYU, No. 21 Civ. 5005 (CM), 2022 WL 2237452, at *1 (S.D.N.Y. June 22, 2022), and (ii) a class seeking a refund of tuition, e.g., Ninivaggi v. Univ. of Delaware, Nos. 20 Civ. 1478 (SB) & 20 Civ. 1693 (SB), 2023 WL 2734343, at *1 (D. Del. March 31, 2023).  Others sought to certify a class containing students seeking refunds of both tuition and fees.  E.g., Wright v. Southern New Hampshire Univ., 565 F. Supp. 3d 193, 201 (D.N.H. 2021); Arredondo v. Univ. of La Verne, 618 F. Supp. 3d 937, 950 (C.D. Cal. 2022); In re Suffolk Univ. Covid Refund Litig., No. 20 Civ. 10985 (WGY), 2022 WL 6819485, at *1 (D. Mass Oct. 11, 2022).

This is a tuition refund case.  (See ECF Nos. 66 ¶ 1; 117 at 1; 184 at 3 ("This is only a tuition class[.]")).  The Supreme Court, Second Circuit, and this District have not had occasion to consider a motion to certify a post-pandemic tuition-refund class, so (apart from recounting the applicable legal standards) no case controls the outcome of the Class Motion.  To the extent that another

court has ruled on the same or substantially similar issues as those presented here, that case is at best persuasive; otherwise, it is merely informative.

On the present record, we find that Hall-Landers has met the Rule 23(a) prerequisites but has not satisfied predominance and superiority under Rule 23(b)(3), so we recommend denying the Class Motion.

### 1. **Rule 23(a) Requirements**

#### a. **Numerosity**

Hall-Landers argues that the Proposed Class contains "tens of thousands of undergraduate students enrolled at NYU for the Spring 2020 Semester." (ECF No. 121 at 19–20). NYU did not mention numerosity in its briefing, but it submitted evidence showing several thousand undergraduate students enrolled for the Spring 2020 semester. (ECF No. 147 ¶ 11). That evidence shows "that joinder of all [putative class] members is impracticable," Fed R. Civ. P. 23(a)(1), because there are thousands of them, and as a result, the Proposed Class is sufficiently numerous. See Stewart v. Hudson Hall LLC, No. 20 Civ. 885 (PGG) (SLC), 2021 WL 6285227, at *7 (S.D.N.Y. Nov. 29, 2021) ("Courts in this Circuit presume numerosity at 40 putative class members.").

#### b. **Commonality & Typicality**

Commonality and typicality "tend to merge into one another," so we consider them together. Marisol A. v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997). They are "guideposts" to determine whether Hall-Landers's claims "and the class claims are so interrelated that the interest of the class members will be firmly and adequately protected in their absence." Vu v. Diversified Collection Servs., Inc., 293 F.R.D. 343, 353–54 (E.D.N.Y. 2013).

Commonality "requires the plaintiff to demonstrate that the class members have suffered the same injury." Dukes, 564 U.S. at 349–50. The common injury "must be of such a nature that it is capable of class wide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id. "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." Id.

Typicality "is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." In re Drexel Burnham Lambert, 960 F.2d 285, 291 (2d Cir. 1992).

Hall-Landers advances the unremarkable position that the Proposed Class suffered the same violations of law, and common questions stem from those violations; for example, whether the information on NYU's Albert Portal and in its marketing materials formed the terms of an implied contract for in-person, on-campus learning that NYU breached when it moved to fully remote classes in Spring 2020, or whether NYU unjustly retained students' tuition for those reasons. (ECF No. 121 at 20–21). Both the Supreme Court and this District have rejected similar arguments that alleged common questions merely from violations of the same law, Dukes, 564 U.S. at 350–51; Garcia, 2022 WL 2237452, at *11–12 (denying class certification for, in part, lack of commonality and typicality in case involving NYU student seeking to certify class of fee-paying students), and those precedents are what NYU hangs it hat on. In addition, NYU argues: that Hall-Landers lacks common evidence showing the putative class suffered the same injury; the alleged implied contracts varied among the Proposed Class; students availed themselves of different

educational experiences and services; and Hall-Landers's own injuries are highly individualized. (ECF No. 134 at 20–23). That is all best addressed during the Rule 23(b)(3) predominance inquiry. (See § II.B.2.a., infra).

At bottom, Hall-Landers's theory of the case is that all members of the Proposed Class paid NYU tuition for the Spring 2020 semester in exchange for the benefits of in-person, on-campus education and services at NYU's New York campuses, and NYU denied them those benefits by moving to remote, online instruction, so all putative class members should get some or all of their Spring 2020 tuition back. To prop up their position, Hall-Landers relies on Ninivaggi, where the District of Delaware certified a class of "[a]ll undergraduate students enrolled in classes at the University of Delaware during the Spring 2020 semester who paid tuition." 2023 WL 2734343, at *1. In Hall-Landers's view, Ninivaggi is pretty much the same case as this one (in no small part because Hall-Landers's counsel won class certification in Delaware and uses the same strategy here). That court made its decision based on the unique record before it, and we do too. More on that later; for now, Hall-Landers met their commonality and typicality burdens.

Commonality is a low bar that is passed by "even a single common question," 564 U.S. at 359, and Hall-Landers has presented, at least, common questions arising from contract formation and liability; that is, whether the putative class members and NYU entered into a valid contract when the putative class members accepted admission to NYU—as Hall-Landers contends (ECF No. 184 at 4 (". . . at the time of enrollment, the relationship between the student and the university becomes contractual"))—and whether NYU promised in-person instruction to its enrolled students during the Spring 2020 semester. Resolution of those questions would generate common, class-wide answers that would resolve a central issue of the dispute in one

stroke, so commonality is met. Moreover, Hall-Landers's claims and those of the Proposed Class certainly "arise from the same course of events[,]" In re Drexel Burnham Lambert, 960 F.2d at 291, and they involve the same or substantially similar legal arguments, so typicality is met too. As discussed later, however, (see § II.B.2.a., infra) individual inquiries predominate over common questions, therefore the Class Motion fails.

### c. **Adequacy**

Hall-Landers unsurprisingly argues that their participation in the litigation so far (through their deposition, involvement in drafting the pleadings and discovery responses, and willingness to testify at a trial in this matter)—together with their "strong interest in proving NYU's common course of conduct" and "obtaining redress"—show their interests are not antagonistic to that of the Proposed Class. (ECF Nos. 118 at ¶¶ 12–14; 121 at 22). They also contend that Bursor & Fisher, P.A. are qualified and experienced enough to conduct this litigation. (ECF Nos. 121 at 17–18; 122-36).

NYU does not contest that Bursor & Fisher, P.A. would be adequate class counsel, but it disputes that Hall-Landers would be an adequate class representative. Specifically, NYU says Hall-Landers: (i) lacks credibility on core issues because they made false or misleading representations in the pleadings and in discovery responses; (ii) is not a member of the Proposed Class because their father, not Hall-Landers themself, paid Hall-Landers's Spring 2020 tuition; (iii) their interests conflict with those of the Proposed Class because Hall-Landers's emails during Spring 2020 supposedly show they found remote instruction effective, and they registered for online courses in semesters after the Spring 2020 term but had no "expectation that NYU was going to discount [the] tuition[.]" (ECF Nos. 134 at 23–28; 134-1 at 85). NYU's arguments are not persuasive.

"Adequacy has two components:  '[f]irst, class counsel must be qualified, experienced and generally able to conduct the litigation,' and '[s]econd, the class members must not have interests that are antagonistic to one another.'"  Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc., 338 F.R.D. 205, 212 (S.D.N.Y. 2021) (quoting In re Drexel Burnham Lambert Grp., Inc., 960 F.2d 285, 291 (2d Cir. 1992)); see Denney v. Deutsche Bank AG, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold:  the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members.").  "Class certification may properly be denied where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."  Maywalt v. Parker & Parsley Petroleum Co., 67 F.3d 1072, 1077–78 (2d Cir. 1995) (cleaned up).  The Court may also consider "the honesty and trustworthiness of the named plaintiff."  Savino v. Comput. Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998).

All here agree that Bursor & Fisher, P.A. would be adequate class counsel.  (See ECF No. 122-36; see generally ECF No. 134).  NYU is wrong, however, about Hall-Landers's ability to be an adequate class representative.  First, on the knowledge component, Hall-Landers need only show "a basic understanding of the instant action" to surpass adequacy; that is, a "sworn affidavit" that "clearly demonstrate[s] that [Hall-Landers is] familiar with, and [is] actively participating in, this litigation" will suffice because they are otherwise "entitled to rely on their counsel for the legal underpinnings of their claims."  Flores v. Anjost Corp., 284 F.R.D. 112, 129–30 (S.D.N.Y. 2012).  Hall-Landers has done so with a sworn declaration and participation in a deposition, in which they explain the operative facts that gave rise to the suit, the conflict involved

(that NYU did not refund Spring 2020 tuition and fees after moving to fully remote education), and that they have been in contact with counsel and participated both with the pleadings and discovery thus far.  (ECF Nos. 118; 134-1).

Second, on the interests component, Hall-Landers need only show that their interests are not "antagonistic" to those of the Proposed Class.  Denney, 443 F.3d at 268.  Hall-Landers seeks a refund of their Spring 2020 tuition, an interest shared by each member of the Proposed Class. That Hall-Landers shared positive experiences with certain instructors and in certain classes during the Spring 2020 semester, and that they participated in additional online courses after the Spring 2020 term does not make them an inadequate representative.  Many putative class members likely did the same thing.

Moreover, NYU places undue weight on the Court's discretion to consider Hall-Landers's "honesty and trustworthiness."  164 F.3d at 87.  NYU argues that some of Hall-Landers's allegations—coupled with their failure to affirmatively correct the details of those allegations after discovery shed more light on them—harm Hall-Landers's credibility and, therefore, their ability to adequately represent the class.  For example, Hall-Landers alleged that: "NYU continued to charge full tuition and fees for the [S]pring 2020 semester, as if nothing had changed[,]" even though NYU refunded some fees to students; Hall-Landers themself paid their Spring 2020 tuition even though their father paid tuition on their behalf; Hall-Landers was denied access to on-campus services and benefits after NYU moved to fully remote instruction even though Hall-Landers did not use them or missed appointments they made.  (ECF No. 134 at 24–27).  These are not the sort of discrepancies that "create serious concerns as to [Hall-Landers's] credibility at any trial[,]" when considering their adequacy to represent the Proposed Class.  Savino, 164 F.3d

at 87.  The credibility disputes here are not as egregious as those in <u>Garcia</u>, 2022 WL 2237452 at

*15, and Hall-Landers does not flip-flop in their account of the facts; nor do they appear now to

contest that NYU gave them partial refunds, that their father paid tuition on their behalf, or that

they missed appointments and did not use some on-campus services when NYU went fully

remote in Spring 2020.  Some of Hall-Landers's inartful allegations raise an eyebrow after the

sunshine of class discovery, the point of which is exactly that—to test the veracity of a plaintiff's

allegations.  Hall-Landers has not yet shown themselves to be so dishonest or untrustworthy as

to render them an inadequate class representative.  Adequacy is met.

### d.  <u>Ascertainability</u>

NYU argues again that the Proposed Class is not readily ascertainable because identifying

putative class members would require an individualized review of student records to determine

who paid tuition, and the Proposed Class is overbroad because it includes students who initially

enrolled in online classes for the Spring 2020 semester prior to the pandemic.  Hall-Landers says

the opposite—NYU can ascertain through its records who paid tuition, who received financial

assistance, and who enrolled in online courses before the pandemic.

In the Second Circuit, "a class must be 'sufficiently definite so that it is administratively

feasible for the court to determine whether a particular individual is a member,' and must be

'defined by objective criteria that are administratively feasible,' such that 'identifying its members

would not require a mini-hearing on the merits of each case.'"  <u>de Lacour v. Colgate-Palmolive</u>

<u>Co.</u>, 338 F.R.D. 324, 334 (S.D.N.Y. 2021), <u>lv. to appeal denied</u>, 2021 WL 5443265 (2d Cir. Sept. 16,

2021) (quoting <u>In re Petrobras Sec.</u>, 862 F.3d 250, 260 (2d Cir. 2017)).

The dispute here comes down to whether it is too much work for NYU to review its undergraduate student records to ascertain who is in the Proposed Class.  Relying on Evans v. Brigham Young Univ., No. 20 Civ. 100 (TS), 2022 WL 596862, at *1, 4–9 (D. Utah Feb. 28, 2022)—where class certification was denied—NYU says it is too arduous a task.  The court reasoned in Evans that it would be too burdensome for Brigham Young University to review its records in search of "all people who paid tuition" during the relevant period in that case.  Id.  The University of Delaware made the same argument in Ninivaggi, relying on Evans, but that court went the other way, concluding that it was administratively feasible for the university to review its records to figure out which students paid tuition; that is, which students did not receive a full-ride scholarship.  2023 WL 2734343, at *2.  Crucially, the proposed class in Ninivaggi was limited to "students" who paid tuition for the relevant period, not "all people who paid tuition," as in Evans. Id.  In Judge Bibas's view in Ninavaggi, based on the proposed class definition, it did not matter whether a third party assisted a student in paying tuition; the University of Delaware had records of which students paid tuition during the relevant period, and it was not too hard for them to figure out who belonged in the class.  Id.  The same is true here.  The Proposed Class includes "[a]ll undergraduate students enrolled in classes at [NYU] at one of NYU's New York campuses during the Spring 2020 semester who paid tuition."  (ECF No. 117 at 1).  NYU has records of those transactions, and it does not matter to the ascertainability analysis whether students paid tuition out of their own pocket or had the assistance of a third party.  See Ninivaggi, 2023 WL 2734343, at *2.  It is also administratively feasible for NYU to search its records for tuition-paying students who received financial assistance or enrolled in online courses during the Spring 2020 term before the pandemic.  The Proposed Class is ascertainable.

### 2. Rule 23(b)(3) Requirements

Hall-Landers satisfied the Rule 23(a) prerequisites, but they fall short on predominance (and therefore superiority), so the Class Motion fails.

#### a. Predominance

"[Q]uestions of law or fact common to class members [must] predominate over any questions affecting only individual members[.]"  Fed. R. Civ. P. 23(b)(3).  Predominance "'is far more demanding' than the commonality requirement," so commonality "is subsumed under, or superseded by, the more stringent" predominance inquiry.  Dial Corp. v. News Corp., 314 F.R.D. 108, 113 (S.D.N.Y. 2015) (quoting Amchem Prods. v. Windsor, 521 U.S. 591, 609, 624 (1997)).  This "inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  521 U.S. at 623.  We "must assess [i] 'the elements of the claims and defenses to be litigated,' [ii] 'whether generalized evidence could be offered to prove those elements on a class wide basis or whether individualized proof will be needed to establish each class member's entitlement to relief,' and [iii] 'whether the common issues can profitably be tried on a class wide basis, or whether they will be overwhelmed by individual issues.'"  Scott v. Chipotle Mexican Grill, Inc., 954 F.3d 502, 512 (2d Cir. 2020).

"Predominance is not simply an exercise in tallying up issues; it is a qualitative inquiry that entails careful scrutiny of the nature and significance of a case's common and individual issues."  Haley v. Teachers Ins. & Annuity Ass'n of Am., 54 F.4th 115, 121 (2d Cir. 2022); accord Petrobras, 862 F.3d at 271.  We must "consider all factual or legal issues"—including affirmative defenses— "and classify them as subject either to common or individual proof."  Haley, 54 F.4th at 121. "Plaintiffs need not prove, however, that the legal or factual issues that predominate will be

answered in their favor." Kurtz v. Costco Wholesale Corp., 818 F. App'x 57, 61 (2d Cir. 2020)

(summary order) (citing Amgen Inc. v. Conn. Ret. Plans & Tr. Funds, 568 U.S. 455, 468 (2013)).

That damages may require individualized proof does not preclude certification of common issues

relating to liability, see Johnson v. Nextel Commc'ns Inc., 780 F.3d 128, 138 (2d Cir. 2015), but the

damages methodology "must actually measure damages that result from the class's asserted

theory of injury." Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015).  "In short, the

question for certifying a Rule 23(b)(3) class is whether resolution of some of the legal or factual

questions that qualify each class member's case as a genuine controversy can be achieved

through generalized proof and whether these particular issues are more substantial than the

issues subject only to individualized proof." Johnson, 780 F.3d at 139.

The Class Motion includes three claims against NYU:  (1) breach of implied contract;

(2) unjust enrichment; and, (3) money had and received.  (ECF No. 121 at 24–29).  See Rynasko II,

63 F.4th at 197 n.12 (noting that Hall-Landers abandoned breach of contract claim).  The parties'

arguments for and against class certification turn on whether common issues of proof of these

claims predominate.  (See, e.g., ECF Nos. 121 at 19–29; 134 at 20–23, 30–40).  Deciding the Class

Motion, then, "involves considerations that are enmeshed in the factual and legal issues

comprising [Hall-Landers's] cause[s] of action[,]"  Dukes, 564 U.S. at 351, so we consider the

elements of each claim under New York law alongside the parties' predominance arguments.

### i.  Breach of Implied Contract

We consider Hall-Landers's breach of implied contract claim first.  In New York, "an implied

contract is formed when a university accepts a student for enrollment." Papelino v. Albany College

of Pharmacy of Union Univ., 633 F.3d 81, 93 (2d Cir. 2011).  The contract terms "are contained in

the university's bulletins, circulars[,] and regulations made available to the student." <u>Amable</u>, 551 F. Supp. 3d at 308. "The interpretation of a university's catalogue, like the interpretation of any contract, is a matter of law for the Court." <u>Id.</u> To succeed on this theory of implied breach of contract, "a student must identify specific language in the school's bulletins, circulars, catalogues[,] and handbooks which establishes the particular contractual right or obligation alleged[.]" <u>Id.</u> In other words, a student "must point to a provision that guarantees 'certain specified services,'" as opposed to a "general statement of policy," "or [] statements of opinion or puffery[.]" <u>Id.</u> "General policy statements and broad and unspecified procedures and guidelines will not suffice." <u>Id.</u> at 308–09 (collecting cases). The "essence" of the contract is that the academic "institution must act in good faith in its dealings with its students," while "the student must fulfill [their] end of the bargain by satisfying the university's academic requirements and complying with its procedures." <u>Papelino</u>, 633 F.3d at 93.

To show the existence and terms of an implied contract between NYU and the putative class members promising in-person, on-campus education during the Spring 2020 semester, Hall-Landers points to (i) the fact that the putative class members accepted their offers of admission to NYU, (ii) the Albert Portal, with its various descriptive fields describing each class; (iii) NYU's website together with its university-wide and school-specific marketing materials, which describe the benefits of in-person, on-campus education; and, (iv) NYU's past course of conduct in providing in-person, on-campus education "from its inception," never—before Spring 2020— "completely alter[ing] its delivery of instruction[.]" (ECF No. 121 at 26). The Second Circuit acknowledged these sources as sufficient to plausibly allege the existence of an implied contract <u>at the pleading stage</u>. <u>Rynasko</u>, 63 F.4th at 198. At the class certification stage, however, NYU

correctly argues that if such an implied contract existed, each student's contract is subject to individualized review because it would involve either examining contract language (i.e., the specific marketing materials on which a student relied) or examining extrinsic evidence to assess ambiguous terms.

Determining whether an implied contract existed is not as simple as asking, "Did NYU promise in-person education in exchange for tuition?"  In a vacuum that question might be resolved class-wide, but we must look closer.  As Judge McMahon noted in Garcia, NYU "advertised different services in exchange for the payment of fees," each of which was "for a different program or service."  2022 WL 2237452, at *18.  Hall-Landers relies on similar marketing materials to those Garcia de León cited, which show that tuition was similarly not uniform across all putative class members.  (See, e.g., ECF Nos. 122-6–122-17).  Rather, "[s]tudents are charged tuition based on the particular college, school, and/or program in which they are enrolled, as well as the number of credits they take in a given semester."  (ECF No. 149 ¶ 6).  In the absence of a form contract, as here, the Court would be required to assess the materials relevant to each implied contract for each putative class member because the services each received depended on the NYU program they attended, whether NYU made a specific and enforceable promise to provide in person instruction for that program (even each class), and the tuition they paid for it. Cf. Zagoria v. New York Univ., No. 20 Civ. 3610 (GBD) (SLC), 2021 WL 1026511, at *4–5 (S.D.N.Y. March 17, 2021) (dismissing breach of contract claims for failure to allege "specific promise to provide in-person educational services"); Hassan v. Fordham Univ., 533 F. Supp. 3d 164, 168–69 (S.D.N.Y. 2021) (same); In re Columbia Tuition Refund Action, 523 F. Supp. 3d 414, 422–23 (S.D.N.Y. 2021) (dismissing Columbia plaintiffs' instructional format claim for failure to plead specific

promise to provide exclusively in-person instruction). Such an individualized inquiry overcomes any common issues concerning the existence and terms of the implied contractual obligations NYU might have owed to all members of the Proposed Class. See Garcia, 2022 WL 2237452, at *18 (explaining that class certification of breach of contract claim is inappropriate where court would have to examine individual contract language).

Because the formation and terms of any implied contracts here are subject to individualized inquiry, so too are the questions of breach, injury, and causation. NYU continued to provide educational instruction to its undergraduate students, so breach is not evident on its face. Moreover, the Court would need to consider each putative class member's circumstances to determine whether they suffered an injury that NYU caused by its purported breach. For example, the coursework and curricular requirements are quite different between an economics major who routinely attends lectures, writes term papers, and takes a final exam, on the one hand, and a visual arts major who designs and creates studio-based, in-person projects in various media. See Brittan v. Trustees of Columbia Univ., No. 20 Civ. 9194 (PKC), 2021 WL 3539664, at *5 (S.D.N.Y. Aug. 30, 2022) (holding that visual arts students whose university's handbook promised "a program geared around the physical creation of art" and sound arts students who were promised studio sessions and meetings with mentors stated plausible contractual claims). Recall too that "individual students could petition the particular school in which they were enrolled to refund their individual tuition based on the student's particular extenuating circumstances[,]" and each "school[] had discretion to issue such refunds if [it] found a refund warranted under the circumstances." (ECF No. 149 at ¶ 8). Injury depends, in part, on the circumstances of each student's course of study and whether each putative class member already received a tuition

refund from their school.  See Garcia, 2022 WL 2237452, at *18 ("To determine whether those refunds were sufficient, this court would have to review each individual fee, each individual refund, and determine whether the associated services, supplies, or equipment were provided and, if not, whether a sufficient refund was issued.").  That requires individualized review.

The same is true of damages.  We do not rely on the parties' expert reports because each putative class member paid tuition—and was or was not injured—in an amount based on their unique circumstances, so determining damages necessarily involves individualized review of the harm to each student under the terms of the alleged implied contract.  See Omori v. Brandeis Univ., 673 F. Supp. 3d 21, 26–29 (D. Mass. 2023) (denying certification of a tuition-seeking class and concluding individual issues predominated because "the value of the post-COVID education provided by [the university] in Spring, 2020 would require individualized proof complicated by 'the presence of thousands of plaintiffs'").  While an individualized damages assessment alone does not necessarily preclude certification, Roach, 778 F.3d at 408, the damages inquiry here is just the last in a cascade of individualized assessments.

Common questions simply do not predominate over individual inquiries here, "among the extremely heterogenous class[.]"  Rynasko, 63 F.4th at 205 n.2 (Parker, J., concurring in part and dissenting in part).  Where such individualized assessments are necessary, we may decline to certify a class action for breach of implied contract.  Garcia, 2022 WL 2237452, at *18 (quoting In re U.S. Foodservice Inc. Pricing Litig., 729 F.3d at 124).  Accordingly, we recommend denying Hall-Landers's request to certify the Proposed Class on a breach of implied contract theory.

### ii.  Unjust Enrichment & Money Had and Received

Next, Hall-Landers argues common evidence is capable of resolving the unjust enrichment and money had and received claims because NYU benefitted from each putative class member paying tuition for the Spring 2020 semester and improperly retained that benefit by "wrongfully plac[ing] the cost and financial hardship associated with the pandemic squarely on the shoulders of" the Proposed Class.  (ECF No. 121 at 28).  NYU contends again that individual issues predominate because determining whether NYU was unjustly enriched involves an individualized inquiry into "the quality and value of the educational services NYU provided," whether each class member availed themselves of those services, what their expectations were for those services, whether they registered for online classes before the pandemic, and how much tuition or other financial assistance they received during the Spring 2020 semester.  Here again, individual issues predominate, so we recommend denying certification.

"The basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover."  Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 306 (2d Cir. 2004).  Unjust enrichment "lies as a quasi-contract claim" that "contemplates 'an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties.'"  Georgia Malone & Co. v. Rieder, 19 N.Y.3d 511, (2012).  The claim is available "only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff."  Corsello v. Verizon N.Y., Inc., 18 N.Y.3d 777, (2012).  Notably, "[u]nder New York law, a plaintiff may not recover under quasi-contract

claims such as unjust enrichment where an enforceable contract governs the same subject matter." Goldberg v. Pace Univ., 535 F. Supp. 3d 180, 198 (S.D.N.Y. 2021); see also Stanley v. Direct Energy Servs., LLC, 466 F. Supp. 3d 415, 430–31 (S.D.N.Y. 2020) (gathering authorities for the proposition that "where the validity of a contract that governs the subject matter at issue is not in dispute, and the claimant alleges breach of the contract, the claimant cannot plead unjust enrichment in the alternative under New York law"). Moreover, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." Id.; see In re Columbia Tuition Refund Action, 523 F. Supp. 3d at 430 (dismissing unjust enrichment claims "that were indistinguishable from contract claims pleaded in the alternative in the same complaint, at least where the parties did not dispute that they shared a contractual relationship").

Like unjust enrichment, a cause of action for money had and received "is one of quasi-contract." Saint-Amour v. Richmond Org., Inc., 388 F. Supp. 3d 277, 292 (S.D.N.Y. 2019) (quoting Melcher v. Apollo Med. Fund Mgmt. L.L.C., 105 A.D.3d 15, (2013)). Money had and received has been described as "an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience [the party] ought not to retain and that belongs to another." Amable, 551 F. Supp. 3d at 319.

Under New York law, "an action for money had and received lies when (1) defendant received money belonging to plaintiff; [] (2) defendant benefitted from the receipt of money; and (3) under principles of equity and good conscience, defendant should not be permitted to keep the money." Johnson v. JPMorgan Chase Bank, N.A., 488 F. Supp. 3d 144, 160 (S.D.N.Y. 2020). The cause of action is "essentially identical to a claim of unjust enrichment." Id.

As with unjust enrichment, "[h]owever, where a valid contract exists between the parties regarding the issue at dispute, a quasi-contractual theory, such as money had and received, cannot be maintained."  Amable, 551 F. Supp. 3d at 319; see also Indep. Order of Foresters v. Donald, Lufkin & Jenrette, Inc., 157 F.3d 933, 940 (2d Cir. 1998) (affirming district court's dismissal of claim for money had and received "on the basis that quasi contract does not lie where, as here, there is a valid contract between the parties respecting the matter at issue").

Deciding whether equity and good conscience militate against allowing NYU to keep the full tuition each putative class member paid requires individualized inquiries into precisely the issues NYU has identified—for example, whether a student registered for online classes during the Spring 2020 semester before the pandemic, and whether NYU failed to meet the quality and value of education each student expected of it.  Moreover, one cannot calculate a simple market difference between online versus in-person courses to prove NYU was unjustly enriched because NYU does not consider the "modality of instruction[,]" whether in-person, online, or a hybrid, "when setting tuition rates for a particular program"; "NYU has offered certain online degree programs at the undergraduate and graduate levels" before, during, and after the Spring 2020 semester.  (ECF No. 146 at ¶¶ 10–11).  In other words, the record shows that online courses cost the same as in-person courses at NYU before and after Spring 2020.  So how do we ascertain whether NYU impermissibly retained a benefit?  That answer turns on whether each student received the quality and value of education they signed up for, and that necessarily involves delving into each putative class member's own circumstances—not necessarily the grades they received or the extra-curricular programming and services they utilized, but the net enrichment of the degree-program they signed up for together with their expectations of it.

The Ninivaggi court concluded that net enrichment could be measured class-wide "by taking the amount [the university] received from each student and subtracting the fair market value of the services it provided to each of them." 2023 WL 2734343, at *9. The same is not true here. First, the record shows that the tuition putative class members paid varies across NYU's many schools and programs and varies based on each program's and each student's circumstances, so individual inquiries predominate. Second, in broad strokes, for example, the market value of a semester toward earning a biology degree is not inherently the same as the market value of a semester toward earning a philosophy degree, and a course of study that includes only lectures and final exams (one amenable to several modes of instruction) differs from one that necessitates laboratory or other in-person activities. Individual issues predominate not because there are thousands of undergraduate students but because the alleged benefit NYU improperly retained varies across the Proposed Class—by school, by program, and by expectations. See Omori, 673 F. Supp. 3d at 26–29; see also Hannibal-Fischer v. Grand Canyon Univ., No. 20 Civ. 1007 (PHX) (SMB), 2023 WL 5951888, at *6–8 (D. Ariz. Sept. 13, 2023) (denying certification of tuition refund class and concluding individual issues predominated on unjust enrichment and money had and received claims, reasoning that each "plaintiff's expectations and the circumstances" must be considered because "[p]laintiffs may have had different understandings of what they were paying for by choosing in person status[,]" and because students paid "differing amounts of tuition[,]" "precise damages will need to be calculated individually [with] an analysis of each individual plaintiff's circumstance[s]"). Again, we do not rely on the parties' expert reports here because the other evidence shows that the calculation of damages requires an individualized inquiry.

We therefore recommend denying certification of the Proposed Class on theories of unjust enrichment and money had and received.  See Hannibal-Fisher, 2023 WL 5951888, at *7; Weiner v. Snapple Beverage Corp., No. 07 Civ. 8742 (DLC), 2010 WL 3119452, at *11 (S.D.N.Y. Aug. 5, 2010).

Although we could stop here, we press on for completeness.

### b.  Superiority

In addition to predominance, Hall-Landers must demonstrate that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3)).  We consider a "nonexhaustive" list of relevant factors:  (i) the class members' interest in individually controlling the prosecution or defense of separate actions; (ii) the extent and nature of any litigation concerning the controversy already begun by or against class members; (iii) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (iv) the likely difficulties in managing a class action.  Id.; see Amchem, 521 U.S. at 615 (listing these criteria).

NYU argues in a footnote that superiority is lacking because individualized issues predominate concerning liability and damages.  (ECF No. 134 at 29 n.9).  Hall-Landers contends class litigation is superior because it is cheaper and more feasible than individual suits, and it is manageable because liability can be established through common, class-wide proof.  (ECF No. 121 at 29–30).

The first three listed factors cut in favor of certification, but because individual issues predominate (see §§ II.B.2.a, supra), it would be too difficult to manage this matter as a class action.  See In re Suffolk Univ. Covid Refund Litig., 2022 WL 6819485, at *3–4 (denying

certification of tuition-refund class after finding that class treatment was "either 'superior' or more just than the available alternatives"); Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co., No. 14 Civ. 4394 (AJN), 2018 WL 175095, at *20 (S.D.N.Y. Apr. 11, 2018) (where plaintiff failed to establish predominance, finding that "its failure to establish superiority largely follows" and denying class certification).  Accordingly, class litigation is not a superior method of adjudication of Hall-Landers's tuition-refund claims against NYU.

### C.  Appointments of Class Representative and Counsel

Because we recommend denying the Class Motion, we do not recommend appointing class counsel or a class representative.  If the District Court disagrees, however, and ultimately certifies the Proposed Class, we recommend, for substantially the same reasons we discussed under typicality and adequacy (see §§ II.B.1.b–c, supra), appointing Bursor & Fisher, P.A. as class counsel and Hall-Landers as class representative.  See Rule 23(g)(1); Martínek, 2022 WL 326320, at *20 (after analyzing Rule 23(a) and Rule 23(b)(3) elements, considering appointment of lead plaintiff and lead counsel).

### III. CONCLUSION

For these reasons, we respectfully recommend that the Class Motion be **DENIED**.

Dated:     New York, New York
           December 6, 2024

_____
**SARAH L. CAVE**
**United States Magistrate Judge**

          *                  *                  *

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Daniels.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  <u>See</u> 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).